**FILED**

APR 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLE DI LELLA
48 Watchung Avenue
Upper Montclair, New Jersey   07043
(973) 746-7069
                    Plaintiff,

v.

UNIVERSITY OF THE DISTRICT OF COLUMBIA
DAVID A. CLARKE SCHOOL OF LAW

ANN BISHOP RICHARDSON, Associate Dean for the
University of the District of Columbia David A. Clarke
School of Law, in individual capacity and acting within
the scope of her employment

AHMAD REED, Educational Specialist for the
Office for Services for Students with Disabilities of the
University of the District of Columbia, in individual capacity
and acting within the scope of his employment

ACADEMIC STANDARDS COMMITTEE for the
University of the District of Columbia David A. Clarke
School of Law, in each member's individual capacity
and acting within the scope of each member's employment

SUSAN L. WAYSDORF, Professor of Law for the
University of the District of Columbia David A. Clarke
School of Law, in individual capacity and acting within
the scope of her employment

   4200 Connecticut Avenue, NW
   Washington, DC   20008

                    Defendants.

Case: 1:07-cv-00747
Assigned To : Kennedy, Henry H.
Assign. Date : 4/24/2007
Description: DI LELLA V UNIV. OF DC, ET AL

JURY ACTION

JURY DEMAND

**COMPLAINT**

LEGAL_US_E # 74660962.2

## I.    PRELIMINARY STATEMENT

1.    This action arises, in part, under the Americans with Disabilities Act of 1990,

42 U.S.C. § 12101 *et seq*. ("ADA").  Plaintiff asserts that defendants, individually and jointly,

denied Plaintiff reasonable, appropriate, effective and consistent accommodations, including, but

not limited to, notetaking and transcription services, which defendants acknowledged that the

University of the District of Columbia David A. Clarke School of Law ("UDC School of Law")

was obligated to provide to Plaintiff based upon documented diagnoses of learning disabilities and

remedial assessments, and her history of previous accommodations dating back to high school.

Rather than provide Plaintiff reasonable, appropriate, effective and consistent accommodations,

defendants instead compelled Plaintiff to fend for herself, and did so with the full knowledge that,

due to Plaintiff's learning disabilities, Plaintiff could not fend for herself and would be placed at

academic disadvantage, adversely affecting her academic performance.  Moreover, when Plaintiff

attempted to fend for herself by substituting old exam study aids for notes the UDC School of Law

failed to provide as an accommodation, and Plaintiff then mistakenly submitted a computer file

containing old exam study aids for a current final exam to which the old exam study aids were

clearly neither related nor responsive, defendants refused to accept Plaintiff's actual and intended

original response to the current final exam even though the mistake had been acknowledged by

defendants, and defendants added insult to injury by suspending her one year on a fraudulent charge

of cheating.  Because this suspension prevents Plaintiff from returning to UDC School of Law with

sufficient time to complete her law degree within the time permitted by the UDC School of Law,

the one year suspension is a *de facto* expulsion.  Because defendants have recorded this fraudulent

Honor Code violation in Plaintiff's record to be reported to other institutions and Bar Examiners,

Plaintiff has also been prevented from transferring to another institution to complete her law degree,

and effectively denied an opportunity to pursue a career as an attorney.

Defendants' conduct caused Plaintiff to be excluded from participation in, and denied the benefits of services, programs, and activities of, a public educational institution, and caused Plaintiff to be subjected to discrimination in violation of the ADA, *see* 42 U.S.C. § 12132 and 28 C.F.R. § 35.130, and continues to cause Plaintiff harm so long as it is not redressed.

2.    This action also arises under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). ("Section 504"). Defendants' conduct described in Paragraph 1, *supra*, caused Plaintiff to be excluded from participation in, denied the benefits of, and subjected to discrimination under a program and activity receiving federal financial assistance in violation of Section 504, *see* 29 U.S.C. § 794(a) and 34 C.F.R §§ 104.43 and 104.44, and continues to cause Plaintiff harm so long as it is not redressed.

3.    This action also arises under the District of Columbia Human Rights Act of 1977, D.C. Code § 2-1401.01 *et seq*. ("DC Human Rights Act"). Defendants' conduct described in Paragraph 1, *supra*, denied, restricted, abridged and conditioned the use of, and access to, the services, programs, and benefits of the UDC School of Law for a discriminatory reason, and based upon the learning disability of Plaintiff, in violation of the DC Human Rights Act, *see* D.C. Code § 2-1402.41, and continues to cause Plaintiff harm so long as it is not redressed.

4.    This complaint also asserts actions under 42 U.S.C. § 1983 ("Section 1983"), against administrators of the University of the District of Columbia, whose conduct described in Paragraph 1, *supra*, in their individual capacities and within the scope of their employment by the District of Columbia, deprived Plaintiff of rights and privileges secured by the Constitution and laws, and continues to cause Plaintiff harm so long as it is not redressed.

5.    This complaint also asserts a defamation action based upon the above-referenced false and defamatory Honor Code violation placed in Plaintiff's permanent record with directions to publish to other institutions and Bar Examiners, which has prevented Plaintiff from transferring to another institution to complete her law degree, and effectively denied her an opportunity to pursue a law career, by ascribing to her conduct and characteristics that adversely affect fitness to practice law and thereby lowering her in the estimation of the educational and professional community.

## II.    JURISDICTION AND VENUE

6.    The District Court has jurisdiction over actions arising under the Constitution and federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over related actions that arise under the DC Human Rights Act and are part of the same case and controversy pursuant to 28 U.S.C. § 1367.

7.    There is also complete diversity of citizenship and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. The District Court therefore also has jurisdiction pursuant to 28 U.S.C. §1332.

8.    Venue is properly in this District Court under 28 U.S.C. § 1391.

## III.    STATEMENT OF FACTS

### A.    General Allegations Regarding UDC School of Law's Failure to Provide Disability Accommodations to Plaintiff

9.    UDC School of Law has, at all relevant times, been in violation of 28 C.F.R. 35.101 *et seq.*, which purpose is to effectuate Subtitle A of Title II of the ADA prohibiting discrimination on the basis of disability by public entities.  Specifically, UDC School of Law has neither "evaluate[d] its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part [Nondiscrimination on the Basis of Disability in State and Local Government Services]," nor, "proceed[ed] to make the necessary modifications," as required under 28 C.F.R. 35.105.  In response to a June 12, 2006, Freedom of Information Act

request for the University of the District of Columbia's ("UDC") "transition plan mandated by the Americans with Disabilities Act, Title 2, 28 CFR Part 35-150(d) and self-evaluation as required by the Americans with Disabilities Act, Title 2, 28 CFR Part 35-105," the UDC responded that, "the documents requested can not be provided as they do not exist." *See* Letter of Clarene Martin, UDC Assistant University Counsel/FOIA Officer, to Deborah Carr Anderson, July 6, 2006, attached hereto as Ex. 1.

10.    UDC School of Law acknowledges that, "[i]n order to provide all students with disabilities the best opportunities possible to participate fully in academic life and in order to comply with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, the David A. Clarke School of Law shall make reasonable academic adjustments for any student who, through a recent assessment or a history of previous accommodations, can document a disability that requires accommodation." *See* Disability Accommodation Request Memo, available on the UDC School of Law website at http://www.law.udc.edu/students/pdf/disability_memo.pdf, and attached hereto as Ex. 2.

11.    UDC School of Law acknowledges that, "to ensure individualized opportunities for students with disabilities," UDC School of Law is obligated to, "make reasonable accommodations to the known disability of a student," and to, "change practices or procedures, or provide or modify devices, services or facilities, in order to match the student with a particular program or activity at the School of Law." *See* UDC School of Law Student Handbook, Academic Year 2005-2006, Vol. I, Section VI. Disabilities Policy and Procedures, at 39-45, attached hereto in relevant part as Ex. 3. Moreover, "**[w]hen documentation of a disability supports the need for notetakers, university and law school staff and faculty will collaborate to arrange this accommodation.**" *Id.* (emphasis supplied).

12.     UDC School of Law's compliance with Section 504 of the Rehabilitation Act of
1973 and the Americans with Disabilities Act, and provision of reasonable accommodations for
qualified individuals with disabilities, are not only required by law, but also are required for
accreditation and approval under the American Bar Association Section of Legal Education and
Admissions to the Bar's *Standards and Rules of Procedure for Approval of Law Schools*,
Standards 211 and 213, available at http://www.abanet.org/legaled/standards/2006-2007Standards
BookMaster.PDF, and attached hereto in relevant part as Ex. 4.

13.     Shortly after enrolling as a first-year law school student at UDC School of Law in
Fall 2003, and after meeting with Ann Bishop Richardson, Associate Dean, Plaintiff presented
UDC School of Law with an accommodation request, supported by documented diagnoses of
learning disabilities and remedial assessments, and her history of previous accommodations dating
back to high school. *See* Letter of Nicole Di Lella to Dean Ann Richardson, Re: Accommodation
Request, Sept. 9, 2003, attached hereto as Ex. 5.  Plaintiff requested, among other accommodations,
"**[a] notetaker for all class lectures**," and, "[a]dditional learning supplements available to the
school (i.e. – literature on audio/video tape, voice to text computer software, **transcriptions,
teacher's notes or outlines**)." *Id*. (emphasis supplied).

14.     UDC School of Law acknowledged the existence of Plaintiff's learning disability,
namely, "Reading Disorder, Disorder of Written Expression, ADHD, Predominantly Inattentive
Type, and Scotopic Sensitivity," and acknowledged that, "these conditions may affect [Plaintiff's]
academic performance." *See* Letter of Ann Bishop Richardson, Associate Dean, to Nicole Di Lella,
Sept. 15, 2003, attached hereto as Ex. 6.  UDC School of Law determined that, "[b]eginning
with the fall, 2003, semester, the School of Law will provide the following accommodations:
• You may have double time to complete examinations which will be administered to you in a
separate, quite testing room and extended time on written projects, when necessary and requested.
• **We will provide you with a notetaker**." *Id.* (emphasis supplied).

15.     But UDC School of Law repeatedly failed to either arrange for a reliable and accurate notetaker to transcribe lectures for Plaintiff, or to audiotape lectures using microphones and quality recording devices available to UDC School of Law and then arrange for reliable and accurate transcription of lecture audiotapes for Plaintiff, in a timely manner or at all.

16.     Instead of fulfilling its obligation to provide reasonable, appropriate, effective and consistent accommodations, such as notetaking and transcription services, UDC School of Law compelled Plaintiff to fend for herself. For example, and without limitation, UDC School of Law compelled Plaintiff to purchase audio recording equipment to attempt to record lectures on her own, even though equipment available for purchase by Plaintiff was inferior to microphones and recording devices available to UDC School of Law in audibly capturing lectures for complete and accurate transcription. The result: tapes recorded by Plaintiff often were not of sufficient quality, or in a compatible format, for transcription services, and those tapes recorded by Plaintiff that were of sufficient quality were still not transcribed in a timely manner or at all.

17.     In past educational experiences, Plaintiff had successfully used notes prepared by notetakers, and/or a transcription service, as part of her regimen to offset effects of her disabilities by re-typing notes into outline and essay. Re-typing notes helps Plaintiff synthesize and process content, and facilitates her recall of pertinent concepts.

18.     In an article published on LD Online.org, an educational service of the Public Broadcasting Service (PBS) and the leading website on learning disabilities serving parents, teachers, and professionals, Dr. Susan A. Vogel explained that it is crucial for students with learning disabilities to be able to, "[r]eview tapes and/or notes as soon after the lecture as possible," and to, "[c]opy your notes over, if for you, the act of writing facilitates memorizing." *See* Susan A. Vogel, *Ways that Students Can Help Themselves*, (1997), at http://www.ldonline.org/article/6145, and attached hereto as Ex. 7. Defendants' conduct denied Plaintiff the benefits of study strategies recommended for students with learning disabilities.

19.     Plaintiff repeatedly complained to UDC School of Law regarding its failure to provide reasonable, appropriate, effective and consistent accommodations, such as notetaking and transcription services, in a timely manner or at all.

20.     Due to UDC School of Law's failure to provide class notes to Plaintiff in a timely manner or at all, Plaintiff was unable to prepare for class assignments and exams, and was placed at academic disadvantage, adversely affecting her academic performance.

21.     Plaintiff was forced to seek extensions of time to complete class assignments and exams to permit additional time for her to attempt to compensate for the failed accommodation.

22.     In an attempt to compensate for UDC School of Law's failure to provide reasonable, appropriate, effective and consistent accommodations, and to fend for herself, Plaintiff tried with uneven success to independently obtain notes from other sources, including classmates.

**B.      Specific Allegations Related to the Constitutional Law II Course Taught by Professor Susan L. Waysdorf**

23.     For the Spring Semester of 2005, Plaintiff enrolled in the Constitutional Law II course taught by Professor Susan Waysdorf.

24.     Throughout Constitutional Law II, Plaintiff sought the notes to which she, as a student with a learning disability, was entitled.  Despite Plaintiff's numerous requests for notes, UDC School of Law failed to provide class notes in a timely manner or at all, placing Plaintiff at academic disadvantage and adversely affecting her academic performance.

25.     Due to UDC School of Law's failure to provide class notes to Plaintiff in a timely manner or at all, Plaintiff was unable to prepare for class assignments and exams, and Plaintiff was forced to seek an extension of time to take the midterm exam in the Constitutional Law II course to permit additional time for her to attempt to compensate for the failed accommodation.

26.     Because UDC School of Law had failed to provide Constitutional Law II class notes to Plaintiff, the midterm exam in Constitutional Law II was not administered to Plaintiff on schedule and contemporaneous with her classmates.

27. Professor Waysdorf was fully aware that Plaintiff has a learning disability, that UDC School of Law had failed to provide accommodation to Plaintiff, including class notes for the Constitutional Law II class taught by Professor Waysdorf, in a timely manner or at all, and that the midterm exam in Constitutional Law II was not administered to Plaintiff on schedule because of UDC School of Law's failure to provide accommodations to Plaintiff. But Professor Waysdorf added insult to injury by admonishing Plaintiff, in the presence of classmates, for Plaintiff's not having taken the midterm exam on schedule, and by alerting classmates to her learning disabilities. Professor Waysdorf's conduct deprived Plaintiff of anonymity regarding her learning disabilities and exposed Plaintiff to harassment related to her learning disabilities.

28. Due to UDC School of Law's continued failure to provide Constitutional Law II class notes to Plaintiff, the final exam in Constitutional Law II was not administered to Plaintiff on schedule and contemporaneous with her classmates in May 2005.

29. During the Spring Semester of 2005, Plaintiff had informed UDC School of Law of her acceptance by, and intent to transfer to, a joint degree program offered at the Rutgers University School of Law and the Bloustein School of Public Policy.

30. Throughout the Summer of 2005, Plaintiff repeatedly requested prompt provision of the class notes, and subsequent rescheduling of the final exam, in Constitutional Law II, so that she could complete her transfer from UDC School of Law to the joint degree program offered at the Rutgers University School of Law and the Bloustein School of Public Policy.

31. UDC School of Law's continued failure, throughout the Summer of 2005, to provide class notes to Plaintiff, and to reschedule her final exam, for Constitutional Law II prevented Plaintiff from completing her transfer to the joint degree program offered at the Rutgers University School of Law and the Bloustein School of Public Policy.

32.     In August 2005, before the start of the Fall Semester of 2005, UDC School of Law still had not provided notes to Plaintiff for Constitutional Law II. Nonetheless, UDC School of Law insisted that Plaintiff take the final exam for Constitutional Law II immediately, even though Plaintiff had been unable to prepare due to the failed accommodation. UDC School of Law set the deadline for Plaintiff to submit the final exam as September 16, 2005.

33.     Associate Dean Ann Richardson agreed to extend the deadline for Plaintiff to submit the final exam for Constitutional Law II to September 19, 2005, after Associate Dean Richardson was informed that Plaintiff had a family emergency, which required her to travel to Buffalo, New York, on short notice on September 15, 2005.

34.     For reasons unexplained, Associate Dean Richardson subsequently reneged on the 3-day extension of the deadline, which had been granted because of Plaintiff's family emergency, and Associate Dean Richardson required Plaintiff to submit the final exam immediately, and while Plaintiff was attending to her family emergency in Buffalo, New York, needlessly subjecting Plaintiff to still another hardship.

35.     In an effort to comply with the withdrawn extension of the deadline while she was attending to her family emergency in Buffalo, New York, and to avoid any further lowering of her grade compounding the adverse effects of having not received accommodations, Plaintiff emailed a computer file for submission that she believed contained her original response to the final exam in Constitutional Law II, rather than submit her final exam in person upon her return to Washington, DC. In fact, and unbeknownst to Plaintiff, the computer file that she emailed for submission for the final exam in Constitutional Law II did not contain her actual and intended original response to the exam, but rather contained an old exam, which she had used as a study aid.

36.     Professor Waysdorf recognized that Plaintiff's submission of an old exam study aid
was neither related, nor responsive, to the Spring 2005 Constitutional Law II final exam assigned,
and clearly was not intended. But rather than inform Plaintiff of her mistake, Professor Waysdorf
accused Plaintiff of an Honor Code violation for submitting study aids in the form of re-typed
"copied" answers to the Spring 2003 Constitutional Law II final exam, and submitted a grade of
"F" for Plaintiff. *See* Letter of Professor Susan L. Waysdorf to Ann Richardson, Associate Dean,
Re: Complaint of Honor System Violations, Oct. 14, 2005, attached hereto as Ex. 8.

37.     Plaintiff was only first made aware of her mistaken submission of an old exam
study aid when Associate Dean Richardson forwarded Professor Waysdorf's Complaint of
Honor System Violations to the Academic Standards Committee, and copied Plaintiff, on
October 14, 2005. *Id.*

38.     Upon being made aware of her mistaken submission of an old exam study aid,
Plaintiff attempted to submit her actual and intended original response to the final exam, but
UDC School of Law would not accept it.

39.     Plaintiff fully explained the circumstances surrounding her mistaken submission
of the old exam study aid, and that she clearly had not intended for the re-typed answers to the
Spring 2003 Constitutional Law II final exam to be graded in response to questions on the
Spring 2005 Constitutional Law II final exam, to which the older exam questions and answers were
neither related, nor responsive. *See* Letter of Nicole Di Lella to Edward Allen, Chair, Academic
Standards Committee, Nov. 4, 2005, attached hereto as Ex. 9.

40.     On February 27, 2006, the Academic Standards Committee adjudged Plaintiff
guilty of the charged Honor Code violation, despite the evidence that UDC School of Law had
failed to provide accommodations to Plaintiff, including class notes required by law to enable her to
prepare for assignments and exams, that Associate Dean Richardson had reneged on a 3-day
extension granted to Plaintiff because of her family emergency requiring her to travel out of state,
and that Plaintiff, under pressure after the extension was withdrawn during her family emergency,

had mistakenly submitted an old exam study aid that was neither related nor responsive to the

current exam assigned. *See* Letter of Edward Allen, Chair, Academic Standards Committee to

Nicole Di Lella, Feb. 27, 2006, attached hereto as Ex. 10.  The Academic Standards Committee

offered the following explanation:

> To the implausible degree that typing out a questions might serve as
> study material, it was already available to view, print, or download from
> the Alberta Law School site.  So there would not appear to be any reason
> for typing out a copy.  And there would appear to be no pedagogical
> purpose whatsoever to changing the names of the parties.
>
> We do not find credible your explanation that the plagiarized document
> was a mere study aid mistakenly submitted.  We find that you are
> responsible for your action in submitting a plagiarized document to a
> professor to meet the deadline imposed on you for submitting an answer
> to her exam.

*Id.*

41.    In an attempt to compensate for UDC School of Law's failure to provide

reasonable, appropriate, effective and consistent accommodations, and to fend for herself, Plaintiff

tried to substitute study aids such as old exams for notes the UDC School of Law failed to provide.

42.    In past educational experiences, Plaintiff had re-typed and modified questions from

old exams and, when available, corresponding model answers as part of her efforts to synthesize

and process content, and facilitate her recall of pertinent concepts.

43.    In fact, on LD Online.org, Dr. Susan Vogel recommends that students with

learning disabilities use old exams as part of test-taking strategies: "Ask your professor for

'practice' exams or find out if old exams are available.  Take as many as you can and check your

answers against the answer key, with a tutor, study partner, or graduate assistant." *See* Vogel,

*Ways that Students Can Help Themselves* (Ex. 7).

44.     Moreover, contrary to the Academic Standards Committee's assertions, UDC
School of Law recognizes that use of old exams as study aids may be appropriate and effective for
any student, and not only for students with learning disabilities.  The UDC School of Law Library,
"strives to provide access to as much past study materials as possible," and, "has digitized old final
exams, old practice exams and old midterm exams, as well as other useful items," including
answers for several old exams. *See* UDC School of Law Library website, "Law School Exams,"
available at: http://www.law.udc.edu/library/exams.html, and attached hereto as Ex. 11.  A more
comprehensive Exams Depository may also be accessed through the UDC School of Law Library
Intranet. *Id.*  In fact, Professor Waysdorf's old Spring 2003 Constitutional Law II exam, which
Plaintiff had used as a study aid, is on file in the UDC School of Law Library and available on the
website for use as a study aid. *See* Letter of Professor Susan L. Waysdorf to Ann Richardson,
Associate Dean, Re: Complaint of Honor System Violations, Oct. 14, 2005. (Ex. 8)

45.     Educational institutions generally recognize that the use of old or practice exams as
study aids may be appropriate and effective for any student, and not only for students having
learning disabilities.  For example, and without limitation, consider the following sample from
*U.S. News & World Report's* Top 10 Law Schools, and Top 10 National Universities:

   a.  Harvard Law School offers Academic Support Services, including the article,
       "How to Approach and Take a Law School Examination," by Professor
       Elizabeth Garrett of the University of Southern California, which states,
       *inter alia*:

       •  "Old exam memos should be consulted because they often contain
          suggestions for approaching particular kinds of questions."

       •   "Past examinations and model examinations are tools to help students learn
          to identify the three types of law school questions.  Students must become
          familiar with the type of test that their professor is apt to give; they can gain
          such knowledge either through discussions with other students who have
          been in the professor's courses, or through examining tests and exam memos
          filed in the library.  Then students can anticipate what types of questions a
          professor is likely to ask on a particular examination."

       *See* http://www.law.harvard.edu/academics/support, and related material
       linked to the webpage, attached hereto as Ex. 12.

b. The University of Chicago Law School offers study resources, including Professor Garrett's article, referenced *supra*, and law school archived exams and student answers. *See* http://www.law.uchicago.edu/students/study_resources.htnl, and related material linked to the webpage, attached hereto as Ex. 13.

c. The University of Michigan Law School offers exam tips, including the on-line lecture, "Taking Law School Exams," by Kent Syverud, and a related lecture outline, which advises students to, "[p]repare for the particular professor and exam in question [using] Old examinations." *See* http://www.law.umich.edu/currentstudents/studentservices/exam-tips.htm, and related material linked to the webpage, attached hereto as Ex. 14.

d. Princeton University's McGraw Center offers academic support services, including the tipsheet, "Exam Success: Preparing for Exams," which states, *inter alia*, "Take a practice exam: ● Take an old exam … ● Review your answers and focus on anything you got wrong or forgot." *See* http://web.princeton.edu/sites/mcgraw/preparing_for_exams.html, attached hereto as Ex. 15.

e. Harvard University's Bureau of Study Counsel offers self-help resources, including study tips and guides, and refers students to Clemson University's "College Survival Skills," which states, *inter alia*:

- "As a general rule, you should practice taking tests to the point that when the real examination comes around, the process of thinking carefully and clearly is second nature. Practice tests supplied by the professor and questions of your own design can all accomplish this goal. Furthermore, by practicing the test-taking process early and often in your studying, you will help yourself learn the subject matter in exactly the context that the professor wants."

*See* http://bsc.harvard.edu/onlineresources.htm, and related material linked to the webpage attached hereto as Ex. 16.

f. University of Pennsylvania's Weingarten Learning Resources Center offers self-help resources, including power point presentations which state, *inter alia*:

- "Work through practice problems and old exam questions."
  *LRC's Top Ten … Study Strategies*

- "Practice answering sample questions under conditions similar to those you will encounter in the actual exam."
  *Exam Strategies for Essay Exams*

*See* http://www.vpul.upenn.edu/lrc/lr/useful_info.html, and related material linked to the webpage attached hereto as Ex. 17.

46.    Moreover, on April 13, 2006, as part of Plaintiff's appeal of the February 27, 2006 decision of the Academic Standards Committee, Plaintiff provided UDC School of Law with a supporting letter from James M. Sydnor-Greenberg, Ph.D, Plaintiff's diagnosing doctor whose neuropsychological evaluation and assessment of Plaintiff's learning disabilities had been accepted by UDC School of Law when it first determined Plaintiff's need for accommodations.[1]  In this supporting letter, Dr. Sydnor-Greenberg stated:

> It is common procedure for students with and without learning disabilities to study for essay exams by writing mock responses to old exams; as such practice helps them develop greater speed and comfort for the actual exam, thereby keeping test-anxiety to a minimum.  It is also common sense that the best preparation for any task is to practice that task again and again prior to being tested on that task.  A web search of essay-preparation techniques suggested by hundreds of universities' Learning Disability Clinics verifies this.
>
> **Ms. Di Lella's multiple learning disorders make memorizing, retrieving from memory, and organizing complex information for lengthy essay writing extremely difficult** despite her superior common sense reasoning skills.  In order to compensate for these learning disorders, I encourage all students, including Ms. Di Lella, to practice as much as possible prior to testing situations.  In preparation for the LSAT, Bar Exams, and MPRE, I recommend that students review study guides and take as many practice exams as they have time for.  **In preparation for final exams in law school, I encourage students to seek out prior exams from professors and practice by writing mock essays for those exams.**  If old exams are not available then the LD [Learning Disabled] student should attempt to anticipate test questions and write mock essays.  Writing mock essays is a way of making the material more real.  The use of celebrity names or family members' names is another technique to aid memorization.
>
> **Ms. Di Lella has difficulty remembering meaningless "factoids" and is better able to remember information in context.  She did exactly what a Learning Disordered student should do.**  She found an exam question on the University of Alberta's Faculty of Law website that seemed to fit the material covered by Professor Waysdorf.  She used that question and the sample response as a guide in generating her own mock response.  LD students, including Ms. Di Lella, need to find ways to make the material more real-life and less rote.  Simply trying to remember discrete facts of Constitutional Law would be much more difficult than using "stories" (meaningful context) such as the Hypothetical Fact Situation.

---

[1] *See, e.g.,* Letter of Nicole Di Lella to Dean Ann Richardson, Re: Accommodation Request, Sept. 9, 2003, (Ex. 5), and Letter of Ann Bishop Richardson, Associate Dean, to Nicole Di Lella, Sept. 15, 2003, (Ex. 6).

The LD student must do whatever she can to make the material come alive, as this enhances encoding of new information and also makes it easier to retrieve information from memory. The use of celebrities' names (Lucy Liu and Ellen Degeneres) allowed Ms. Di Lella to be able to visualize in her mind's eye a conversation between the two people described in the Fact Situation better than the names used in the sample response on the website (Joe Smith and Tom Tuttle do not trigger any association and can not be visualized except by a person who knows them, if they even exist). It is well established that emotionally laden and outlandish information is easier to encode and retrieve than dry, boring material. **Changing names and the wording of the sample response was a simple and effective way to improve memory.**

Three additional points deserve mention. **It is to the Learning Disabled student's advantage to simulate the actual testing experience when studying for a test and (a) this is why Ms. Di Lella actually typed her practice response. In fact, Ms. Di Lella frequently types and re-types class notes into outlines and outlines into essays. (b) The repetition is another way to improve her memory of material.** (c) The mental process of summarizing the lecture notes into outlines and then essays also forces her to analyze the information from different perspectives. For example, when writing outlines she has to summarize it succinctly, distilling the material down to the most important points. When turning the outlines into essays she must elaborate on the important points and integrate that information with material she has learned in other classes.

Thus, I find it completely reasonable and understandable that Ms. Di Lella used an exam question found on the internet as practice for her final exam.

**What I find surprising is that a learning disabilities expert from the main UDC campus or from the David A. Clark School of Law was not asked to comment on Ms. Di Lella's use of this pedagogical technique and that I was not contacted before the assumption was made that she was somehow attempting to cheat.**

*See* Letter of Michael D. White to Ann Bishop Richardson, Associate Dean, Re: Supplemental and Amended Appeal to the Full Faculty of Nicole Di Lella, Apr. 13, 2006, at Exhibit N, attached hereto as Ex. 18.

47.     On April 19, 2006, the faculty denied Plaintiff's petition for plenary review of the February 27, 2006, decision of the Academic Standards Committee, terminating the appeals process within UDC School of Law. *See* Letter of Ann B. Richardson, Associate Dean, to Michael White, Apr. 21, 2006, attached hereto as Ex. 19.

48.     Because UDC School of Law permitted the February 27, 2006, decision of the Academic Standards Committee to stand, Plaintiff suffered the following adverse actions, in addition to the adverse consequences already visited upon her due to UDC School of Law's failure to provide accommodations:

      a.   Suspension for one year beginning in August, 2006.

      b.   The Academic Standards Committee's determination of Honor Code violation was placed in Plaintiff's permanent file.

      c.   The Registrar has been directed to inform Bar Examiners – of any jurisdiction where Plaintiff seeks admission – of the Academic Standards Committee's determination and to state, in response to Character and Fitness Inquiries or forms required by bar examiners, that "the student's records reflect a violation of the Honor Code resulting from the student's plagiarism and cheating on an examination." The Dean's office has been directed to similarly respond to such inquiries.

      d.   The Registrar has also been directed to include in any formal letter of good standing submitted to another institution the same statement, "the student's records reflect a violation of the Honor Code resulting from the student's plagiarism and cheating on an examination." The Dean's office has also been directed to similarly respond to such inquiries.

*See* Letter of Edward Allen, Chair, Academic Standards Committee to Nicole Di Lella, (Ex. 10).

49.     Because this one year suspension prevents Plaintiff from returning to UDC School of Law with sufficient time to complete her law degree within the time permitted by UDC School of Law, the suspension is a *de facto* expulsion.

50.     Because UDC School of Law maintains the Academic Standards Committee's false and defamatory determination of Honor Code violation in Plaintiff's permanent record with directions to publish to other institutions and Bar Examiners, Plaintiff has also been prevented from transferring to another institution to complete her law degree, and effectively denied an opportunity to pursue a law career, by virtue of UDC School of Law's ascribing to her conduct and characteristics that adversely affect fitness to practice law and thereby lowering her in the estimation of the educational and professional community.

**C.    Plaintiff's Good Faith Efforts to Resolve Her Complaints of Discrimination without Resort to Litigation**

51.    Still, Plaintiff attempted, in good faith, to resolve her complaint of discrimination on the basis of disability against defendants without resort to litigation. On September 5, 2006, Plaintiff's counsel requested a meeting to discuss a potential settlement, including, "(1) to have the suspension expunged from Ms. Di Lella's record, including the sending of a corrective notice to any institution or employer that has been informed of the suspension, indicating that the finding against her has been appealed and overturned; (2) to have the class and grade affected by the mistaken submission, and the subject of the suspension, removed from her transcript; (3) to refund her costs for the academic year(s) affected by the law school's failure to provide accommodations to her; and (4) to reinstate her so that she may complete her degree .... with all appropriate and required accommodations." *See* Letter of Paul L. McDonald to Ann Bishop Richardson, Associate Dean, Re: Nicole Di Lella, Sept. 5, 2006, attached hereto as Ex. 20.

52.    On October 23, 2006, Robin Alexander, UDC General Counsel, sent an email to Plaintiff's counsel stating: "I will respond to your letter requesting a meeting after I have discussed it with the deans at the law school. The only information I have about your client relates to an honor code violation. I have no information about this failure to accommodate a disability claim that you assert." *See* Email of Robin Alexander, University General Counsel, to Paul L. McDonald, Re: Nicole Di Lella, Oct. 23, 2006, attached hereto as Ex. 21.

53.    When UDC School of Law still had not responded to the September 5, 2006, letter requested a meeting to discuss potential settlement by December 4, 2006, Plaintiff's counsel sent an email copied to UDC General Counsel Alexander requesting she, "please let me know when you have completed your internal review related to my September 5, 2006, letter to Dean Richardson, proposing a meeting to discuss a potential settlement of Ms. Di Lella's complaint of discrimination on the basis of disability against UDC Law, and if you are amenable to further discuss resolution." *See* Email of Paul L. McDonald Re: Nicole Di Lella, Dec. 4, 2006, attached hereto as Ex. 22.

Plaintiff's counsel further explained: "For my client, there really is no option but to see this through because of the ongoing adverse impact to her career and life. It has already prevented her from completing her law degree at UDC, or completing her education elsewhere, and has delayed her pursuit of a career and constrained her career and earnings opportunities. The longer this remains unresolved, the greater, and more permanent, the repercussions and damages to her." *Id.*

54.    When UDC School of Law still had not responded to the September 5, 2006, letter requested a meeting to discuss potential settlement by January 29, 2007, Plaintiff's counsel sent an email copied to UDC General Counsel Alexander requesting that she, "please let me know if you are amenable to discuss a resolution of Ms. Di Lella's complaint of discrimination on the basis of disability against UDC Law - **or not**." *See* Email of Paul L. McDonald Re: Nicole Di Lella, Jan. 29, 2007, attached hereto as Ex. 23. Plaintiff's counsel further explained:

> I believe it is in our mutual best interests to resolve this matter with a global settlement of all outstanding issues - in Ms. Di Lella's interest, so that she can get on with her career and life without an academic record tainted by an unjust indictment of her character, and in UDC Law's interest so that it can be spared further scrutiny of its record on disability rights issues in the wake of the DC Office of Human Rights' July 26, 2006 Letter of Determination in Dennis O'Connor v. University of the District of Columbia.
>
> That said, it has now been almost five months since my September 5, 2006, letter to Dean Richardson, and UDC Law has yet to express any real interest in discussing a resolution. I have only heard from you once - your October 23, 2006, email to me in which you stated, "I will respond to your letter requesting a meeting after I have discussed it with the deans at the law school.... It will probably be next week before I can schedule a meeting with you."
>
> **If UDC Law is at all interested in discussing a resolution, let me know by this Friday, February 2nd, so we can schedule a meeting in early to mid-February.** If I do not hear from you by then, I will assume that UDC Law's silence for the past five months indicates UDC Law's preference to address Ms. Di Lella's claims through litigation, and in the court of public opinion. The record will show that my client and I more than did our part to avoid such a public confrontation.

*Id.*

55.     On February 27, 2007, Plaintiff's counsel called UDC General Counsel Alexander to make sure that UDC School of Law indeed had rejected Plaintiff counsel's request to meet to discuss a potential settlement before Plaintiff initiated litigation.  UDC General Counsel Alexander indicated that she would have a response shortly.  Plaintiff's counsel sent an email that same date to UDC General Counsel Alexander, summarizing their discussion.  *See* Email of Paul L. McDonald to Robin Alexander, UDC General Counsel, Re: Nicole Di Lella, Feb. 27, 2007, attached hereto as Ex. 24.

56.     On March 13, 2007, UDC General Counsel Alexander rejected Plaintiff counsel's request to meet to discuss a potential settlement before Plaintiff initiated litigation, stating: "I'm afraid I can't help you.  Your client must accept responsibility for her own lack of diligence."

## IV.     CLAIMS FOR RELIEF

### COUNT ONE
#### Violation of the Americans with Disabilities Act of 1990
#### against All Defendants, Individually and Jointly

57.     Plaintiff incorporates herein, as though fully set forth, paragraphs 1 through 56.

58.     Defendants, individually and jointly, caused Plaintiff to be excluded from participation in, and denied benefits of services, programs, and activities of, UDC School of Law, a public educational institution, and caused Plaintiff to be subjected to discrimination, in violation of the ADA.  *See* 42 U.S.C. § 12132 and 28 C.F.R. § 35.130.

59.     Defendants, individually and jointly, coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of rights granted and protected by the ADA, and retaliated against Plaintiff for opposing, and complaining about, defendants' conduct in violation of the ADA.  *See* 42 U.S.C. § 12203 and 28 C.F.R. § 35.134.

## COUNT TWO

### Violation of Section 504 of the Rehabilitation Act of 1973
### against All Defendants, Individually and Jointly

60.     Plaintiff incorporates herein, as though fully set forth, paragraphs 1 through 59.

61.     Defendants, individually and jointly, caused Plaintiff to be excluded from the participation in, denied the benefits of, and subjected to discrimination under a program and activity receiving federal financial assistance, in violation of Section 504. *See* 29 U.S.C. § 794(a) and 34 C.F.R §§ 104.43 and 104.44

62.     Defendants, individually and jointly, coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of rights granted and protected by Section 504, and retaliated against Plaintiff for opposing, and complaining about, defendants' conduct in violation of Section 504. *See* 29 U.S.C. § 794.

## COUNT THREE

### Violation of the District of Columbia Human Rights Act of 1977
### against All Defendants, Individually and Jointly

63.     Plaintiff incorporates herein, as though fully set forth, paragraphs 1 through 62.

64.     Defendants, individually and jointly, denied, restricted, abridged and conditioned the use of, and access to, the services, programs, and benefits of the UDC School of Law for a discriminatory reason, and based upon the learning disability of Plaintiff, in violation of the DC Human Rights Act. *See* D.C. Code § 2-1402.41.

65.     Defendants, individually and jointly, coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of rights granted and protected by the DC Human Rights Act, and retaliated against Plaintiff for opposing, and complaining about, defendants' conduct in violation of the DC Human Rights Act. *See* D.C. Code § 2-1402.61.

## COUNT FOUR

### Violation of 42 U.S.C. § 1983

### against Named and Referenced Administrators of the University of the District of Columbia Individually and Jointly

66.    Plaintiff incorporates herein, as though fully set forth, paragraphs 1 through 65.

67.    Defendants, individually and jointly, as administrators of the University of the District of Columbia, acting in their individual capacities and within the scope of their employment by the District of Columbia, deprived Plaintiff of rights and privileges secured by the Constitution and laws, in violation of Section 1983.

68.    Defendants, individually and jointly, as administrators of the University of the District of Columbia, acting in their individual capacities and within the scope of their employment by the District of Columbia, coerced, intimidated, threatened, and interfered with Plaintiff in the exercise and enjoyment of rights granted and protected by Section 1983, and retaliated against Plaintiff for opposing, and complaining about, defendants' conduct in violation of Section 1983.

## COUNT FIVE

### Defamation

### against All Defendants, Individually and Jointly

69.    Plaintiff incorporates herein, as though fully set forth, paragraphs 1 through 68.

70.    Defendants, individually and jointly, placed, and maintain, a false and defamatory Honor Code violation in Plaintiff's permanent record with directions to publish to other institutions and Bar Examiners, and have prevented Plaintiff from transferring to another institution to complete her law degree, and effectively denied her an opportunity to pursue a law career, by ascribing to her conduct and characteristics that adversely affect fitness to practice law and thereby lowering her in the estimation of the educational and professional community.

WHEREFORE, Plaintiff demands a jury trial and prays for:

(i)     an order directing defendants to expunge the Honor Code violation and related suspension from Plaintiff's record, including the sending of a corrective notice to any institution or employer that has been informed of the Honor Code violation and related suspension, indicating that the finding and sanction have been appealed and overturned;

(ii)     an order directing defendants to remove the grade of "F" recorded for the Constitutional Law Class II from Plaintiff's record;

(iii)     compensatory damages to be determined and according to proof at trial;

(iv)     punitive damages to the extent available and according to proof at trial;

(v)     Plaintiff's reasonable fees, costs, expenses, and disbursements, including attorney fees, associated with this litigation; and

(vi)     such additional and further relief as the Court may deem just and proper.

Respectfully submitted,

Nicole Di Lella, *pro se*
48 Watchung Avenue
Upper Montclair, NJ   07043
(973) 746-7069

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I (a) PLAINTIFFS

Nicole Di Lella

*88887*

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Essex County, NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Nicole Di Lella, Pro Se
48 Watchung Avenue
Upper Montclair, NJ  07043
(973) 746-7069

### DEFENDANTS

University of the District of Columbia
David A. Clarke School of Law, et al.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    District of Columbia
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

Case: 1:07-cv-00747
Assigned To : Kennedy, Henry H.
Assign. Date : 4/24/2007
Description: DI LELLA V UNIV. OF DC, ET AL

*JURY ACTION*

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government   ◉ 3 Federal Question
   Plaintiff              (U.S. Government Not a Party)

○ 2 U.S. Government   ○ 4 Diversity
   Defendant              (Indicate Citizenship of
                          Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
    Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.**  *General Civil (Other)*     **OR**     ○ **F.**  *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
    defendant
☐ 871 IRS-Third Party 26
    USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
    of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
    Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
    Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
    Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
    Exchange
☐ 875 Customer Challenge 12 USC
    3410
☐ 900 Appeal of fee determination
    under equal access to Justice
☐ 950 Constitutionality of State
    Statutes
☐ 890 Other Statutory Actions (if
    not administrative agency
    review or Privacy Act

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | ⊚  L. *Other Civil Rights (non-employment)* | M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☒ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊚ 1 Original Proceeding   O 2 Removed from State Court   O 3 Remanded from Appellate Court   O 4 Reinstated or Reopened   O 5 Transferred from another district (specify)   O 6 Multi district Litigation   O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Failure to provide accommodations to qualified disabled student in violation of 42 U.S.C. 12101 et seq., 29 U.S.C. 794(a), and 42 U.S.C. 1983.

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** 250,000   **JURY DEMAND:**   YES ☒   NO ☐   Check YES only if demanded in complaint

**VIII. RELATED CASE(S) IF ANY** *N.F.*   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 4/24/07    SIGNATURE OF ATTORNEY OF RECORD _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

University of the District of Columbia

Office of the General Counsel
4200 Connecticut Avenue, N.W.
Washington, DC 20008

Telephone (202) 274-5400
Facsimile (202) 274-5320

July 6, 2006

Deborah Carr Anderson
Attorney at Law
3636 Sixteenth Street N. W.
Suite A-648
Washington, D.C. 20008

Re:    **Deborah Carr Anderson**
       **Matter No.: 06-FOIA-04**

Dear Ms. Anderson:

This letter is in further response to your June 12, 2006, FOIA request for copies of the University's "transition plan mandated by the Americans with Disabilities Act, Title 2, 28 CFR Part 35-150(d) and self-evaluation as required by The Americans with Disabilities Act, Title 2, 28 CFR Part 35-105."

Apart from considerations under the Freedom of Information Act, the documents requested can not be provided as they do not exist.

Yours truly,

Clarence Martin
Assistant University Counsel/FOIA Officer

# UNIVERSITY OF THE DISTRICT OF COLUMBIA
## David A. Clarke School of Law

**Ann Bishop Richardson**
**Associate Dean for Academic Affairs**
**4200 Connecticut Avenue, N.W.**
**Washington, D.C.  20008**
(202) 274-7345
(202) 274-5441 (fax)
arichardson@udc.edu
http://www.law.udc.edu



To:     Students Intending to Enroll at the David A. Clarke School of Law

The University of the District of Columbia David A. Clarke School of Law is committed to the success of every student.  In order to provide all students with disabilities the best opportunities possible to participate fully in academic life and in order to comply with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, the David A. Clarke School of Law shall make reasonable academic adjustments for any student who, through a recent assessment or a history of previous accommodations, can document a disability that requires accommodation.

If you are a student with a disability and will be requesting accommodations, I encourage you to submit the enclosed Request for Disability Accommodation form to the Office for Services to Students with Disabilities with appropriate documentation at the earliest possible time, or no later than the beginning of orientation.  The required documentation must be no more than 3 years old and must be provided by a professional health care provider who is qualified in the diagnosis of the disability.

Please consult Section VI of the David A. Clarke School of Law's *Student Handbook* for complete disability policy and procedures.

I look forward to welcoming all of you.

Sincerely,

Ann Bishop Richardson
Associate Dean for Academic Affairs

**Public Service * Public Interest * Public Policy**

FILED

APR 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**University of the District of Columbia**
**David A. Clarke School of Law**

**REQUEST FOR DISABILITY ACCOMMODATION**

1.   Nature of Disability:

_____

_____

_____

2.   Accommodation(s) requested (please be as specific as possible):

_____

_____

_____

3.   List of documentation attached (see attached Guidelines regarding required
     documentation):

_____

_____

_____

4.   Authorization and Release: By signing and submitting this form, I authorize the Office
     for Services to Students with Disabilities to speak with and seek additional
     documentation from (write in the names of the professionals on the attached
     documentation)

_____

_____

     concerning my disability and my requested accommodation(s).

Date: _____ Signature: _____

                              Print name: _____

**Submit this form to Ahmad Reed, Office for Services to Students With Disabilities,**
**University of the District of Columbia, 4200 Connecticut Avenue, N.W., Building 38, Room**
**A-11, Washington, D.C., 20008.**

## UNIVERSITY OF THE DISTRICT OF COLUMBIA
## DAVID A. CLARKE SCHOOL OF LAW

### General Guidelines for Documentation
### Of a Disability

In order to fully evaluate requests for accommodations or auxiliary aids, the Office for Services to Students with Disabilities needs documentation of your disability. The documentation should include an evaluation by an appropriate professional that makes evident the current impact of the disability as it relates to the accommodation(s) requested.

The general guidelines listed below are developed to assist you in working with your treating/diagnosing professional(s) to prepare the information needed to evaluate your requests(s).

1. **Current functional impact of the condition(s).** The current functional impact on physical (mobility, dexterity, endurance, etc.), perceptual, cognitive (attention, distractibility, communication, etc.), and behavioral abilities should be described as a clinical narrative and/or through the provision of specific results from the diagnostic procedures/assessment.

2. **Treatments, medications, accommodations, auxiliary aids, services currently prescribed.** Provide a description of treatments, medications, accommodations, auxiliary aids, and/or services currently in use and their estimated effectiveness in minimizing the impact of the condition(s). Include any significant side effects that may impact physical, perceptual, behavioral or cognitive performance. If any additional accommodations or auxiliary aids are warranted, they should be listed along with a clear rationale and related functional limitations. Any accommodations or auxiliary aids will be taken into consideration, but not automatically implemented.

3. **The expected progression or stability of the disability over time.** If possible, provide a description of the expected change in the functional impact of the condition(s) over time. If the condition is variable, describe the known triggers that may exacerbate the condition.

4. **A diagnostic statement identifying the disability.** When appropriate, include International Classification of Diseases (UCD) or Diagnostic Statistical Manual (DSM) codes, the date of the most recent evaluation, or the dates of evaluations performed by referring professionals. If the most recent evaluation was not a full evaluation, indicate when the last full evaluation was conducted.

**UNIVERSITY OF THE DISTRICT OF COLUMBIA
DAVID A. CLARKE SCHOOL OF LAW**

**Guidelines for Documentation of a
Learning Disability**

Students with learning disabilities must provide the Office for Services to Students with Disabilities with documentation that meets general documentation guidelines. Described below is a preferred documentation profile for individuals with learning disabilities who are requesting accommodations or auxiliary aids. This type of documentation not only validates the presence of a disability under Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, but is most useful in providing information to support educational planning and anticipate future accommodation needs. All documentation will be evaluated on a case-by-case basis.

- A comprehensive psycho-educational test battery, which means intelligence/ability testing and educational/achievement testing, is recommended. A full diagnostic report, including all standard test scores as well as subtest scores and the evaluator's narrative, is recommended. If you are providing information from a public school, include the most recent Multifactored Evaluation (MFE) and Individual Educational Program (IEP) and the original eligibility evaluation and/or any other MFE's that include the results of a psycho-educational test battery. These documents alone may or may not provide adequate information to document the learning disability.

- A diagnosis made by (a) qualified professional(s), *i.e.*, licensed school psychologist, licensed psychologist, or learning disabilities/educational specialist, is required. The learning disability diagnosis must be clearly stated. References to academic weaknesses and learning differences alone may not substantiate a learning disability diagnosis.

- Assessments normed for adults are preferred. What this means is that your assessments should not be assessments for children, but rather tests that are designed for adults, *i.e.*, WAIS-III rather than WISC-III.

- A diagnosis of a learning disability and type(s) of learning disability (ies), which should be supported by test data and a description of current functional limitations, is important. Psycho-educational testing completed within the last three years provides a better assessment of current functional limitations.

- Suggestions for appropriate accommodations are helpful. It is important that these suggestions are based upon functional limitations. If it is not evident why an accommodation is suggested by assessing test scores and resulting functional limitations, then a rationale for the accommodations is necessary.

## UNIVERSITY OF THE DISTRICT OF COLUMBIA
## DAVID A. CLARKE SCHOOL OF LAW

### Guidelines for Documentation of a
### Psychiatric Disability

To determine eligibility for appropriate accommodations for a psychiatric disability, the Office for Services to Students with Disabilities requires current and comprehensive documentation of this disability from the diagnosing psychiatrist, psychologist or other appropriate professional.

The outline listed below is developed to assist you in working with your treating/diagnosing professional(s) to prepare the information needed to evaluate request(s). The health professional should answer the following questions:

1. What is the diagnosis, date of diagnosis, last contact with the student, and expected duration of the disability.

2. Describe the symptoms that meet the criteria for this diagnosis.

3. How does this psychiatric disability impact the student in an educational setting (functional limitations)?

4. Please list current medication(s) including dosage, frequency, and adverse side effects and any other prescribed treatment plan(s) for this student's condition.

5. Is there any indication that this student may have an additional diagnosis, *i.e.*, ADHD, learning disabilities, etc? If there is, please describe and attach pertinent information?

6. What recommendation do you have regarding accommodations, *i.e.*, extra time for exams, distraction reduced exam space, etc., and your rationale for these accommodations?

## UNIVERSITY OF THE DISTRICT OF COLUMBIA
## DAVID A. CLARKE SCHOOL OF LAW

### Guidelines for Documentation
### Attention Deficit Hyperactivity Disorder (ADHD) or
### Attention Deficit Disorder (ADD)

In order to fully evaluate requests for accommodations or auxiliary aids and to determine eligibility for services, the Office for Services to Students with Disabilities needs documentation of your disability. The documentation should include an evaluation by an appropriate professional that makes evident the current impact of the disability as it relates to the accommodation(s) requested as well as provide evidence that suggests you meet the criteria for a diagnosis of ADD or ADHD.

The outline listed below is developed to assist you in working with your treating/diagnosing professional(s) to prepare the information needed to evaluate request(s). The health professional should answer the following questions:

1. What is the diagnosis, date of diagnosis, and your last contact with the student?

2. Indicate the diagnostic criteria used (*e.g.*, DSM or ICD), and describe the salient features met by this individual.

3. Describe the historical characteristics including but not limited to developmental, educational and medical evidence used in making your diagnosis. To assist us in anticipating needed accommodations and services, include information that can be used to understand the range and impact of the condition.

4. Indicate all instruments and procedures used to diagnose the ADD (*i.e.*, clinical interview, psycho-educational testing, behavioral rating scales, etc.) Also, report all of these assessments including all test scores as well as subtest scores. You are encouraged to include a diagnostic report.

5. Describe the treatments recommended including medication. If the student is medicated, state the type of medication, the dosage, the frequency of use, the adverse side effects, and the effectiveness of the medication.

6. How does the ADD impact this student in an educational setting (functional limitations)?

7. What recommendations do you have regarding accommodations and your rationale for each of the accommodations?

8. Are there any indications that this student may have an additional diagnosis (*i.e.*, depression, bipolar, anxiety, learning disabilities, etc.)? Please describe pertinent characteristics and give an explanation for your reason to suspect this secondary diagnosis.

# University of the District of Columbia
# David A. Clarke School of Law



# STUDENT
# HANDBOOK

### A Guide to Academic

### Regulations and Requirements

### Academic Year 2005-2006

## Volume I





FILED

APR 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# SECTION VI.   DISABILITIES POLICY AND PROCEDURES

It is the policy of the School of Law to ensure individualized opportunities for students with disabilities. The School of Law will make reasonable accommodations to the known disability of a student. Thus, UDC-DCSL will change practices or procedures, or provide or modify devices, services or facilities, in order to match the student with a particular program or activity at the School of Law. To the degree consistent with the disability and the accommodation, confidentiality will be maintained.

(a)    <u>Definition</u>: The term "disability" means a physical or mental impairment that substantially limits one or more of the major life activities of an individual; a record of such an impairment; or being regarded as having such an impairment.

(b)    <u>Procedures</u>: Reasonable accommodation is a joint responsibility of the student and the School of Law.

(1). The student seeking a reasonable accommodation shall notify the University's Office of Services for Students with Disabilities of his or her disability as soon as practicable and shall request an accommodation. The student shall provide a statement from a professional qualified to certify the existence of the disability. The professional must also specify the way in which the disability will or might be expected to affect educational performance in the absence of a particular accommodation by the School of Law. Please see pages 41 et seq. for guidelines for documentation of a disability.

(2). The Director of the Office of Services for Students with Disabilities shall meet with the student to discuss the requested accommodation and alternative accommodations. The Director will communicate to the student in writing his or her final decision as to what accommodation will be made. The process should be accomplished expeditiously, generally within two weeks from submission by the student of the statement from the professional.

(3). In the event that the student is dissatisfied with the arrangements for accommodation, the student shall consult the Section 504 Coordinator within one week of receipt of the Director's decision. The Coordinator will act expeditiously to resolve the matter in accordance with University grievance procedures.

Section 504 Coordinator:    William Penn, Office of Human Resources
                            (202) 274-5452, wpenn@udc.edu
                            Building 38, 3rd Floor

<u>Example</u>: An example of an accommodation procedure might be useful: A student with a learning disability has a letter from an educational psychologist that states what the disability is. It also states that the learning disability necessitates additional time for exams to ensure that the student can have the opportunity to perform well. The student notifies the Director of the Office

of Services for Students with Disabilities that the student has a learning disability and presents the required statement from a professional. The student and the Director meet in advance of examinations scheduled in the student's course(s). The two agree that time-and-a-half for each exam would be necessary.

The School of Law's Associate Dean for Academic Affairs assists the Director in arranging the accommodation, ensuring that the student is given time-and-a-half to complete the examination.

The same procedure may be followed for a variety of situations such as classroom seating arrangements and installation of equipment.

When documentation of a disability supports the need for notetakers, university and law school staff and faculty will collaborate to arrange this accommodation. The primary source of qualified notetakers are other students enrolled in the same class(es) in which notes are needed. It is the student's responsibility to contact the Director of the Office of Services for Students with Disabilities prior to the beginning of the semester in order to request that a faculty member make an anonymous announcement in class regarding the need for a notetaker. When making the announcement, the faculty member will be sensitive to confidentiality issues.

Notetakers may be volunteers or paid. Paid notetakers must be hired through the work study program.

Notetakers will not provide notes for classes that the student eligible for notetaking does not attend; medical absences and other emergency situations may be exceptions.

Once it has been determined that notetaking is an appropriate accommodation, students must notify the Office of Services for Students with Disabilities of notetaking needs and class scheduling. The Associate Dean for Academic Affairs will ask the professor(s) to make an anonymous announcement regarding the need for a peer notetaker. Peer notetakers will be advised to see the Financial Aid Officer who will act as the coordinator for notetakers and who will process work-study stipends for those who are not volunteers. The Financial Aid Officer will collect the notes from the notetakers and e-mail them or have them xeroxed for the students' use in a way that preserves student anonymity.

40

University of the District of Columbia
David A. Clarke School of Law

## REQUEST FOR DISABILITY ACCOMMODATION

A.    Nature of Disability:

_____

_____

_____

B.    Accommodation(s) requested (please be as specific as possible):

_____

_____

_____

C.    List of documentation attached (see attached Guidelines regarding required
documentation):

_____

_____

_____

D.    Authorization and Release: By signing and submitting this form, I authorize the Director
of the Office of Services for Students with Disabilities to speak with and seek additional
documentation from (write in the names of the professionals on the attached
documentation)

_____

_____

concerning my disability and my requested accommodation(s).

Date: _____Signature: _____

Print name: _____

**Submit this form to the Office of Services for Students With Disabilities, University of the
District of Columbia David A. Clarke School of Law, 4200 Connecticut Avenue, N.W.,
Building 38, Room A-11, Washington, D.C., 20008.**

41

## General Guidelines for Documentation
## Of a Disability

In order to fully evaluate requests for accommodations or auxiliary aids, the Office for Services to Students with Disabilities needs documentation of your disability. The documentation should include an evaluation by an appropriate professional that makes evident the current impact of the disability as it relates to the accommodation(s) requested.

The general guidelines listed below are developed to assist you in working with your treating/diagnosing professional(s) to prepare the information needed to evaluate your requests(s).

1. Current functional impact of the condition(s). The current functional impact on physical (mobility, dexterity, endurance, etc.), perceptual, cognitive (attention, distractibility, communication, etc.), and behavioral abilities should be described as a clinical narrative and/or through the provision of specific results from the diagnostic procedures/assessment.

2. Treatments, medications, accommodations, auxiliary aids, services currently prescribed. Provide a description of treatments, medications, accommodations, auxiliary aids, and/or services currently in use and their estimated effectiveness in minimizing the impact of the condition(s). Include any significant side effects that may impact physical, perceptual, behavioral or cognitive performance. If any additional accommodations or auxiliary aids are warranted, they should be listed along with a clear rationale and related functional limitations. Any accommodations or auxiliary aids will be taken into consideration, but not automatically implemented.

3. The expected progression or stability of the disability over time. If possible, provide a description of the expected change in the functional impact of the condition(s) over time. If the condition is variable, describe the known triggers that may exacerbate the condition.

4. A diagnostic statement identifying the disability. When appropriate, include International Classification of Diseases (UCD) or Diagnostic Statistical Manual (DSM) codes, the date of the most recent evaluation, or the dates of evaluations performed by referring professionals. If the most recent evaluation was not a full evaluation, indicate when the last full evaluation was conducted.

42

### Guidelines for Documentation of a
### Learning Disability

Students with learning disabilities must provide the Office of Services for Students with Disabilities with documentation that meets general documentation guidelines. Described below is a preferred documentation profile for individuals with learning disabilities who are requesting accommodations or auxiliary aids. This type of documentation not only validates the presence of a disability under Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, but is most useful in providing information to support educational planning and anticipate future accommodation needs. All documentation will be evaluated on a case-by-case basis.

- A comprehensive psycho-educational test battery, which means intelligence/ability testing and educational/achievement testing, is recommended. A full diagnostic report, including all standard test scores as well as subtest scores and the evaluator's narrative, is recommended. If you are providing information from a public school, include the most recent Multifactored Evaluation (MFE) and Individual Educational Program (IEP) and the original eligibility evaluation and/or any other MFE's that include the results of a psycho-educational test battery. These documents alone may or may not provide adequate information to document the learning disability.

- A diagnosis made by (a) qualified professional(s), i.e., licensed school psychologist, licensed psychologist, or learning disabilities/educational specialist, is required. The learning disability diagnosis must be clearly stated. References to academic weaknesses and learning differences alone may not substantiate a learning disability diagnosis.

- Assessments normed for adults are preferred. What this means is that your assessments should not be assessments for children, but rather tests that are designed for adults, i.e., WAIS-III rather than WISC-III.

- A diagnosis of a learning disability and type(s) of learning disability (ies), which should be supported by test data and a description of current functional limitations, is important. Psycho-educational testing completed within the last three years provides a better assessment of current functional limitations.

- Suggestions for appropriate accommodations are helpful. It is important that these suggestions are based upon functional limitations. If it is not evident why an accommodation is suggested by assessing test scores and resulting functional limitations, then a rationale for the accommodations is necessary.

43

## Guidelines for Documentation of a
## Psychiatric Disability

To determine eligibility for appropriate accommodations for a psychiatric disability, the Office for Services to Students with Disabilities requires current and comprehensive documentation of this disability from the diagnosing psychiatrist, psychologist or other appropriate professional.

The outline listed below is developed to assist you in working with your treating/diagnosing professional(s) to prepare the information needed to evaluate request(s). The health professional should answer the following questions:

1.    What is the diagnosis, date of diagnosis, last contact with the student, and expected duration of the disability.

2.    Describe the symptoms that meet the criteria for this diagnosis.

3.    How does this psychiatric disability impact the student in an educational setting (functional limitations)?

4.    Please list current medication(s) including dosage, frequency, and adverse side effects and any other prescribed treatment plan(s) for this student's condition.

5.    Is there any indication that this student may have an additional diagnosis, i.e., ADHD, learning disabilities, etc? If there is, please describe and attach pertinent information?

6.    What recommendation do you have regarding accommodations, i.e., extra time for exams, distraction reduced exam space, etc., and your rationale for these accommodations?

44

Guidelines for Documentation of Attention Deficit Hyperactivity Disorder (ADHD) or Attention Deficit Disorder (ADD)

In order to fully evaluate requests for accommodations or auxiliary aids and to determine eligibility for services, the Office for Services to Students with Disabilities needs documentation of your disability. The documentation should include an evaluation by an appropriate professional that makes evident the current impact of the disability as it relates to the accommodation(s) requested as well as provide evidence that suggests you meet the criteria for a diagnosis of ADD or ADHD.

The outline listed below is developed to assist you in working with your treating/diagnosing professional(s) to prepare the information needed to evaluate request(s). The health professional should answer the following questions:

1. What is the diagnosis, date of diagnosis, and your last contact with the student?

2. Indicate the diagnostic criteria used (e.g., DSM or ICD), and describe the salient features met by this individual.

3. Describe the historical characteristics including but not limited to developmental, educational and medical evidence used in making your diagnosis. To assist us in anticipating needed accommodations and services, include information that can be used to understand the range and impact of the condition.

4. Indicate all instruments and procedures used to diagnose the ADD (i.e., clinical interview, psycho-educational testing, behavioral rating scales, etc.) Also, report all of these assessments including all test scores as well as subtest scores. You are encouraged to include a diagnostic report.

5. Describe the treatments recommended including medication. If the student is medicated, state the type of medication, the dosage, the frequency of use, the adverse side effects, and the effectiveness of the medication.

6. How does the ADD impact this student in an educational setting (functional limitations)?

7. What recommendations do you have regarding accommodations and your rationale for each of the accommodations?

8. Are there any indications that this student may have an additional diagnosis (i.e., depression, bipolar, anxiety, learning disabilities, etc.)? Please describe pertinent characteristics and give an explanation for your reason to suspect this secondary diagnosis.



American Bar Association
Section of Legal Education and Admissions to the Bar



2006 - 2007

**Standards**

and **Rules of Procedure**

for approval of law schools



*Cover Image: "© Scott Rothstein. Image from BigStockPhoto.com"*



FILED

APR 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Interpretation 210-1:*
*A law school does not comply with the Standards if the charges and costs assessed against the law school's revenue by the university leave the law school with financial resources so inadequate as to have a negative and material effect on the education students receive.*

*Interpretation 210-2:*
*The resources generated by a law school that is part of a university should be made available to the law school to maintain and enhance its program of legal education. "Resources generated" includes law school tuition and fees, endowment restricted to the law school, gifts to the law school, and income from grants, contracts, and property of the law school. The university should provide the law school with a satisfactory explanation for any use of resources generated by the law school to support non-law school activities and central university services. In turn, the law school should benefit on a reasonable basis in the allocation of university resources.*

## Standard 211. *NON-DISCRIMINATION AND EQUALITY OF OPPORTUNITY*

(a) A law school shall foster and maintain equality of opportunity in legal education, including employment of faculty and staff, without discrimination or segregation on the basis of race, color, religion, national origin, gender or sexual orientation, age or disability.

(b) A law school shall not use admission policies or take other action to preclude admission of applicants or retention of students on the basis of race, color, religion, national origin, gender, sexual orientation, age or disability.

(c) This Standard does not prevent a law school from having a religious affiliation or purpose and adopting and applying policies of admission of students and employment of faculty and staff that directly relate to this affiliation or purpose so long as (i) notice of these policies has been given to applicants, students, faculty, and staff before their affiliation with the law school, and (ii) the religious affiliation, purpose, or policies do not contravene any other Standard, including Standard 405(b) concerning academic freedom. These policies may provide a preference for persons adhering to the religious affiliation or purpose of the law school, but shall not be applied to use admission policies or take other action to preclude admission of applicants or retention of students on the basis of race, color, religion, national origin, gender, sexual orientation, age or disability. This Standard permits religious affiliation or purpose policies as to admission, retention, and employment only to the extent that these policies are protected by the United States Constitution. It is administered as though the First Amendment of the United States Constitution governs its application.

(d) Non-discrimination and equality of opportunity in legal education includes equal opportunity to obtain employment. A law school shall communicate to every employer to whom it furnishes assistance and facilities for interviewing and other placement functions the school's firm expectation that the employer will observe the principles of non-discrimination and equality of opportunity on the basis of race, color, religion, national origin, gender, sexual orientation, age and disability in regard to hiring, promotion, retention and conditions of employment.

*Interpretation 211-1:*
*Schools may not require applicants, students, faculty or employees to disclose their sexual orientation, although they may provide opportunities for them to do so voluntarily.*

*Interpretation 211-2:*
*As long as a school complies with the requirements of Standard 211(c), the prohibition concerning sexual orientation does not require a religiously affiliated school to act inconsistently with the essential elements of its religious values and beliefs. For example, it does not require a school to recognize or fund organizations whose purposes or objectives with respect to sexual orientation conflict with the essential elements of the religious values and beliefs held by the school.*

*Interpretation 211-3:*
*Standard 211(d) applies to all employers, including government agencies, to which a school furnishes assistance and facilities for interviewing and other placement services. However, this Standard does not require a law school to implement its terms by excluding any employer unless that employer discriminates unlawfully.*

*Interpretation 211-4:*
*The denial by a law school of admission to a qualified applicant is treated as made upon the basis of race, color, religion, national origin, gender, sexual orientation, age or disability if the basis of denial relied upon is an admissions qualification of the school which is intended to prevent the admission of applicants on the basis of race, color, religion, national origin, gender, sexual orientation, age or disability though not purporting to do so.*

*Interpretation 211-5:*
*The denial by a law school of employment to a qualified individual is treated as made upon the basis of race, color, religion, national origin, gender, sexual orientation, age or disability if the basis of denial relied upon is an employment policy of the school which is intended to prevent the employment of individuals on the basis of race, color, religion, national origin, gender, sexual orientation, age or disability though not purporting to do so.*

## Standard 212. *EQUAL OPPORTUNITY AND DIVERSITY*

**(a) Consistent with sound legal education policy and the Standards, a law school shall demonstrate by concrete action a commitment to providing full opportunities for the study of law and entry into the profession by members of underrepresented groups, particularly racial and ethnic minorities, and a commitment to having a student body that is diverse with respect to gender, race, and ethnicity.**

**(b) Consistent with sound educational policy and the Standards, a law school shall demonstrate by concrete action a commitment to having a faculty and staff that are diverse with respect to gender, race and ethnicity.**

*Interpretation 212-1:*
*The requirement of a constitutional provision or statute that purports to prohibit consideration of gender, race, ethnicity or national origin in admissions or employment*

decisions is not a justification for a school's non-compliance with Standard 212. A law school that is subject to such constitutional or statutory provisions would have to demonstrate the commitment required by Standard 212 by means other than those prohibited by the applicable constitutional or statutory provisions.

**Interpretation 212-2:**
Consistent with the U.S. Supreme Court's decision in Grutter v. Bollinger, 529 U.S. 306 (2003), a law school may use race and ethnicity in its admissions process to promote equal opportunity and diversity. Through its admissions policies and practices, a law school shall take concrete actions to enroll a diverse student body that promotes cross-cultural understanding, helps break down racial and ethnic stereotypes, and enables students to better understand persons of different races, ethnic groups and backgrounds.

**Interpretation 212-3:**
This Standard does not specify the forms of concrete actions a law school must take to satisfy its equal opportunity and diversity obligations. The determination of a law school's satisfaction of such obligations is based on the totality of the law school's actions and the results achieved. The commitment to providing full educational opportunities for members of underrepresented groups typically includes a special concern for determining the potential of these applicants through the admission process, special recruitment efforts, programs that assist in meeting the academic and financial needs of many of these students and that create a more favorable environment for students from underrepresented groups.

## Standard 213. *REASONABLE ACCOMMODATION FOR QUALIFIED INDIVIDUALS WITH DISABILITIES*

**Assuring equality of opportunity for qualified individuals with disabilities, as required by Standard 211, may require a law school to provide such students, faculty and staff with reasonable accommodations.**

**Interpretation 213-1:**
For the purpose of this Standard and Standard 211, disability is defined as in Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794, as further defined by the regulations on post secondary education, 45 C.F.R. Section 84.3(k)(3) and by the Americans with Disabilities Act, 42 U.S.C. Sections 12101 et seq.

**Interpretation 213-2:**
As to those matters covered by Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act, neither this Standard nor Standard 211 imposes obligations upon law schools beyond those provided by those statutes.

**Interpretation 213-3:**
Applicants and students shall be individually evaluated to determine whether they meet the academic standards requisite to admission and participation in the law school program. The use of the term "qualified" in the Standard requires a careful and thorough consideration of each applicant and each student's qualifications in light of reasonable accommodations. Reasonable accommodations are those that are consistent with the fundamental nature of the school's program of legal education, that can be provided without undue financial or administrative burden, and that can be provided while maintaining academic and other essential performance standards.

Dean Ann Richardson
Associate Dean, Academic Affairs
UDC - School of Law
4200 Connecticut Avenue
Washington, DC 20008

September 9, 2003

Re:             ACCOMMODATION REQUEST

Dear Dean Richardson;

                Per our meeting during the second week of orientation
regarding my status as a classified student with LD and my accommodation needs at UDC
School of Law, I am attaching three psychological/ educational evaluations for your
review and consideration for accommodation. The two most recent were performed in
2001 by Dr. Sydnor - Greenberg and NJ Certified Learning Consultant, Nancy Thomas,
for appeal to the LSAT for accommodation. The third evaluation is the original
diagnosis received in 1993, while I was a junior in high school, performed by Donna
Karanja. All three are original documents or only copies and therefore may be need to
be duplicated at your discretion.

                As prescribed in the reports, I would like to request the
following accommodations, in addition to accommodations that I have utilized with
success in the past:
1.      Extended time on exams;

2.      Extended time on written projects, when necessary and requested;

3.      A separate, quite work room for exams;

4.      Timed breaks during exams when necessary and requested;

5.      A note taker for all class lectures;

6.      Additional learning supplements available to the school (i.e. - literature on
audio/ video tape, voice to text computer software, transcriptions, teacher's notes
or outlines)

7.      Any other provisions provided by the school that may be of benefit, as
necessary (i.e. - tutoring, additional academic support, recent LD materials/
information/ groups that may be helpful in coping with and developing learning
strategies, etc.)

Should you need additional information or should you have any questions or concerns
regarding this request, please let me know at your soonest convenience so that I may
be of timely assistance in the matter.

                                        Sincerely,

FILED
APR 2 4 2007
U.S. DISTRICT COURT
WHITTINGTON, CLERK

University of the District of Columbia

David A. Clarke School of Law

**Ann Bishop Richardson**
**Associate Dean for Academic Affairs**



4200 Connecticut Avenue, N.W.
Washington, D.C. 20008

Telephone: (202) 274-7345
FAX: (202) 274-5583
Email: arichardson@udc.edu

| | | |
|---|---|---|
| To: | Nicole Di Lella | September 15, 2003 |
| From: | Ann Richardson | |
| Re: | Disability Determination | |

Please accept this letter as memorializing my verbal communication to you that it is the policy of the David A. Clarke School of Law to provide reasonable, appropriate, and effective accommodations for students with known, qualifying disabilities. Thus, the School of Law will change practices or procedures, or provide or modify devices, services, or facilities, in order to match the student with a particular program or activity at the school. However, the school is unable to provide accommodations that fundamentally alter the educational program, such as absence from a large number of classes or waiving attendance at required courses, nor can it provide retroactive accommodations.

Within those parameters and based upon the documentation you have submitted, the School of Law has decided:

<u>Existence of a Disability</u>: You have provided me with documentation from Dr. James M. Sydnor-Greenberg, Nancy Thomas, and Karen C. Romm that indicates the following diagnoses: Reading Disorder, Disorder of Written Expression, ADHD, Predominantly Inattentive Type, and Scotopic Sensitivity and that these conditions may affect your academic performance.

<u>Determination as to Accommodation</u>: Beginning with the fall, 2003, semester, the School of Law will provide the following accommodations:

• You may have double time to complete examinations which will be administered to you in a separate, quiet testing room and extended time on written projects, when necessary and requested.

• We will provide you with a notetaker. The School of Law's policy and procedures for notetakers is attached.

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

For auxiliary aids such as adaptive materials and equipment, please contact the University of the District of Columbia's Division of Student Affairs, Services for Students with Disabilities. A brochure describing those services is attached. The Director of Academic Support is Professor Derek Alphran, and you should not hesitate to contact him for advise.

Joint Responsibility as to Accommodation: Reasonable accommodation is a joint responsibility of the student and the School of Law. As part of your responsibility in this process, you must

(A) Inform me in advance of upcoming examinations so arrangements for a separate administration can be made;

(B) Consult with me periodically.

Future Review of Adequacy of Accommodation: The accommodations indicated above reflect my determination based on information provided to date. If a change in circumstances occurs that indicates that the accommodation requires modification at some future date, please bring the matter to my attention for review.

Please sign and date below to acknowledge receipt of this memorandum, and please keep a copy for your records.

Welcome to the David A. Clarke School of Law.

_____

Nicole Di Leila

Date: _____

A Renewed University for A New Century
Excellence Through Service



# Ways that Students Can Help Themselves

By: Susan A. Vogel (1997)

## General strategies

1. Many students with LD come to college and do not anticipate needing any accommodations or support services. However, if you have been previously diagnosed as having a learning disability, secure a copy of the most recent evaluation or Individualized Education Plan (IEP). You will need to provide this documentation or be reevaluated in order to be eligible for services.

2. Learn about Section 504. Find out what accommodations and support services your college provides, and, should you need them, where to find them.

3. Increase your understanding of the nature of learning disabilities in general and specifically the type and severity of your own learning disability by discussing your test results with an LD specialist.

4. Rehearse your explanation of the above information with your LD specialist or a friend so that you can explain fully to faculty the reason for requesting an accommodation such as extended time on an examination.

5. If you require classroom accommodations of some kind, schedule an appointment with your instructor early in the semester.

6. If you need to tape record lectures, ask permission of the instructor before doing so as a courtesy to the instructor. Be sure to explain why you need this modification and how you will use the tape to enhance your learning.

7. Take notes simultaneously while tape recording. Indicate questions in the margin when material is unclear. If your tape recorder has a counter, begin it at zero in the beginning of the lecture, and note the counter number in the margin next to your question.

8. Listen to tape, rewrite notes, and highlight key concepts, as soon after class as possible. Compare your notes with a study partners

9. Apply the following principles of effective learning when you study. They will increase your chances of success. Included are:
   - Complete the reading assignments prior to class. Associating the lecture with the readings is a lot easier than listening to the lecture "cold." In addition, you will be better prepared to ask the instructor for clarification and/or elaboration and to participate in class discussion, should the opportunity arise. Most instructors value the active participation of students who come to class prepared.

   - Attend all classes. Other students can get by missing an occasional class, but for you, hearing the lecture may be a critical factor in learning new material.

   - Preview new material and review the previous lecture before each class.

   - Sit toward the front of the class so you can hear and see well and be more easily recognized when you have a question or want to participate in the discussion.

   - If you tape record in class, carefully label every tape (for example, Side 1, Intro to Psychology, 2/8/97) before you insert it into the recorder. Set the counter to zero and if you are unsure of a concept during the lecture, jot

FILED
APR 2 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

down the counter number in the margin of your notes for easy review and clarification later.

- o Review tapes and/or notes as soon after the lecture as possible. Compare your notes with a study partner's note. Copy notes over, if necessary. Highlight and summarize the main points. Keep a glossary of important terms, lists of key concepts, major events, contributors and their theories, or formulas.

10. Keep a master calendar. Make sure it's large enough to enter assignments, exams, social events, and important appointments. Use other calendars for specific tasks, e.g., a wall calendar for longrange assignments.

11. Work backwards from due date on longrange assignments and build in extra time. Go over this time line with your instructor and ask for feedback on your progress periodically.

12. Make sure you have understood the assignment correctly and completely before plunging in or soon after you have started by scheduling an appointment with your instructor early. Don't wait till you have finished the assignment to find out you have not fulfilled the requirements.

13. Often, the hardest part of getting your work done on time and keeping up with the workload is getting started on a new assignment. Start by making a commitment of 30 minutes and then lengthen the studying periods gradually.

14. Because most college students with LD have trouble recognizing and correcting spelling errors in their handwriting, it is important to use a word processor with a spell checker and grammar check to identify misspelled words and incorrect grammar. However, proper nouns and homonym errors may not be identified. Use the grammar check to identify inappropriate prepositions and word choices, errors of punctuation, or poor sentence structure. If your instructor agrees to the plan, request a writing tutor, friend, roommate, or relative proofread your paper and assist you in error identification and correction as a final step. (See Appendix VI for listing of adaptive technology that students with LD have found useful.)

15. Reach out for assistance early, if needed. Schedule an appointment with your instructor when you begin to get confused or flounder. Do not wait until you are already in danger of failing the course. Speak to the coordinator of the Office for Disabled Student Services and/or your advisor and find out what help is available.

16. Be aware of Drop-Add and Pass-Fail options and deadlines to adjust your schedule. Use them to your advantage to enhance success.

17. Work with others to inform and sensitize the student body, faculty, administration, and staff about learning disabilities. Organize public lectures, student panels, films, and videos. Write articles for the student newspaper on your campus.

18. Become a student member of and/or provide input to policy making university committees.

19. Find out if there is a support group for students with learning disabilities on your campus and become an active member in this group. At such group meetings you will find out your problems are not unique and you are not alone in your struggles. In addition to the comfort that provides, you will learn studying and test taking strategies and about instructors whose teaching style will be most compatible with your learning style.

20. Call the International Dyslexia Association (formerly The Orton Dyslexia Society) at 412/296-0232 and find out how your student support group for those with learning disabilities (or if you do not presently have one, how you could start a student group) could become affiliated with a national network of student support groups. Request information about how you could become part of this network and ask them to send you copies of the past issues of "2.3 Point," the college affiliate newsletter. Official student organizations on campus receive financial support from the student government. Find out how your group could be recognized as an official student organization and qualify for funding.

21. Provide peer counseling and support to other students with learning disabilities on an individual basis or through a support group on campus.

22. Join professional organizations as a student member advocating for rights of adults with learning disabilities and other

persons with disabilities (e.g., Learning Disabilities Association, The Association of Higher Education and Disabilities [AHEAD], and the International Dyslexia Association). See Appendix VII for further information.)

## Memory strategies

1. Learning is synonymous with reviewing and for you, reviewing frequently and regularly throughout the semester is essential.

2. Color code, enlarge, underline, and highlight your notes to strengthen your visual memory of the material.

3. Copy your notes over, if for you, the act of writing facilitates memorizing.

4. Read aloud (tape recording while reading) if hearing with or without seeing words helps you remember what you've read.

5. Tape record lectures and listen to them while driving, exercising, eating, grocery shopping, etc.

6. Rehearse material to be mastered either orally or in writing. Write out concepts in full. Read your notes silently or aloud whichever works best for you. Paraphrase or explain concepts to a friend.

7. Review frequently and commit material to memory using strategies that aid recall such as listing, categorizing, drawing, imaging, revisualizing, alphabetizing, devising acronyms, and associations.

## Test-taking strategies

1. Find out what examination format your professor will use (e.g., long answer essay questions, multiple choice, short answer essay questions). Ask your professor for "practice" exams or find out if old exams are available. Take as many as you can and check your answers against the answer key, with a tutor, study partner, or graduate assistant.

2. If no prior exams or questions are provided, and if essay-type exams will be given, try to anticipate the questions that will be asked on the exam. Write out your answers to the anticipated questions.

3. Be sure to go into exams rested and not having just consumed a large amount of sugar or caffeine; complex carbohydrates and some protein will provide the best source of energy over an extended period of time.

4. If you have memorized specific formula, dates, names, or terminology for an exam, before you begin working on the exam, write down all that you have committed to memory and use, as needed, later in the exam.

5. Read test directions carefully, underlining the verb that describes what you are to do: describe, compare, summarize, list. Then follow the directions precisely.

6. Begin by answering the easiest questions first. Circle the hard ones and come back to them after you have answered the easy ones.

7. Pace yourself. Even if you have extended time, it is not unlimited.

8. If you come to a question you don't understand, paraphrase it for the proctor in order to get confirmation that you have understood what the question meant.

## Self-confidence building strategies

Building self-confidence is not an easy task. Many people benefit from the assistance of a counselor, psychologist, or therapist on a one-to-one basis or in a support group. You should explore such options in the Counseling Center on campus. In addition, the following strategies may prove helpful:

1.  After preparing as well as you could, tell yourself as you go into an exam or to make a presentation, you will succeed and you are well prepared, rather than you are going to fail;

2.  Identify a realistic goal and work toward it. When you succeed in accomplishing it, identify the strategies that you developed that contributed to your success. Building self-confidence is a step-by-step process in which you meet increasingly difficult challenges and take credit as you accomplish each one.

3.  If you don't achieve your goal on the first attempt, sit down with a family member, friend, teacher, or counselor and analyze and refine your strategies. Identify new strategies and intermediate goals that will prepare you better to achieve your final goal. Tell yourself, "Next time I know I'll do better."

4.  Develop a time line to accomplish each goal, building in extra time for the unexpected. Rememberthere is no point rushing toward failure. Take a longrange perspective on your life, rather than focusing on just one semester.

5.  Keep a list of your past successes and accomplishments and read this list over frequently.

6.  Take credit for your achievements and work well done. Accept compliments with a simple "thank you". A compliment is like a gift. When you reject a compliment, you are rejecting not only the compliment but also the person giving it. How would you feel if you brought a Lift for someone and it was rejected? If your performance did not meet your expectations, you can critique it at a later time with your teacher, coach, counselor, or friend.

7.  Identify your strengths and keep expanding the list of what you do well. Your learning disability gave you some special talents as well as difficulties. Identify your talents, develop them, and enjoy them.

8.  Keep disappointments in perspective; a "D" on one quiz does not mean you will fail the course; a "D" in one course does not mean you will be dismissed from college.

9.  If you do poorly on a paper or exam, find out why rather than condemning yourself or rejecting the good along with the ineffective strategies that you may have used. Chalk it up to experience. Mistakes are often the best teachers. By analyzing what went wrong, you will be better able to avoid such mistakes in the future.

10. Look at your friends. What do you admire and respect in them? Because they also chose you as a friend, you share in their attributes and have other qualities that they admire and respect as well.

11. Dress for success. If you are not sure of the appropriate dress code for a specific occasion, setting, or social event, check ahead of time with a knowledgeable person.

12. Smile. People who smile send a message to others that they are comfortable with themselves and are self-confident. Smiling is contagious. You will find people around you will reflect your facial expression, be much more pleasant, and have confidence in you when you smile.

13. Look at those who have expressed confidence in you, provided you with opportunities, and given you responsibilities. These people know you well, have observed your past performance, and have confidence in your abilities and potential to succeed. As you accept new challenges, keep them and their confidence in you clearly in mind.

## About the author

Dr. Susan A Vogel is Professor of Special Education in the Department of Educational Psychology, Counseling, and Special Education at Northern Illinois University in De Kalb, IL. She has published over 50 articles as well as several handbooks, chapters, and books on adults with learning disabilities with a specific focus on factors contributing to success, postsecondary support services, and most recently, adults with severe problems of literacy. Her handbook, College Students with Learning Disabilities, has sold over 45,000 copies in the United States and Canada. She serves on the advisory boards of several national organizations and as consulting editor for six journals including the Annals of Dyslexia and the Journal of Learning Disabilities. Presently, Dr. Vogel serves as President of the International Academy for Research in Learning Disabilities which is composed of 300 elected Distinguished Scientists world-wide involved in cutting edge research on learning disabilities.

College Students with Learning Disabilities: A Handbook Dr. Susan Vogel, 1997
http://www.ldonline.org/article/6145?theme=print

©2006 WETA. All Rights Reserved.

# UNIVERSITY OF THE DISTRICT OF COLUMBIA
## David A. Clarke School of Law

Ann Bishop Richardson
Associate Dean for Academic Affairs

4200 Connecticut Avenue, N.W.
Washington, D.C. 20008
(202) 274-7345
(202) 274-5441 (fax)



October 14, 2005

To:          Academic Standards Committee

From:       Ann Richardson

Re:          Complaint of Honor System Violations

I am attaching a memorandum and attachments I received from Professor Susan Waysdorf today in which she reports plagiarism and cheating on an examination by Nicole DiLella in violation of Sections 1(a) and 1(b) of the Honor System. In accordance with Section 4(c)(3), I am referring this matter to the Academic Standards Committee.

I trust you will investigate this complaint at your earliest convenience.

cc      Professor Waysdorf
        Nicole DiLella



FILED

APR 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**University of the District of Columbia**

David A. Clarke School of Law
4200 Connecticut Avenue, N.W.
Building 38, 2nd Floor
Washington, D.C. 20008



*Susan L. Waysdorf*
*Professor of Law*
Office Telephone: (202) 274-7330
Fax: (202) 274-5583
e-mail: swaysdorf@udc.edu

**CONFIDENTIAL**

October 14, 2005

TO:        Ann Richardson,
                Associate Dean for Academic Affairs

FROM:     Professor Susan L. Waysdorf

RE:         Complaint of Honor System Violations

      Pursuant to Section 4(b), of the Student Handbook, Vol. II, p. 7 ("Honor System"), I am forwarding to you this complaint of plagiarism and cheating on an examination, against Ms. Nicole Dilella. It is my contention that Ms. Dilella violated both Section 1(a) of the Honor System ("Honesty in crediting sources of ideas, information, and written work") and also Section 1(b) ("Honesty in taking examination"), by copying material directly from other sources and failing to credit those sources on the "take-home" essay portion of the final examination in my course, Constitutional Law II (Spring 2005 semester).

      The final examination in this course consisted of two parts: (1) take-home essays which students were to complete in typing and submit when they took the (2) in-class examination, which consisted of Multiple-Choice questions. This complaint concerns the take-home portion essays that Ms. Dilella submitted (see attachment 1). For some reason (which is not a part of this complaint *at this point*), she answered the essay questions from my Spring 2003 Constitutional Law II exam (see attachment 2), which is on file in the Law Library and on the School of Law's website. Ms. Dilella submitted answers to those questions, rather than the essay questions on the Spring 2005 exam, which she was given (see attachment 3).

      Be that as it may, the answer that she submitted for "Question 1 - Write An Exam Question" was taken in its entirety (except for a change of names of the parties) from the University of Alberta Faculty of Law website, Constitutional Law Exam 1999-2000, Professor B. Billingsley, "Question 3: Hypothetical Fact Situation (Charter)" (see attachment 4).

Assoc. Dean Ann Richardson
Complaint of Honor System Violations
October 14, 2005
Page Two

In addition, the answer that Ms. Dilella submitted in response to Question 4 of the Spring 2003 exam was copied directly and extensively from the *Petition for Writ of Certiorari* to the United States Supreme Court, submitted by Counsel for Petitioners (Lambda Legal Defense and Education Fund) on July 16, 2002, in the case of <u>Lawrence v. Texas</u>. This official and public court document is easily accessible on-line from a variety of websites (see attachment 5). I have provided notations on Lambda's *cert* petition which show the direct and exact correlation between that text, and the sentences and paragraphs that Ms. Dilella copied and submitted as her exam answer.

Based on the above, Ms. Dilella violated the School of Law's Honor System policies against plagiarism and cheating on examinations.[1]  Thank you for your attention to this matter.

Attachment 1 - Constitutional Law II Final Exam answers submitted by Ms. Dilella
Attachment 2 - Constitutional Law II, Spring 2003 Take Home Essay Exam
Attachment 3 - Constitutional Law II, Spring 2005 Take Home Essay Exam
Attachment 4 - University of Alberta Faculty of Law website, Constitutional Law Exam
                1999-2000, Professor B. Billingsley, "Question 3: Hypothetical Fact Situation
                (Charter)"
Attachment 5 - *Petition for Writ of Certiorari* to the United States Supreme Court, Counsel for
                Petitioners (Lambda Legal Defense and Education Fund), <u>Lawrence v. Texas</u>

---

[1]    Ms. Dilella failed to submit an answer to the third essay question, as required under the examination she took. In addition, she received a grade of "D" on the other half of the exam - the Multiple Choice portion (scoring 13 out of a total of 25). I have separately submitted to the Registrar's Office a grade of "F" for Ms. Dilella in this course.

Edward Allen
Chair, Academic Standards Committee
4200 Connecticut Avenue, N.W.
Building 38 Room 226
Washington, DC 20008

November 4, 2005

Dear Professor Allen:

I am responding to the Committee's letter of October 25th containing allegations of plagiarism and cheating on an examination pursuant to §1(a) and (b) of the UDCSL Honor System. For your fair review and prompt judgment, please accept this as a "Statement of Explanation" in reference to the present matter.

UDCSL's code of conduct calls for fairness and honesty in accordance with the norms of legal, professional and educational practices. The duty to uphold such policies is the obligation of the student, faculty and staff. Plagiarism is a form of cheating which reflects on an individual's honesty; in turn, it is a reflection of character and ethical fitness to practice law. [1] I support the Committee's interest and share in their intent to promote integrity, academic responsibility and well-defined standards of acceptable practices among the Law School community. I also share in the Committee's interest in achieving that mission by addressing the issue of plagiarism with full commitment to ensuring that the School of Law's policies are fair and workable within the institution and the law.

To be in full compliance with the requests of the Committee, and as not to overlook any expected argument that should be raised here in my Response, I would just like to set out my understanding of the issue before us, as it may or may not be relevant to my representation. In review of the "Complaint of Honor Code Violation" submitted on October 14th, by Professor Susan Waysdorf, I had difficulty with numerous language inconsistencies, making it unclear to determine what, in fact, the Committee has been asked to consider; more so, what I am required to explain in order for the Committee to press forward in their duty to me, as a student with a vested interested in continuing my educated at the School of Law and the overall student body, faculty and staff. Throughout the Complaint, the terms "take-home essay" "essay" "final examination" "her exam" and "exam answer" are interchangeably used to make a conclusion regarding the Constitutional Law –Spring 2005 Final Examination now introduced to the Committee. [2] However, the terms refer to statements of allegations made in regard to the 2003 exam. The Complaint makes no claim of copying on the final examination that I was instructed to take and that was assigned to the class during the semester I was enrolled in the course. Professor Waysdorf points out that I "answered the essay questions from [the] Spring 2003 Constitutional Law II exam.....rather than the essay question on the Spring 2005 exam which she [I] was given." [3] It is not in debate, then, whether or not I submitted the assigned final exam. I agree that the answers received were not assigned. However, nor were they my "exam answers" because the 2003 essay questions at issue were previously administered to the class of 2004 and are published by the Law School on their library internet as a recommended resource or "adjunct" for students to use in their various forms of study. It is not longer "an exam" in the context to which has been addressed. [4]

---

[1] UDCSL Student Handbook: Vol. II Honor System (herein "Honor System') states in part: "Students must conduct themselves lawfully and with integrity in all aspects...must observe norms of fairness and honesty...must not engage in conduct that is illegal or contrary to the general norms of conduct in a professional institution...norms and standards of the academic world as well as rules and regulations of the profession and everyday life."
[2] In ¶1 line 6 the use of the terms "'take-home' essay" and "essay portion" refer to the Constitutional Law II - Spring 2003 Final Examination on the internet (herein referred to as "sample essay questions".) The Complaint makes no claim of copying on the actual final examination that was assigned to the 2005 class during the semester I was enrolled in the course. Also, in ¶1 line 6 the term "final examination" refers to the sample essay questions from the library internet. In ¶4 line 8 "...that Ms. Dilella copied and submitted as her exam answer," "her exam" and "exam answer" refer to the sample essay questions. )
[3] October 14, 2005, *Complaint of Honor Code Violations* ¶2 line 5 - 8)
[4] The Honor System cites examples as books, notes, outlines, papers, These materials are distinct from what is considered "work" in a section of the Code and are reserved under §1(f) *Non-interference with the educational process.*)

APR 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
FILED

The resounding conclusion, in good faith, would seem to indicate that the incomplete answers to the 2003 sample essay questions are my personal study references and that they were received rather than purposely submitted in error. On record I say so now in support of my position and the corroborated facts now introduced for your review.[5] I would also like to explain the circumstances that produced my less than presentable study habits for the Committee's inspection and the resulting confusion, for which I apologize and take responsibility for.

The morning I took part II, the Multiple Choice Section, of my final examination for the 2005 semester of Con Law II, a family emergency called me out of state. Due to the urgency of the matter, I spent time before my final arranging for a flight departure rather than printing out copies of my final essay answers for part I of that same exam. As Dean Richardson found the circumstances considerable to warrant other arrangements, she allowed me to take the Multiple Choice section of the 2005 final out of turn and extended the time in which to deliver my 2005 final essays. In my absence and because communication was limited in the area where I was staying, arrangements were made through Derek Littin with Dean Richardson to drop off the remaining part I of my final to complete the course for the 2005 Spring semester. On Friday, September 16th, due to a lapse in correspondence between Dean Richardson and Mr. Littin, Mr. Littin initially obtained on my behalf an extension of three additionally days to submit outstanding work. However, in a follow up email from Dean Richardson at a later time, the extension was limited and did not pertain to the submission of my Con Law II final. On Monday, the 19th, upon receiving Dean Richardson's correspondence to the latter, Mr. Littin contacted me. Already at the airport and before boarding my airplane on return from upstate NY that afternoon, in a panic, I quickly sent him several email transmissions of what I thought were my essays to part I of my final with the instruction to print and deliver the attachment as soon as he possibly could; which he did. As I was already under immense emotional stress, the fear of failing the course only heightened my depleted clarity. In preparing the documents and email from the gate and painstakingly trying to secure and re-secure a viable internet signal in the airport, I made the error of sending the wrong file with the wrong documents. At the time, I was suffering through a crisis, I was extremely affected emotionally and physically, and my performance was not at its best. In hindsight, I see that I succumbed to the moment and failed to pay more attention to detail than I did. As Mr. Littin does not keep up with my studies, he had no occasion to know that the material delivered was anything other than what it was supposed to be. He knew of no potential error for confusing sample essay answers with actual exam essays, because he was not aware that sample exam questions were made available for student reference or that I used them as an aid in developing better answer writing techniques. Although a mistake of fact as to what was expected to be delivered and what Mr. Littin actually had and did deliver can be easily explained by his lack of law school experience and the fact that is not affiliated with the field of law, I accept the fault for making the mistake. I had absolutely no idea, or further, was I given any indication, whatsoever, that the document sent and delivered to Professor Waysdorf on September 19th was anything other than my final, part I essay of my 2005 Con Law II exam until I received notification from Dean Richardson in her correspondence to the ASC, and in a later return phone call she placed to me.

Under the irregular circumstances that has brought this matter before the Committee, it would not be consistent with common practice to find that I "submitted" study materials when they were unknowingly and mistakenly given under the duress of an extenuating circumstance (and to a third party), however. Such an interpretation goes too far and would extend the boundary to an almost limitless definition of what could constitute a submission under the term.[6] The rules of plagiarism and cheating function is to insure that credit is given where credit is due and not to create a use for litigiousness that would operate to uncut the purpose of upholding rules at all. The Committee should not accept this occurrence or hang its integrity on the action I took in an emergency circumstance to constitute a rightfully submission of work claiming credit.

---

[5] See attached Affidavit from Derek Littin and corresponding emails.
[6] Specifically, in reference with the definition of plagiarism as it appears in §1(a) footnote 1: Model of Definition and Policy for Plagiarism: "Plagiarism is the submission or presentation of any work, in any form, that is not a student's own, without acknowledgment of the source."

It would also be inconsistent to hold that I "copied material directly from other sources and fail[ed] to credit those sources on the 'take-home' essay portion of the final examination" when the final examination referred to is without application to the context to which it is applied. The "take-home" portion identified to contain "copied material" is not the Con Law II 2005 final or a "final" as it has been intermingled with in the context of the Complaint. Accurately, the Con Law II 2003 exam is a resource of old essay questions made available by the Law School for study and reference use. It is not within my discretion to authorize the acceptable terms of work for each course I take, nor do I undertake to ascribe that discretion by choosing the final examinations I would like my professors to consider in determining my grade. I did not conceive to solicit credit for , nor did my actions insinuate that I was "submitting" work of my own choice, namely the 2003 exam previously administer to be substituted and objectively evaluated against the my classmates performance on the assigned course exam. It would be an impossible task to do, as well as a breach of conduct under the Honor System.[7]

"Every type of work encountered at law school" that is required to include an appropriate citation is subject to plagiarism.[8] Plagiarism refers to unearned credit and unfair advantage. It is synonymous with cheating, and "applies to every type of work encountered at law school."[9] Personal study notes are not held to the standard of "work" and do not fall within the intent of the statute, however.[10] The customary norm of academic practice defines "work" as "essays, law review articles, case briefs, pleadings and legal memoranda for class credit, homework, and examinations. Plagiarism is possible with any formal work performed in any medium"[11] or "...document for which you will receive credit (like a paper, or review, or an open book exam) [12] or an "academic exercise"[13] In addition to concluding that the 2003 sample essay questions are not an "exam" under §1(b), the assertion of plagiarism is also not evoked in this matter before the Committee. The failure to fully credit the source of information along with the copied materials into my notes that I personal use was not a failure at all. Notes of the type that I rely on to develop my writing skills allow me to accomplish what I need to do in the limited amount of personal time I have to devote to learning activities separate from school assigned coursework. Formal citations and source credits are not necessary or are they required as the Complaint suggests they should be. It would seem evident that the objective for crediting sources is not to give notice to myself or the original author for that matter, but to represent to all others in the unknowing public that the work presented is not my own by requiring a citation to include to the original source of work or ideas. The academic definition of "work" although not exhaustive, does not include nor has it ever been applied to evoked unassigned, uncredited, unpublished personal notes. To do so would expand the normal understanding beyond precedent and arguably beyond enforceability. I urge the Committee to uphold the customary norms of academia that do not advocate for a reading of "work" in plagiarism to include personal spheres of property in one's own thoughts and personal notes.

---

[7] Examples of responsibility for prevention of violations of the Honor System. "Faculty have an obligation to prevent violations of the Honor System by making the conditions of acceptable work and the types of permissible conduct clear to students in a course." §4(a) Honor System
[8] See Footnote 4.
[9] Id.
[10] "A crucial phrase in this definition is "as one's own." In all learning at University it is completely acceptable to use another person's thoughts, writings or inventions to aid our own learning and understanding. Indeed, this is a primary method of learning. We all read textbooks, research papers, manuals and many other documents, and make use of the material contained in them. This is perfectly normal and acceptable. The use of another person's work does not constitute plagiarism unless we present that work as our own. When writing essays, project reports, computer programs, or when giving any form of presentation, it is important that whenever we include the work of others, it is clearly acknowledged as such." Univ. of Birmingham (website address temporarily unavailable); "Personal notes and synthesis of library sources are one's own…" Wellesley College
http://www.wellesley.edu/Activities/homepage/genjudic/plagiarism.html; See also Fairfield, Connecticut Public School System, "Warning: Proceed With Caution! How Do I Avoid Plagiarism?" http://www.fairfield.k12.ct.us/fairfieldhs/cfairfieldhs03/avoidplagiarism.htm ("Personal notes and synthesis of outside sources are one's own.")
[11] Robert D. Bills, "Plagiarism in Law School: Close Resemblance of the Worst Kind?" 31 Santa Clara L. Rev. 103 (1990).
[12] Dr. R.W. Butcher, former Dean of the GSBS, Univ. of Texas, Graduate School of Biomedical Science website.
[13] "PLAGIARISM: intentionally or knowingly representing the words or ideas of another as one's own in any academic exercise" Univ. of Maryland, Code of Conduct, http://www.studenthonorcouncil.umd.edu/code.html

Responsible students use all sources of information that are available to them in their pursuit of knowledge. It would be undesirable and an unproductive waste of time to find and precisely document every bit of information collected, whether used for research of an assignment or personal fulfillment. The progress of academia could not move forward without the vitality of emerging new information into the marketplace. As well, the looming threat of being labeled a plagiarist and the stigma so attached would certainly prevent great mind and ideas from every hitting a page of paper. On another thought, how could UDCSL prevent and how would the Committee handle all of the Honor System violations as a result of the community's obligation to report incidences of known plagiarism when simply sitting in a class next to your colleague taking lecture notes would subject most if not all participants in the free follow of discussion to disciplinary action? Unless, of course the professor cites ever bit of information taught and no one misses or incorrectly writes down whom exactly deserves what credit. Of course, this is only what I predict could be the result of reading and accepting plagiarism to apply to personal work viewed, received, dropped or submitted on university grounds, as the overall issues of the Complaint before the Committee suggests.

Plagiarism and cheating are offensive to the legitimate work done by scholars everywhere. Plagiarism warrants sanctioning because it is dishonest and plagiarists reaps what they have not sown. But that is not at all the issue or an honest and fair reading of the facts. I ask that the Committee dismiss the allegations against me of plagiarism and cheating and to expeditiously absolve my record of any wrong doing in light of the facts illustrated. Further, that my correct final examination be reviewed to determine my grade in Con Law II for the spring 2005 semester and any determination assessed from the 2003 sample be promptly disposed of.

I would like to thank the ASC members for their time and attention. I look forward to concluding our discussion on Tuesday, November 16th at 12:00 pm. Shouldyou require any addition information, please contact at your soonest opportunity so that I can be timely assistance to you and the Committee in this regard. 202.549.3597.

Sincerely,

Nicole Di Lella

# David A. Clarke School of Law
**University of the District of Columbia**



**Edward Allen**
**Professor of Law**
**4200 Connecticut Ave. N.W.**
**Bldg 38 Room 226**
**Washington, D.C. 20008**

| | |
|---|---|
| **Phone:** | **202 274-7326** |
| **Facsimile:** | **202-274-5583** |
| **E-mail:** | **eallen@udc.edu** |

**February 27, 2006**

Nicole Di Lella
2950 Van Ness St. N.W., #528
Washington D.C. 20008

Dear Ms. Di Lella:

I am sending you this letter to inform you of the decision of the academic standards committee regarding Professor Waysdorf's allegations that you plagiarized and cheated on an examination in violation of the Honor Code as outlined in her memorandum to Dean Richardson dated October 14, 2005. In making its decision, the committee considered your written submissions to us as well as your statements and demeanor at the January 24, 2006 hearing.

The Academic Standards Committee finds as follows:

You were required to submit an answer to a take home final exam in Constitutional Law II by a deadline of September 16, 2005. No further extension was granted, but no answer was forthcoming on that date.

On September 19, 2005, you submitted a document, identified by your exam number as your work, and proffered as your answer to Professor Waysdorf's Constitutional Law II take home exam for the Spring, 2005, semester.

That document, on its face, ""'claims as your own work product ideas or words [you had] taken, in whole or in part, from someone else.'"" Handbook, Vol II, sec.1(a).

The answer you submitted for ""'Question 1'"" was taken in its entirety, except for change of names of the parties and other minimal changes, from a University of Alberta Faculty of Law web site. The answer you submitted for ""'Question 4'"" was copied directly and extensively from the Petition for Writ of Certiorari prepared by the Lamda Legal Defense and Education Fund, filed in Lawrence v.Texas.

You failed entirely to credit or acknowledge these sources.

Your response to these charges is that in your attempt to submit your already completed answer to the Spring 2005 exam, you mistakenly submitted an answer to the Spring 2003 exam, which

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

while facially plagiarized, you had prepared solely as a ""study aid"" for your own use. As such, you argue, it was therefore not a document subject to the honor code..

You further assert that you had no idea you had submitted the wrong document until approximately one month later when you were informed you were being charged with plagiarism. After being so informed, you then submitted, for the first time, an answer responsive to the 2005 exam, a month beyond the September 16 deadline.

You argue that it must have been a mistake, since intentionally submitting a 2003 exam answer as an answer to the completely different 2005 exam would be of no use.

In short, your defense is that you mistakenly submitted a study aid rather than an answer you hoped would suffice to win you a passing grade, or would at least create enough confusion to result in even more time to submit an already overdue correct answer to the 2005 exam.

Further, you request that your ""correct final examination,"" submitted well after the September 16 deadline, now be ""reviewed to determine my grade in Con Law II for the spring 2005 semester."" The effect of our granting your request would of course be that because of your ""mistake,"" you will have achieved what you were originally denied, an extension beyond the September 16 deadline, an extra month in which to have submitted a proper answer.

Nowhere in your responses, either written or oral, have you given any explanation why, as a study aid, you would type out a constitutional law question you found on the web, word for word, except for changing the names of the parties in the question, e.g.:

""Joe Smith is a teacher and soccer coach at Dickson High"" (Alberta law school)

""Lucy Lu is a teacher and cheerleading coach at Montclair High""(you)

""Tom Tuttle is a player on Joe''s team""

""Ellen Degenereous is a player on Lucy''s squad""

""Joe has explained to Tom that the purpose of the team prayer......""

Ellen Degenereous explained to Ellen that the purpose of the team prayer......""

To the implausible degree that typing out a question might serve as study material, it was already available to view, print, or download from the Alberta Law School site. So there would not appear to be any reason for typing out a copy. And there would appear to be no pedagogical purpose whatsoever to changing the names of the parties.

We do not find credible your explanation that the plagiarized document was a mere study aid mistakenly submitted. We find that you are responsible for your action in submitting a plagiarized document to a professor to meet the deadline imposed on you for submitting an answer to her exam. As such, we find that you violated the honor code as charged.

Pursuant to its responsibilities and powers under the Honor System, the Committee has determined to impose the sanction of suspension for one year beginning in August, 2006.

In addition, the committee forwards this determination to the Academic Dean and the Registrar with instructions as follows:

1. This letter shall serve as a report of the Committee on this matter and shall be place in your permanent file.

2. The Registrar's office is direction to inform Bar Examiners—of any jurisdiction where you seek admission—of this determination and to state, in response to Character and Fitness inquiries or forms required by bar examiners, that "the student's records reflects a violation of the Honor code resulting from the student's plagiarism and cheating on an examination. The Dean's office shall similarly respond to any such inquiries addressed to them.

3. The Registrar's office is further directed to include in any formal letter of good standing submitted to another institution the same statement provided above. The Dean's office shall similarly respond to any such inquires directed to them

These sanctions, while tailored to the particular circumstances of this case, are consistent with the Committee's prior disciplinary decisions regarding students who have plagiarized, as well as the practices of many other law schools.

If you disagree with this decision, you should consult the procedures for appealing this decision in Volume II of the student handbook.

You should consult Dean Richardson regarding any question you may have concerning any related matters.

Yours Truly,

Edward Allen
Chair, academic standards committee

cc: Ann Richardson, Academic Dean
    Barbara Green,  Registrar





**Law Library**

Home > Law Library > Law School Exams

Law Library Mer

- Current Students
- Clinics & Programs
- Law Library Services
- Prospective Students
- Career & Alumni Services
- Faculty & Administration
- News & Events
- The Advocate
- Search

# Law School Exams

The UDC-DCSL Library strives to provide access to as much past study materials as possible. To do this the Law Library has digitized old final exams, old practice exams and old midterm exams, as well as other useful items. The majority of the collection is available on the Law Library Intranet.

The following materials represent a portion of the total exam archive. They are presented here for your convenience and are also available on the Law Library Intranet.

Con Law II | Evidence | Remedies | Torts

## Constitutional Law II

- Professor Thomas Mack, Constitutional Law II, Final, Spring 1999
- Professor Thomas Mack, Constitutional Law II, Final, Spring 2000
- Professor Thomas Mack, Constitutional Law II, Final, Spring 2001

## Evidence

- Professor Thomas Mack, Evidence, Midterm, Fall 1989
- Professor Thomas Mack, Evidence, Final, Fall 1989
- Professor Thomas Mack, Evidence, Midterm, Fall 1990
- Professor Thomas Mack, Evidence, Final, Fall 1990
- Professor Thomas Mack, Evidence, Midterm, Fall 1991
- Professor Thomas Mack, Evidence, Final, Fall 1991
- Professor Thomas Mack, Evidence, Midterm, Fall 1992
- Professor Thomas Mack, Evidence, Final, Fall 1992
- Professor Thomas Mack, Evidence, Midterm, Spring 1995
- Professor Thomas Mack, Evidence, Final, Spring 1995
- Professor Thomas Mack, Evidence, Final, Fall 1998
- Professor Thomas Mack, Evidence, Midterm, Spring 1999
- Professor Thomas Mack, Evidence, Final, Fall 1999
- Professor Thomas Mack, Evidence, Midterm, Fall 2000
- Professor Thomas Mack, Evidence, Final, Fall 2000
- Professor Thomas Mack, Evidence, Midterm, Fall 2001
- Professor Thomas Mack, Evidence, Final, Fall 2001
- Professor Thomas Mack, Evidence, Midterm, Fall 2002*
- Professor Thomas Mack, Evidence, Final, Fall 2002*
- Professor Thomas Mack, Evidence, Midterm, Fall 2003*
- Professor Thomas Mack, Evidence, Final, Fall 2004*

\* Posted 12/05/05

## Remedies



FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON,
U.S. DISTRICT COURT, CLERK

- Professor Thomas Mack, Remedies, Outline
- Professor Thomas Mack, Remedies, Restitution Outline

- Professor Thomas Mack, Remedies, Final, Spring 1999
- Professor Thomas Mack, Remedies, Final, Spring 2000
- Professor Thomas Mack, Remedies, Final, Spring 2001

## Torts

(I)=Intentional; (N)=Negligence; (B)=Both

- Professor Thomas Mack, Torts, Review - Negligence
- Professor Thomas Mack, Torts, Review - Intentional
- Professor Thomas Mack, Torts, Practice Questions A (I)
- Professor Thomas Mack, Torts, Practice Questions B (I)
- Professor Thomas Mack, Torts, Practice Questions C (I)
- Professor Thomas Mack, Torts, Practice Questions D (N)
- Professor Thomas Mack, Torts, Practice Question E (N)
  - Professor Thomas Mack, Torts, Answer Key, Practice Question E (N)

- Professor Thomas Mack, Torts, Midterm, 1985-86 (I)
- Professor Thomas Mack, Torts, Final, Fall 1989 (N)
  - Professor Thomas Mack, Torts, Final Answer Key, Fall 1989 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1990 (I)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1990 (I)
- Professor Thomas Mack, Torts, Final, Fall 1990 (N)
  - Professor Thomas Mack, Torts, Final Answer Key, Fall 1990 (missing a page) (N)
- Professor Thomas Mack, Torts, Final, Fall 1991 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1992 (I)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1992 (I)
- Professor Thomas Mack, Torts, Final, Fall 1992 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1993 (I)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1993 (I)
- Professor Thomas Mack, Torts, Final, Fall 1993 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1994 (I)
- Professor Thomas Mack, Torts, Final, Fall 1994 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1995 (I)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1995 (I)
  - See also Professor Thomas Mack, Torts, Midterm Answer Key, 1989 (I)
- Professor Thomas Mack, Torts, Final, Fall 1995 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1996 (I)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1996 (I)
- Professor Thomas Mack, Torts, Final, Fall 1996 (N)
- Professor Thomas Mack, Torts, Final, Fall 1997 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1998 (I)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1998 (I)
- Professor Thomas Mack, Torts, Final, Fall 1998 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 1999 (B)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 1999 (B)
- Professor Thomas Mack, Torts, Final, Fall 1999 (B)
- Professor Thomas Mack, Torts, Midterm, Fall 2000 (N)
- Professor Thomas Mack, Torts, Final, Fall 2000 (B)

- Professor Thomas Mack, Torts, Midterm, Fall 2001 (B)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 2001 (B)
- Professor Thomas Mack, Torts, Final, Fall 2001 (B)
- Professor Thomas Mack, Torts, Final, Fall 2002 (B)
- Professor Thomas Mack, Torts, Midterm, Fall 2003 (N)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 2003 (N)
- Professor Thomas Mack, Torts, Final, Fall 2003 (N)
  - Professor Thomas Mack, Torts, Final Answer Key, Fall 2003 (N)
- Professor Thomas Mack, Torts, Midterm, Fall 2004 (N)
  - Professor Thomas Mack, Torts, Midterm Answer Key, Fall 2004 (N)
- Professor Thomas Mack, Torts, Final, Fall 2004 (N)
  - Professor Thomas Mack, Torts, Final Answer Key, Fall 2004 (N)





Home - Current Students - Clinics & Programs - Law Library - Prospective Students - Career & Alumni Services
Faculty & Administration - News & Events - The Advocate - Search - Site Map - Contact

# *UDC-DCSL Mason Law Library*

## *Remote Access*

Please login here for:

**Exams Depository | BNA | HeinOnline| Lexis Congressional | Oxford English Dictionary| Project Muse**

USERNAME:

PASSWORD:

Login

***Note to Students: Your username is "**firstname.lastname**" (as one word). Your password is the **last four of your SSN** . Faculty and staff can contact Randi Robinson, rrobinson@udc.edu to request passwords..

<u>Harvard Law School</u>

# Academic Support Services

Harvard Law School strives to ensure the success of each student. If you are having difficulties with your academic studies, please contact Elizabeth Bangs, Director, First-Year Legal Research and Writing and Academic Support Services, by e-mail (ebangs@law.harvard.edu) or phone (617-496-3673), to set up an appointment.

## On-campus resources

Academic counseling sessions for 1Ls will be available beginning in mid-October. We will offer both drop-in hours and individual appointments.

Exam Book Archives

Institute for English Language Programs (Harvard Extension School) for ESL students

University Health Services Programs

Harvard Bureau of Study Counsel

## On-line resources

"How to Approach and Take a Law School Examination"
**Professor Elizabeth Garrett**
**University of Southern California**

Writing Law Examinations
**John H. Langbein, Sterling Professor of Law**
**Yale Law School**

How to Write Good Legal Stuff
**Professor Eugene Volokh, UCLA**
**Professor Alexander Tanford, University of Indiana-Bloomington**

"How to Read a Judicial Opinion"
**Professor Orin Kerr**
**George Washington University Law School**

CALI lessons on legal writing and law school exams

To get a CALI password, click here

**Stress Management**

Law School and Stress
**Professor Barbara Glesner Fines**
**University of Missouri-Kansas City School of Law**

"Stress Management"
**Martha M. Peters, Ph.D.**



http://www.law.harvard.edu/academics/support/

University of Iowa

Stress Management (Suffolk University)

**Time Management**

Time Management (Villanova University)

**Note-taking and study skills**

Taking Notes
**Stanford University**

It All Starts with Listening
**University of Pennsylvania**

The Cornell Note-Taking System

Page last updated: Mon, Oct 16, 2006, 13:39:19 EDT. HLS Contact Information

# HOW TO APPROACH AND TAKE A LAW SCHOOL EXAMINATION

by Elizabeth Garrett

I.    SETTING THE FOUNDATION: PREPARATION FOR TAKING A LAW SCHOOL EXAMINATION

The perspective of law students toward study should change in the few weeks before they take an exam. During most of the semester, students should attempt to understand all the concepts, the "trees" in the "forest." During this time, law students should review the readings and lectures on a weekly basis. This weekly review can take many forms: outlining the course every week; reviewing and highlighting notes every week; integrating readings with lectures at the end of the week; or participating with other law students in thoughtful discussions about the preceding week's material. Students probably will devise methods that suit their study habits most appropriately without substantial outside help.

In the few weeks before a final, law students, who should already have a grasp of all key concepts through previous study, must attempt to synthesize those concepts into a greater understanding of the "forest." During this time, students should identify overarching concepts around which the course has revolved. This process can be done by examining a comprehensive syllabus (if such a syllabus has been handed out), using the table of contents in the casebook, or identifying main topics through a perusal of lecture notes.

Students can expect a law school final to revolve primarily around the topics that the professor played out in class. Once these topics have been identified, students should analyze possible approaches to questions dealing with the topics. For example, in the Civil Procedure II course, the key concepts tend to be jurisdiction, joinder, the Erie doctrine and preclusion. Students can assume that questions on the final will deal with one or more of these topics. So, in preparation for the final, students should develop a framework through which they will answer questions. In the above example, students might sketch out how they will deal with a question concerning personal jurisdiction. For example, they will set out the minimum contacts test. They may think about the difference between general and specific jurisdiction. They will fit the key cases into the analytic framework for such a question. They will address the continuing relevance of presence as a foundation for jurisdiction. Old exam memos should be consulted because they often contain suggestions for approaching particular kinds of questions.

The type of studying students do immediately before the final, then, is focused specifically on taking the test. By the time students receive the final, they will have identified the key concepts. If the test is "open note," they may even bring to the test a written framework for analysis. In the test itself, students need only decide which part of the framework is relevant to a particular question and adapt it to the specific facts given in the final.

1

II.    IDENTIFYING THE TYPES OF QUESTIONS IN A LAW SCHOOL FINAL

Law School finals seem to consist of three kinds of questions, all of which necessitate slightly different approaches and organizational structures. Some questions may be combinations of two or more of the basic types. Past examinations and model examinations are tools to help students learn to identify the three types of law school questions. Students must become familiar with the type of test that their professor is apt to give; they can gain such knowledge either through discussions with other students who have been in the professor's courses, or through examining tests and exam memos filed in the library. Then students can anticipate what types of question a professor is likely to ask on a particular examination.

The first type of question is commonly referred to as an "issue-spotting" question. The question is a long, very involved fact pattern that may be spun out over several pages. The key to answering such a question is to discern key information, identify relevant issues, and discuss those issues in a concise and organized fashion.

The second type of question is referred to as a "thematic" question. Although thematic questions involve fact patterns, the fact patterns are typically one or two paragraphs and contain only relevant facts. The facts implicate one or two important issues that have been discussed in the lectures or in the reading materials. Students should be able to identify the issue readily. The key to this type of question is identifying the possible approaches to the issue and presenting those approaches in an organized and concise fashion.

Finally, an exam can involve a type of question that I call a "brainstorming" question. Students faced with such a question are asked to react to a fact pattern or idea that they probably have not encountered directly in the lectures or in the reading material. Moreover, students probably have been unable to plan for such a question in their pre-final study and formulation of frameworks for analysis. Here students must relate by analogy the novel situation to the themes or policies discussed in the course and present their thoughts in a concise and organized fashion.

One tip with respect to all closed-book exams. Some students find it helpful to develop a mnemonic list which they commit to memory and write down on a scratch piece of paper immediately when the exam begins, before they read the instructions and look at the questions on the exam. A mnemonic device is a memory trick which creates an associative pattern or suggestive link so that students can remember and recall material. A mnemonic list serves as a useful checklist for issues and principles raised by the exam and may insure that students don't "blank out" or "freeze-up."

A.    Issue-Spotting Questions

Students faced with a large issue-spotting question should first go to the end of the question where the professor sets out what the students are to do in the answer. The end of the question usually tells students what their role is (e.g. advocate or law

2

clerk) and what issues to discuss. Moreover, this part of the question will often indicate what students may assume or disregard in answering the question. Once students understand the question and the perspective, their reading of the fact pattern should influenced by that perspective.

Next, students should read through the entire fact pattern fairly carefully, jotting down in the margin or on scratch paper any concepts, legal principles, or relevant cases that are suggested by the facts. This reading should be a careful one; however, students should be concerned primarily with getting an idea of the fact pattern.

Finally, students should read through the question one more time. On this reading, they should disregard (and perhaps even mark through) any parts of the facts that are digressions or that are irrelevant to the actual question. At the same time, they should underline or highlight those facts that are relevant to legal principles implicated by the question.

After this three-step careful reading, students are ready to outline. Outlining the answer to an involved fact pattern usually requires a careful tracing or flow-charting of the steps necessary to reach the conclusion called for by the question. For example, an intricate fact pattern in a property exam would ask students to discover who owns a piece of real or personal property at the conclusion of a convoluted set of occurrences. In the outline, students should simply trace out the steps necessary to assess the ramifications of each twist and turn of the facts. An alternative approach is suggested by Wentworth Miller in The Bar Exam/Essay Writing Primer (3d ed. 1986). He indicates that one organizational approach to this type of question is to isolate "conflict-pairing" in the facts. For example, X has rights in the property as opposed to Y; Y has rights in the property as opposed to X; X has rights to the property as opposed to Z; and so forth.

Whether one approaches the question by using the conflict-pairing approach or by tracing the temporal and logical relationships in each set of facts, the key is to reduce the question into manageable components. The intimidating part of these questions is their very length and complexity. If students take the problem each step at a time, resolve each step before moving to the next, and explain the resolution in a manner that the professor can follow, they will have reduced the complex fact pattern to more manageable parts.

Clearly, this process of reducing a complicated fact pattern into a series of manageable components will take a significant amount of time. Most law students are very nervous about spending much time organizing and analyzing; they tend to want to begin to write as quickly as possible. This reaction can be disastrous in an issue-spotting question. Instead, students should feel comfortable spending approximately one-fourth of the time allocated for a question in organizing their thoughts.

B.    Thematic Questions

The second type of question is the thematic question. Generally, these are only a couple of paragraphs long so there is no need to read the end of the question first. Instead, students should first read the entire question and attempt to identify the one,

3

two, or at most three issues in the question. For example, in a contracts examination, a thematic question may deal only with the damages aspect of a fact pattern. (In a parallel issue-spotting question, the fact pattern may deal with acceptance, consideration, the Statute of Frauds, and damages.)

After the issues have been identified, students should read the question again very carefully. On this reading, each fact given should be noted and analyzed. What does the fact mean with regard to the issues? How does each fact make this particular fact pattern slightly different from patterns discussed in the readings or the lectures? Because thematic questions are so short, virtually every fact included is important to the resolution of the question.

After students have identified the issues and determined how each fact interacts with those issues, they should work out their outlines. Again, students should not feel self-conscious about spending time organizing before they begin writing the exam. In the thematic exam, students should spend approximately one-fourth of the allocated time on outlining. Because the question is less complex and confusing, however, organizing a concise and clear answer may take less time than in the issue-spotting exam.

C.    *Brainstorming Questions*

The final type of question, the brainstorming question, calls for exactly what the name implies. Because students will not have foreseen the content of this question, they should spend a significant amount of time discovering how the question interrelates with the policies and themes developed in the course. On the first reading of the question, students are concerned primarily with understanding the new idea. If the question reminds students of themes of policies discussed in the course, they should jot those themes down in the margin.

On the second, closer reading, students should focus on the component parts of the new concept. Students should study each part to understand how it combines with the other parts to lead to the new conclusion or thesis and to determine how the question relates to the course as a whole. Does it remind them of any cases discussed in the course? Does it implicate theories, concerns, or policies in any other courses that could serve as bridges between the new idea and the ideas previously discussed in this particular course?

Again, students should spend approximately one-fourth of the allocated time in outlining the answer to the question. The answer to such a question might resemble a typical answer in an undergraduate course in humanities. In other words, students should identify three or four themes that they will discuss in the answer and then organize their reactions and thoughts under those themes.

III.    OUTLINING AND WRITING THE ANSWER

Outlining a law school answer is probably the most important step in taking a law school exam. To prepare for a final, law students should outline answers to questions

4

given previously by their professors and contained in the tests on file. Many law students have not outlined answers before and will tend to construct intricate or lengthy outlines. However, students should be aware that the outline is for their own use so it can be scrawled, very brief, and understandable only to them. The important thing about an outline is that it indicate to students the organization of the answer and relevant ideas and cases.

In a thematic or brainstorming question, students should jot down the issues or themes they will discuss, relevant facts or portions of the question that they will consider under each of those themes, case names if they are relevant and stand for concepts that are crucial to answering the question, and legal principles that are relevant to the question. In an issue-spotting outline, students should trace through the individual components of the question and decide how they will resolve each one in logical succession. Students should remember that time spent on outlining is not wasted time.

After an answer is outlined, students are ready to begin writing the answer. First, students should construct an introductory paragraph that will indicate to the professor what major concepts will be discussed in the answer and in what order. This type of introduction is simply a <u>roadmap</u> and should be easy to write, because the entire answer has already been outlined. The roadmap can be simple; the prose, concise. It need only set out the issues and organization that will be developed in the following paragraphs.

Next, students will write the body of the answer. A helpful trick that eliminates the need for transitions and makes the organization of the question readily apparent is the use of <u>headings</u>. For example, in a criminal procedure test where students are asked to rule on the admissibility of three different types of evidence, students can first give an introductory paragraph detailing in what order the evidence will be discussed and next can use headings (perhaps delineated with roman numerals or written in all caps or underlined) that identify the pieces of evidence as they are discussed. Or, in an administrative law examination, students might first deal with justiciability issues before merits issues. To that extent, a heading may indicate the beginning of the justiciability portion, and then subheadings may indicate the discussions of the issues relating to justiciability (e.g., (A) Ripeness; (B) Standing; and so on).

As students begin to discuss each issue, they should first sketch out the legal principles that will shape the answer to the question. This portion of the answer is largely an abstract discussion that will reveal their understanding of the legal analysis in the area. Although the concepts are the key concern, citations to cases that illustrate a particular concept may ensure that the professor knows the students are familiar with the concept, understand the concept, and remember which case exemplifies that concept. Moreover, citation of cases can be a quick way to identify a legal principle for the professor.

In addition to citing cases that illustrate relevant concepts, students should use the phraseology used by the professor to refer to concepts. This serves two purposes. First, it makes the paper more accessible to the professor because it uses his or her language; and second, it allows students to demonstrate their knowledge of the material

presented in the professor's lectures.

Moreover, students should be sensitive to the predilections of a professor when they present the legal concepts and should tailor the answer to deal with those peculiarities. This is not to say that students must always agree with the professor. Students should feel free to disagree with the professor, so long as their presentation is well reasoned and supported by thoughtful analysis.

After sketching out the legal framework in an abstract way, students should bring the answer to a practical level by applying that framework to the facts. This step is crucial in a law school examination. Anyone can reiterate the applicable legal principles once an issue has been identified; the real skill is applying those legal principles to a new and different fact situation. In addition, restatement of the facts wastes times; instead, students should indicate how the fact pattern fits in with the principles and how the facts lead to certain conclusions.

A common mistake of law students is to lose objectivity early in the exam and advocate only one side of an issue. Students should understand that it is important to sketch out the arguments on both sides. If the question calls for students to discuss the ramifications of an issue, then they may need never present a conclusion. Even if the question calls for the students to make a clear decision, students must spin out the implications on both sides of an issue; in the end, this analysis is more important to their grades than is the conclusion. Students should disregard this advice if the instructions clearly reveal the professor's interest into eliciting only one side of an argument.

An additional note on perspective in an answer seems appropriate here. If students are asked to play a role (e.g., to write a memo to a judge or to be an advocate for a certain side), they should adopt that tone throughout the answer. This perspective indicates an awareness of the role in the factual situation that the professor has asked students to take. Nonetheless, even if students are to take one side or another, the question must include some analysis of all the relevant issues (unless the instructions clearly indicate otherwise).

After the body of the answer has been completed, students should concisely-- perhaps in one sentence--indicate the conclusion they have drawn from their analysis.

This process--from outlining to concluding--should take no more time than that allocated to the question by the professor. Students must always be aware of the time limitations and should not transgress these limitations.

If students find that they have run out of the time allocated to answer the question, the outline can serve an additional function. At this point in the examination, they can indicate the time problem to the professor and then very quickly write in outline form what the remainder of the answer would have been. Although this outline is certainly not as complete an answer as one written in prose, it is a solution when students have not covered the issues and the time has run out. It is a better solution than writing past the allocated time and wrecking the schedule for the entire examination. Moreover, points may be obtained only for material written on the exam.

6



Prospectives
Students
Faculty
Alumni
Academics
Life
Socrates
Blog
News
Calendar

Go
SearchUs
Staff
Library
Careers
University
Maps



**Academic assistance**

Academic counselors

University counseling assistance

Assistance for students with disabilities

Useful study resources

Career services

Degree requirements

Financial Aid

Graduation Information

Incoming JD students

Joint Degrees

Library services

Student Handbook

Student Records

*Home > Students > Academic assistance > Useful study resources*

# Useful study resources

Although the best suggestions for preparing for exams at the University of Chicago Law School come from faculty teaching the courses and students who have taken them, other materials such as those provided by links below may also be useful.

**Law School Exams**
Law School Archived exams and student answers

BLSA's shared outline website

**Further Reading**
Preparation for Law School Exams by Prof. Elizabeth Garrett

Exam Tips

**RELATED LINKS**

Law school archived exams and students answers

BLSA's shared outline website

Preparation for law school exams

Exam tips

Site Index
Contact

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON
U.S. DISTRICT COURT



D'Angelo Law
LIBRARY

Search  the Library catalog       for                          in
                                   Keyword anywhere        Go

Catalogs  •  Database Finder  •  Hours  •  My Accounts  •  Libraries  •  Help

**Exams**

## Library - Past Examinations

This is a collection of examinations and related materials from recent Law School courses. Copies of the complete historical collection of Law School examinations are available in print, in the stacks and the Reserve Reading Room, under the call number KA662.A3C5.

Exams are restricted to the University of Chicago. If you are dialing in through another Internet service provider, you may download exams using the proxy server.

**First Year Courses**

Civil Procedure
Contracts
Criminal Law
Elements
Property
Torts

**Second & Third Year Courses**

Accounting Theory
Administrative Law
Admiralty
Advanced Antitrust
Advanced Corporate Law
Advanced Corporations
Advanced Criminal Law
Advanced Labor Law
Advanced Securities
Agency and Partnership
Alternative Dispute Resolution
American Indian Law and Politics
Antitrust
Art Law -No Exams Given
Bankruptcy
Business Organizations
Business Planning
Business Tax
Class Actions
Commercial Transactions
Commercial Real Estate Transactions
Comparative Constitutional Law
Comparative Constitutionalism and Rights
Comparative Law
Complex Corporate Litigation Management
Conflict of Laws
Constitutional Ideas of the Founding Era

Constitutional Law I : Governmental Structure
Constitutional Law II : Freedom of Speech
Constitutional Law III: Equal Protection and Due Process
Constitutional Law IV : Speech and Religion
Constitutional Law V : Freedom of Religion
Contemporary Theories of Justice
Copyright
Corporate Crime
Corporate Finance
Corporate Governance
Corporate Reorganizations
Corporate Taxation
Corporation Law
Creating a European Common Market
Criminal Procedure I and II and III
Decedents' Estates
Decisionmaking
Economic Analysis of Law
Electronic Commerce
Elements of World Law
Emerging Law of Electronic Commerce
Employee Benefits
Employment and Labor Law
Employment Discrimination
Employment Law
Entertainment Law
Environmental Law
Estate and Gift Tax
European Constitutional Law
European Market
European Legal History
European Union Law
Evidence
Family Law
Federal Courts
Federal Jurisdiction
Federal Criminal Law
Federal Land Law
Federal Regulation of Securities
Federal Taxation
Federalist Papers
Feminist Jurisprudence
Feminist Legal Theory
Feminist Philosophy
Fiduciary Duties in Corporate Transactions
Financial Accounting for Lawyers
First Amendment
Foreign Affairs
Foreign Relations Law
Fundamentals of Commercial Real Estate
Game Theory
Hart and Dworkin
Health Care Law and Policy
Health Care Resources Allocation
Holmes: Jurist and Icon
Human Rights

Information Technology Law
Immigration Law and the Rights of Non-Citizens
Immigration Policy & Law
Income Tax
Insurance Law
Insurance Law and Policy
International Business Problems
International Criminal Law
International Environmental Law
International Finance
International Human Rights
International Intellectual Property
International Law
International Litigation and Arbitration
International Litigation Seminar
International Regulation of Intellectual Property Seminar
International Taxation
International Trade
Introduction to Income Tax
Introductory Income Tax
Investment Management
Jurisprudence
Labor Law
Land Use Law
Law and Economic Development
Law and Mental Health
Law and the Mental Health System
Law and Literature
Law and Practice of Zoning, Land Use & Eminent Domain
Law & the Political Process
Law of Abuse
Law of Food, Drugs, and Cosmetics
Law of Lawyering
Law of the Executive Branch
Legal and Political Philosophy of Ronald Dworkin

Legal Issues in the War on Terrorism
Legal Profession
Legislation
Legislative Process
Local Government Law
Marriage
Mass Media Law
National Security Law
Natural Law
Natural Resources Law
Network Industries
Networked Resources
Nonprofit Entities
Nonprofit Organizations
Oil and Gas Law
Parent, Child and the State
Partnership Taxation
Patent Law
Patents
Price Theory - No Exams Given

Privacy
Public Choice
Public International Law
Public Land and Resource Law
Readings in Federal Courts
Regulation of Sexuality
Religion and the First Amendment
Remedies
Securities Regulation
Secured Transactions
Selected Topics in Commercial Law
Sex Discrimination
Sex Equality
Sports Law - No Exams Given
State and Local Government Law
Structuring Venture Capital Transactions
Studies in Corporate Control
Taxation of Business Enterprises
Tax Policy Seminar
Taxation of Corporations
Taxation of Derivatives
Taxation of Financial Instruments
Taxation of Individual Income
Taxation of Partnerships
Technology, Innovation and Society
Telecommunications Law
Trademarks
Trusts and Estates
The United States and the World Economy
Venture Capital Transactions
Western Legal Tradition
White Collar Criminal Practice
World Law I

Suggestions · University Home Page · University Library Home Page · Questions and comments about this
page?

The D'Angelo Law Library
1121 East 60th Street Chicago Illinois 60637
Phone Numbers

Page last generated on: 17 November 2006 at 10:11 AM CST

© The University of Chicago Library




Prospectives
Students
Faculty
Alumni
Academics
Life
Socrates
Blog
News
Calendar

Go

SearchUs
Staff
Library
Careers
University
Maps

**Academic assistance**

**Academic counselors**

**University counseling assistance**

**Assistance for students with disabilities**

**Useful study resources**

---

Career services

Degree requirements

Financial Aid

Graduation Information

Incoming JD students

Joint Degrees

Library services

Student Handbook

Student Records

*Home > Students > Academic assistance > Useful study resources >
Preparation for law school exams*

# Preparation for law school exams

**How to Approach and take a Law School Examination** by Elizabeth Garrett
**I. Setting the foundation: preparation for taking a Law School examination**

The perspective of law students toward study should change in the few weeks before they take an exam. During most of the semester, students should attempt to understand all the concepts, the "trees" in the "forest." During this time, law students should review the readings and lectures on a weekly basis. This weekly review can take many forms: outlining the course every week; reviewing and highlighting notes every week; integrating readings with lectures at the end of the week; or participating with other law students in thoughtful discussions about the preceding week's material.

Students probably will devise methods that suit their study habits most appropriately without substantial outside help. In the few weeks before a final, law students, who should already have a grasp of all key concepts through previous study, must attempt to synthesize those concepts into a greater understanding of the "forest." During this time, students should identify overarching concepts around which the course has revolved. This process can be done by examining a comprehensive syllabus (if such a syllabus has been handed out), using the table of contents in the casebook, or identifying main topics through a perusal of lecture notes.

Students can expect a law school final to revolve primarily around the topics that the professor played out in class. Once these topics have been identified, students should analyze possible approaches to questions dealing with the topics. For example, in the Civil Procedure II course, the key concepts tend to be jurisdiction, joinder, the Erie doctrine and preclusion. Students can assume that questions on the final will deal with one or more of these topics. So, in preparation for the final, students should develop a framework through which they will answer questions. In the above example, students might sketch out how they will deal with a question concerning personal jurisdiction. For example, they will set out the minimum contacts test. They may think about the difference between general and specific jurisdiction. They will fit the key cases into the analytic framework for such a question. They will address the continuing relevance of presence as a foundation for jurisdiction. Old exam memos should be consulted because they often contain suggestions for approaching particular kinds of questions.

The type of studying students do immediately before the final, then, is focused specifically on taking the test. By the time students

receive the final, they will have identified the key concepts. If the test is "open note," they may even bring to the test a written framework for analysis. In the test itself, students need only decide which part of the framework is relevant to a particular question and adapt it to the specific facts given in the final.

**II. Identifying the types of questions in Law School finals.**

Law School finals seem to consist of three kinds of questions, all of which necessitate slightly different approaches and organizational structures. Some questions may be combinations of two or more of the basic types. Past examinations and model examinations are tools to help students learn to identify the three types of law school questions. Students must become familiar with the type of test that their professor is apt to give; they can gain such knowledge either through discussions with other students who have been in the professor's courses, or through examining tests and exam memos filed in the library. Then students can anticipate what types of question a professor is likely to ask on a particular examination.

The first type of question is commonly referred to as an "issue-spotting" question. The question is a long, very involved fact pattern that may be spun out over several pages. The key to answering such a question is to discern key information, identify relevant issues, and discuss those issues in a concise and organized fashion.

The second type of question is referred to as a "thematic" question. Although thematic questions involve fact patterns, the fact patterns are typically one or two paragraphs and contain only relevant facts. The facts implicate one or two important issues that have been discussed in the lectures or in the reading materials. Students should be able to identify the issue readily. The key to this type of question is identifying the possible approaches to the issue and presenting those approaches in an organized and concise fashion.

Finally, an exam can involve a type of question that I call a "brainstorming" question. Students faced with such a question are asked to react to a fact pattern or idea that they probably have not encountered directly in the lectures or in the reading material. Moreover, students probably have been unable to plan for such a question in their pre-final study and formulation of frameworks for analysis. Here students must relate by analogy the novel situation to the themes or policies discussed in the course and present their thoughts in a concise and organized fashion.

One tip with respect to all closed-book exams. Some students find it helpful to develop a mnemonic list which they commit to memory and write down on a scratch piece of paper immediately when the exam begins, before they read the instructions and look at the questions on the exam. A mnemonic device is a memory trick which creates an associative pattern or suggestive link so that students can remember and recall material. A mnemonic list serves as a useful checklist for issues and principles raised by the exam and may insure that students don't "blank out" or "freeze-up."

*A. Issue-Spotting Questions*

Students faced with a large issue-spotting question should first go to the end of the question where the professor sets out what the students are to do in the answer. The end of the question usually tells students what their role is (e.g. advocate or law clerk) and what issues to discuss. Moreover, this part of the question will often indicate what students may assume or disregard in answering the question. Once students understand the question and the perspective, their reading of the fact pattern should influenced by that perspective. Next, students should read through the entire fact

pattern fairly carefully, jotting down in the margin or on scratch paper any concepts, legal principles, or relevant cases that are suggested by the facts. This reading should be a careful one; however, students should be concerned primarily with getting an idea of the fact pattern. Finally, students should read through the question one more time. On this reading, they should disregard (and perhaps even mark through) any parts of the facts that are digressions or that are irrelevant to the actual question. At the same time, they should underline or highlight those facts that are relevant to legal principles implicated by the question. After this three-step careful reading, students are ready to outline.

Outlining the answer to an involved fact pattern usually requires a careful tracing or flow-charting of the steps necessary to reach the conclusion called for by the question. For example, an intricate fact pattern in a property exam would ask students to discover who owns a piece of real or personal property at the conclusion of a convoluted set of occurrences. In the outline, students should simply trace out the steps necessary to assess the ramifications of each twist and turn of the facts.

An alternative approach is suggested by Wentworth Miller in The Bar Exam/Essay Writing Primer (3d ed. 1986). He indicates that one organizational approach to this type of question is to isolate "conflict-pairing" in the facts. For example, X has rights in the property as opposed to Y; Y has rights in the property as opposed to X; X has rights to the property as opposed to Z; and so forth. Whether one approaches the question by using the conflict-pairing approach or by tracing the temporal and logical relationships in each set of facts, the key is to reduce the question into manageable components.

The intimidating part of these questions is their very length and complexity. If students take the problem each step at a time, resolve each step before moving to the next, and explain the resolution in a manner that the professor can follow, they will have reduced the complex fact pattern to more manageable parts. Clearly, this process of reducing a complicated fact pattern into a series of manageable components will take a significant amount of time. Most law students are very nervous about spending much time organizing and analyzing; they tend to want to begin to write as quickly as possible. This reaction can be disastrous in an issue-spotting question. Instead, students should feel comfortable spending approximately one-fourth of the time allocated for a question in organizing their thoughts.

*B. Thematic Questions*

The second type of question is the thematic question. Generally, these are only a couple of paragraphs long so there is no need to read the end of the question first. Instead, students should first read the entire question and attempt to identify the one, two, or at most three issues in the question. For example, in a contracts examination, a thematic question may deal only with the damages aspect of a fact pattern. (In a parallel issue-spotting question, the fact pattern may deal with acceptance, consideration, the Statute of Frauds, and damages.) After the issues have been identified, students should read the question again very carefully. On this reading, each fact given should be noted and analyzed. What does the fact mean with regard to the issues? How does each fact make this particular fact pattern slightly different from patterns discussed in the readings or the lectures? Because thematic questions are so short, virtually every fact included is important to the resolution of the question.

After students have identified the issues and determined how each

fact interacts with those issues, they should work out their outlines. Again, students should not feel self-conscious about spending time organizing before they begin writing the exam. In the thematic exam, students should spend approximately one-fourth of the allocated time on outlining. Because the question is less complex and confusing, however, organizing a concise and clear answer may take less time than in the issue-spotting exam.

*C. Brainstorming Questions*

The final type of question, the brainstorming question, calls for exactly what the name implies. Because students will not have foreseen the content of this question, they should spend a significant amount of time discovering how the question interrelates with the policies and themes developed in the course.

On the first reading of the question, students are concerned primarily with understanding the new idea. If the question reminds students of themes of policies discussed in the course, they should jot those themes down in the margin.

On the second, closer reading, students should focus on the component parts of the new concept. Students should study each part to understand how it combines with the other parts to lead to the new conclusion or thesis and to determine how the question relates to the course as a whole. Does it remind them of any cases discussed in the course? Does it implicate theories, concerns, or policies in any other courses that could serve as bridges between the new idea and the ideas previously discussed in this particular course?

Again, students should spend approximately one-fourth of the allocated time in outlining the answer to the question. The answer to such a question might resemble a typical answer in an undergraduate course in humanities. In other words, students should identify three or four themes that they will discuss in the answer and then organize their reactions and thoughts under those themes.

### III. Outlining and writing the answer

Outlining a law school answer is probably the most important step in taking a law school exam. To prepare for a final, law students should outline answers to questions given previously by their professors and contained in the tests on file. Many law students have not outlined answers before and will tend to construct intricate or lengthy outlines. However, students should be aware that the outline is for their own use so it can be scrawled, very brief, and understandable only to them.

The important thing about an outline is that it indicate to students the organization of the answer and relevant ideas and cases. In a thematic or brainstorming question, students should jot down the issues or themes they will discuss, relevant facts or portions of the question that they will consider under each of those themes, case names if they are relevant and stand for concepts that are crucial to answering the question, and legal principles that are relevant to the question. In an issue-spotting outline, students should trace through the individual components of the question and decide how they will resolve each one in logical succession. Students should remember that time spent on outlining is not wasted time.

After an answer is outlined, students are ready to begin writing the answer. First, students should construct an introductory paragraph that will indicate to the professor what major concepts will be discussed in the answer and in what order. This type of introduction

is simply a roadmap and should be easy to write, because the entire answer has already been outlined. The roadmap can be simple; the prose, concise. It need only set out the issues and organization that will be developed in the following paragraphs.

Next, students will write the body of the answer. A helpful trick that eliminates the need for transitions and makes the organization of the question readily apparent is the use of headings. For example, in a criminal procedure test where students are asked to rule on the admissibility of three different types of evidence, students can first give an introductory paragraph detailing in what order the evidence will be discussed and next can use headings (perhaps delineated with roman numerals or written in all caps or underlined) that identify the pieces of evidence as they are discussed. Or, in an administrative law examination, students might first deal with justiciability issues before merits issues. To that extent, a heading may indicate the beginning of the justiciability portion, and then subheadings may indicate the discussions of the issues relating to justiciability (e.g., (A) Ripeness; (B) Standing; and so on).

As students begin to discuss each issue, they should first sketch out the legal principles that will shape the answer to the question. This portion of the answer is largely an abstract discussion that will reveal their understanding of the legal analysis in the area. Although the concepts are the key concern, citations to cases that illustrate a particular concept may ensure that the professor knows the students are familiar with the concept, understand the concept, and remember which case exemplifies that concept. Moreover, citation of cases can be a quick way to identify a legal principle for the professor.

In addition to citing cases that illustrate relevant concepts, students should use the phraseology used by the professor to refer to concepts. This serves two purposes. First, it makes the paper more accessible to the professor because it uses his or her language; and second, it allows students to demonstrate their knowledge of the material presented in the professor's lectures. Moreover, students should be sensitive to the predilections of a professor when they present the legal concepts and should tailor the answer to deal with those peculiarities. This is not to say that students must always agree with the professor. Students should feel free to disagree with the professor, so long as their presentation is well reasoned and supported by thoughtful analysis.

After sketching out the legal framework in an abstract way, students should bring the answer to a practical level by applying that framework to the facts. This step is crucial in a law school examination. Anyone can reiterate the applicable legal principles once an issue has been identified; the real skill is applying those legal principles to a new and different fact situation. In addition, restatement of the facts wastes time; instead, students should indicate how the fact pattern fits in with the principles and how the facts lead to certain conclusions. A common mistake of law students is to lose objectivity early in the exam and advocate only one side of an issue. Students should understand that it is important to sketch out the arguments on both sides. If the question calls for students to discuss the ramifications of an issue, then they may need never present a conclusion. Even if the question calls for the students to make a clear decision, students must spin out the implications on both sides of an issue; in the end, this analysis is more important to their grades than is the conclusion. Students should disregard this advice if the instructions clearly reveal the professor's interest into eliciting only one side of an argument. An additional note on perspective in an answer seems appropriate here. If students are asked to play a role (e.g., to write a memo to a judge or to be an

advocate for a certain side), they should adopt that tone throughout the answer. This perspective indicates an awareness of the role in the factual situation that the professor has asked students to take. Nonetheless, even if students are to take one side or another, the question must include some analysis of all the relevant issues (unless the instructions clearly indicate otherwise).

After the body of the answer has been completed, students should concisely--perhaps in one sentence--indicate the conclusion they have drawn from their analysis. This process--from outlining to concluding--should take no more time than that allocated to the question by the professor.

Students must always be aware of the time limitations and should not transgress these limitations. If students find that they have run out of the time allocated to answer the question, the outline can serve an additional function. At this point in the examination, they can indicate the time problem to the professor and then very quickly write in outline form what the remainder of the answer would have been. Although this outline is certainly not as complete an answer as one written in prose, it is a solution when students have not covered the issues and the time has run out. It is a better solution than writing past the allocated time and wrecking the schedule for the entire examination. Moreover, points may be obtained only for material written on the exam.

The brief outline may garner additional points.

### IV. General examination strategies

Disagreement exists about whether students should read the entire examination before answering any part of it or whether they should read each question as they come to it. The following is a suggestion which builds on a suggestion made by Wentworth Miller in his Primer. When students receive the exam, they should first read the instructions carefully. This point cannot be emphasized enough: students should read the instructions, including allocation of time and percentage of grade allotted to each question. Most tragic exam mistakes, i.e., not answering all the questions or running out of time, can be traced to a lack of careful attention to the instructions on the exam.

Next, students should flip through the exam and note the number of questions and whether time has been allocated to each. Sometimes the professor will not allocate time but will instead allocate a point basis to each question. If this is the case, students should extrapolate from the point basis an allocated time for each question. That time should be written at the top of each question. It is crucial that students stay within the allocated time period for each question.

Now students should return to the first question. They should quickly determine the type of question and then begin to deal with it appropriately. In other words, I do not recommend that students read through the entire test and then decide which question to answer first. This is simply a waste of time and is unnecessary as long as students stay within the allocated time period for each question. If for some reason, students simply cannot remain within allocated time periods, they should answer the question with the highest point value first, and then answer questions in descending order of point value. However, other professors disagree with this advice. They recommend that students skim through all the questions before answering any to get a sense of which questions implicate which issues.

A law school examination should be an interactive process in which

law students engage the examination and attempt to demonstrate to the professor the breadth of their knowledge and their ability to apply it. When students answer the questions, they should make sure that the answers cover in a cumulative fashion each of the major concepts identified during their studies. For example, if at the end of a contracts examination, students realize that they have not dealt with a damages issue, then something may be wrong. Students should quickly review the examination and discover if they have overlooked a question dealing with damages. Occasionally, professors do ignore major issues and topics in a course; however, this is the exception, rather than the rule. The test should be seen as an interactive process in another way. If two or more questions deal with the same topic, students should comprehensively delineate the legal framework only once and then refer back to that framework in the subsequent questions. For example, if question one in a constitutional law course calls for a discussion of the classifications in an equal protection analysis, and question two also implicates equal protection, the students can, in question two, refer back to the legal analysis in question one and avoid repetition. After referring the professor to the previous legal analysis, students can apply that analysis to the particular facts of question two.

**V. Conclusion**

First, preparation for final exams must begin weeks before the exam when students examine the course to identify over-arching concepts (the "forest") from the many ideas discussed during the course (the "trees"). As part of the pre-exam preparation, students must discover as much information as possible about the professor's past exams by reviewing available past exams, by talking to other law students who have taken the course and, if warranted, by talking to the professor. Students should never go into an exam "cold"; they should have some idea as to what will be tested and how they will be tested.

Second, students must read the instructions to the exam carefully. They should note the number of questions, the time allocated for each, and any specific, unique instructions. They should count the pages to make sure none is missing. If students don't understand the instructions, they should ask for clarification at the beginning of the exam.

Third, students should follow the guidelines given in this handout regarding the type of exam question, how much time should be spent on preparing an outline of the answer (approximately one-fourth of the exam time), and how an answer should be structured. They should answer the question asked by the professor. Also, students who set out that "roadmap" paragraph at the start of an answer to a complex question may influence the reader positively.

Fourth, simple declarative, easy-to-read sentences should be used in the answer. Communication and expression skills are necessary legal skills which the professor implicitly (if not expressly) looks for while grading examinations. The method of presentation and the manner in which the content of the answer is transmitted to the instructor are as important as the substance. By transmitting answers in a powerful, aggressive and concise manner, students will improve their chance of receiving a high grade. Also, in transmitting the answer--the knowledge of content--to the professor, students should avoid two rather common mistakes. First, students should not waste time by restating or rewriting the question in their bluebooks before beginning the answer. The professor is familiar with the fact pattern; he or she wrote it! On the other hand, students should not ignore the facts, but they should skillfully integrate the relevant facts into the exam answer. Second, when

writing the answer, students should assume the professor has no knowledge of law, but only of the facts. This concept is difficult to describe in the abstract. For example, students should not assume the professor knows that they know the prima facie elements of the tort of assault and battery if those concepts are relevant to the answer. Instead, students should lay out these elements, either in outline form (if time is short) or textually.

Fifth and finally, if time remains at the end of the exam, students should reread and improve their exam answers, for example, by writing in the margin or on a blank opposing page. There is no such thing as a perfect exam. Punctuation, grammar, and analysis can always be improved. Good luck!




Prospectives

**Students**

Faculty

Alumni

Academics

Life

Socrates

Blog

News

Calendar



Go

SearchUs

Staff

Library

Careers

University

Maps

*Home > Students > Academic assistance > Useful study resources > Exam tips*

**Academic assistance**

Academic counselors

University counseling assistance

Assistance for students with disabilities

Useful study resources

Career services

Degree requirements

Financial Aid

Graduation Information

Incoming JD students

Joint Degrees

Library services

Student Handbook

Student Records

# Exam tips

Take practice exams. To be truly effective, write out an answer under timed conditions. Reading an exam question and sample answer is not as helpful.

Read the instructions for the exam carefully. In the heat of the moment, it is tempting to skip over the instructions. This is a really bad idea. It is very important to note the time allotted or word limits for each question. Allocate your time and stick to the time limits. It cannot possibly help your grade to overlook such instructions.

Pay attention to the call of the question. What are you being asked to do? If your professor asks you to make the best arguments for the plaintiff, or write an appellate court opinion, make sure you do that.

Skim the entire exam once. Make sure you know how many questions there are. See where the major issues are. You do not want to waste your time fully exploring an issue in response to question 1, only to find that the issue is the focus of question 2.

Read the entire fact pattern of a question carefully before beginning to answer. Though there may be an occasional red herring, each fact is usually there for a reason.

Spend some time organizing and outlining your answer before beginning to write. Again, it is tempting to panic and begin writing, especially if everyone around you is furiously typing away. But your answer will be better organized, and possibly even better thought out, if you spend approximately a quarter of your time allotted for the question outlining before writing. If you run out of time to answer a question, outline what you were going to say. You may get points for this. This is also a very good reason why you want to outline before you begin writing; your outline will come in handy if you run out of time.

IRAC your answers. Identify the issues and the rules, show how the rules apply to the facts of the question, and offer a conclusion. Remember that the most important part of IRAC for purposes of writing your exam is your analysis of how the rules apply to the facts. Lay out the arguments on both sides. Show how you reached the conclusions you did.

Carry out your analysis. For example, on a contracts question, even if you conclude there was no offer, you should still analyze whether there was an acceptance. There are usually no absolute answers on exams, so don't cut off your analysis based on a possibly incorrect conclusion.

Finally, write clearly. Use short sentences and break your paragraphs often. Avoid lengthy introductions. Give a concise and thoughtful analysis of the problem.

Site Index

Contact

The University of Michigan Law School | Site Map | Search | Contact Us

## The University of Michigan Law School



**March 26, 2007**

Alumni & Development | News & Info | Law Library

**Prospective Students**

**Current Students**

  **Academic & Student Services**

  Curriculum Interest Areas

  Externships

  Joint Degrees

  Office of the Registrar

  Peer Support Services

  Student Handbook

  Writing Competitions

  Docket

  Law Student Toolbox

  Other U of M Sites

**Faculty & Staff**

**The Curriculum**

**Centers & Programs**

**Journals & Organizations**

### Exam Tips

Kent Syverud Taking Law School Exams Lecture
[ Running Time approximately 65 minutes ]

Audio and video real media for broadband users

Audio real media for modem users

*Visit www.real.com to download a real player in order to view the audio and video files above.*

**Related links to view while listening:**

Taking Law School Examinations [PDF]

Example Examination Instruction and Questions [PDF]

*Visit www.adobe.com to download Adobe Acrobat in order to view the pdf files above.*

**Contact Us**

**Student Affairs**

**David Baum**
Assistant Dean for Student Affairs
301 Hutchins Hall
625 S. State Street
Ann Arbor, MI 48109-1215

**Telephone**
734.764.0516

**Fax**
734.936.1973

**Christine Gregory**
Director of Student Affairs
313 Hutchins Hall
625 S. State Street
Ann Arbor, MI 48109-1215

**Telephone**
734.615.0019

**Fax**
734.647.5226

**E-mail**
lawstudentaffairs
@umich.edu

*Last updated 10/09/2006*

Copyright © 2007 The Regents of the University of Michigan



FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# TAKING LAW SCHOOL EXAMINATIONS

The outline that follows is to be consulted, along with the separate handout of Example Examination Questions, while watching the video presentation.

   I.  Introduction
  II.  Preparing for Law School Examinations
 III.  Types of Law School Examinations
  IV.  Classic Mistakes in Answering Law School Examinations
   V.  A Suggested Approach for In-Class Examinations
  VI.  Take Home Examinations
 VII.  Common Questions about Law School Examinations
VIII.  After the Examination
  IX.  Conclusion

---

## I.   Introduction

## II.  Preparing for Law School Examinations

A. Professors are different
B. Examinations are different
C. Prepare for the particular professor and exam in question
   1. Old examinations
   2. Instructions
   3. Discussing the material with classmates

## III. Types of Exams
A. Undergraduate
B. Public Policy
C. Kitchen Sink
D. Role Play
E. Multiple Choice/Short Answers
F. Weird

## IV.  Classic Mistakes in Answering Law Examinations

A. Not Knowing the Material
   1.    Not having done the work
   2.    Not thinking about the exam when reviewing the work

B. Missing Major Issues
   1.    Not answering the question that is asked
   2.    Answering questions that you are not asked
   3.    Failing to allocate time wisely
   4.    Failing to break a long question down into shorter pieces
C. Regurgitating Facts and Law: G.T.T.A.

D. Failing to Make the Analysis Explicit
   1.    The Problem Described

2.   Reason #1 for the failure: "It is so obvious that this conclusion follows from these facts and rules; I would look stupid if I said why."

3.   Reason #2 for the failure: "It is not obvious at all which conclusion follows from these facts and rules; I must nevertheless sound authoritative and make it look like the answer is clear."

E. Failing to Acknowledge Counterarguments
F. Not employing common Sense At The Last Stage

## V.   A Suggested Approach for In-Class Examinations

A. Step #1: Focus on the question asked.
B. Step #2: Identify the major issues that must be addressed.
C. Step #3: Allocate time among the issues.
D. Step #4: For each issue, state applicable law briefly; identify what is most problematic about applying that law to these facts and why.
E. Step #5: Analyze how you would resolve the most problematic part. Identify counterarguments.

## VI.   Take Home Examinations

A. Word limits are equivalent to time limits.
B. Thinking and Analysis are even more vital.
C. Style is more important than on an in-class examination.

## VII.   Common Questions about Law School Examinations

A. What do I do when time is short?
B. What do I do if I am totally panicked by the question?
C. What do I do if I realize the last four paragraphs I have written are wrong?
D. The question asks me to be a judge (or lawyer or legislator). Can I be the kind of judge (or lawyer or legislator) I want to be, or do I have to be the kind of judge (or lawyer or legislator) the professor wants me to be?
E. What if the professor has no previous examinations available for review?
F. What if the professor emphasizes a mode of analysis (e.g. economics or literary theory) that I find totally alien?
G. What if the question is entirely open-ended? What approach shall I take?
H. I see many issues in this question. How do I know which ones the professor cares about most, and will give the most credit for in grading?

## VIII.   After The Examination

A. Discussing the Exam with Classmates
B. Receiving Your Grade
C. Reviewing Your Own Exam
D. Visiting Your Professor

## IX.   Conclusion





**Enhancing                    and**

Home
Faculty                              ▶
Graduate Mentoring Award
Graduate Students                    ▶
Teaching Transcript
Undergraduate Students
Calendar
English Language Program
Library                              ▶
Teaching Resources                   ▶
Mid-Career Fellowship
About Us
Contact Us

Undergraduate Tipsheet Index

## Exam Success: Preparing for Exams

### Come up with a game plan.

- **Set reasonable goals.** Develop a realistic schedule with clear goals for each study session. Write down where you'll study, at what time, and exactly what you intend to do with that time.

- **Gather** all the materials you will need.

- **Organize** your study area.

### Ask about the format of the exam, but don't ask "what's going to be on the test?"

### Create study aids such as:

- **Flashcards** with unfamiliar vocabulary, key terms or important concepts, formulas or theorems.

- **Reading summaries** that convey the main points of important texts.

- **Lists** of theorems, mechanisms, or principles rewritten in your own words.

- An **annotated syllabus** which focuses on main points and concepts for the course.

### Predict questions from your lecture notes, problem sets, precept discussions, & reading.

- **Formulate** central questions on fundamental concepts and answer them.

- **Identify and memorize** information that might show up in an identification or short-answer section.

### Focus on main principles and concepts first, then look for factual information that provides evidence for them.

- **Reorganize course material conceptually;** don't necessarily follow the order your professor used to present it in class.

- Pay attention to **concepts professors particularly focused on** in class or in homework, quizzes, problem sets, and other assignments.

### For quantitative courses, work through problems.

- Work through problems on your assignments, the end of the chapter, or old exams.

- Don't think of each problem as unique; look for similarities.

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

- Don't consult the answer key until you have tried to solve the problem yourself.

- Review our tipsheet on preparing for problem-solving exams.

**For essay exams, practice writing your response.**

- Make an **outline** to structure your response.

- Provide specific **examples** of your points .

- **Evaluate** your response and remember what you left out for next time.

**Try to explain difficult material to someone else.**

- You can do this with a study partner or in study groups. You can also work with others to generate questions.

**Take a practice exam:**

- **Take an old exam.**

- **Time yourself** and use only the materials you will have at the exam.

- **Review** your answers and **focus** on anything you got wrong or forgot.

If after reviewing, you still don't understand something, ask the instructor for clarification during her office hours or at a review session.

Remember to eat well, exercise, and get enough sleep. You'll study and perform better.

The McGraw Center • 328 Frist Campus Center • Princeton University
©2003 The McGraw Center. All Rights Reserved



# Bureau of Study Counsel
## Center for Academic and Personal Development



Harvard University

Home · About · Staff · Contact Us · Search

**Counseling · Groups & Workshops · Reading Course · Peer Tutoring · Self-Help Resources
Other Harvard Resources · Consultation, Outreach & Supervision · The Success/Failure Project**

# Self-Help Resources

## HOW TO USE THIS PAGE

During your university years, academic development and personal development go hand in hand -- personal worries can affect you academically and academic difficulties can affect you emotionally. The links on this page include a wide variety of resources related to both *academics* and *student life*.

Read what you find here with a critical eye. These links are not magic bullets, sure cures, or one-size-fits-all. Rather, they are tools, food for thought, and stepping stones in your efforts to develop as a student and person. If you have worries or wonderings about what you read here, come talk them over with a Bureau counselor. Appointments: (617) 495-2581.

 The crimson shield indicates a Harvard University site or resource.

## TABLE OF CONTENTS

### *ACADEMICS*

Academic Integrity
Anxiety
Assertiveness
Assessing Your Learning Style
Career Decisions and Direction
Concentration
Motivation
Exams and Tests
Foreign Language/ESL
LD/ADHD in College
Listening
Memory

Note-making
Perfectionism
Plagiarism (see Academic Integrity)
Procrastination
Reading
Study Groups
Study in Sciences
Study in Social Sciences
Study in Humanities/Arts
Study Tips and Guides
Time Management
Writing

### *STUDENT LIFE*

Adjusting to College Life/Culture
Alcohol and Drug Use
Smoking
Grief and Loss
How To Help Someone
Relationships
Sexuality
Sexual Assault/Rape
Sleep
Spirituality
Stress

### *MENTAL HEALTH*

Mental Health Information.

### *ACADEMICS*

### Academic Integrity

 Harvard - **Harvard College Student Handbook: Academic Dishonesty**
 Harvard - **Writing Center**
Center for Academic Integrity - Duke University
Plagiarism - University of North Carolina
How to Avoid Internet Plagiarism - University of Pennsylvania
Collaboration and Plagiarism (guide in a computer science course) - MIT
How Do I Know When I Am in Trouble? Self-Tests for Plagiarism - New Humanities Reader
Collaboration and Plagiarism in Computer Science - James Mason University

▲ RETURN TO TABLE OF CONTENTS

### Anxiety

 Harvard - **BSC Groups and Workshops (e.g., Insanely Busy; Speaking Up in Class; and Exam-Taking)**
Anxiety: Taming the Butterflies - University of Oregon
Understanding Academic Anxiety - Cornell University
Letting Go of Test Anxiety - Cornell University
Managing Nervousness During Oral Presentations - University of Guelph
Does This Sound Like You? (Anxiety Disorder) - NIMH Self-Assessment
Study Habits and Test Anxiety - SUNY at Buffalo



Test Anxiety - George Washington University
How to Cope with Stress, Anxiety and Fears - MentalHelp.net
Six Habits that Defeat Anxiety - MentalHelp.net
How to Handle Fears - University of Florida

▲ RETURN TO TABLE OF CONTENTS ▲

## Communication, Assertiveness, Speaking Up in Class

● Harvard - BSC Groups and Workshops  (e.g., Speaking Up in Class; Creative Relating; Cultural Transitions)
Public Speaking Anxiety - University of Tennessee at Martin
Improving Your Communication Skills - MindTools.com
Assertive Communication - University of Iowa
Assertive Communication: An Introduction - University of Wisconsin-Eau Claire
Learning to Be Assertive - University of Texas at Austin
Class Participation - University of Minnesota
How to Approach a Professor for Help - University of Florida
How to Say No - University of Florida

▲ RETURN TO TABLE OF CONTENTS ▲

## Assessing Your Learning Style

● Harvard -  BSC Groups and Workshops  (e.g., Maximize Your Learning Approach)
● Harvard -  Bureau of Study Counsel  (individual consultation)
Learning Styles - Pace University
Index of Learning Styles Questionnaire - Solomon and Felder, North Carolina State University
Learning Style Survey for College - Jester and Miller, Diablo Valley College
Paragon learning style Inventory PLSI -  Shindler and Yang, State University of New York/Oswego
Study Skills Checklist - Virginia Tech university

▲ RETURN TO TABLE OF CONTENTS ▲

## Career Decisions and Direction

● Harvard - Office of Career Services
● Harvard - BSC Groups and Workshops (e.g., What are You Doing With Your Life?)
Decision-Making Techniques - How To Make Better Decisions - MindTools.com
Career Decisions: Self Assessment - About.com
Students for Informed Career Decisions - Stanford University
Sexual Orientation and Career Decision-Making and Coming Out in the Workplace - Lawrence University
Planning Your Future - University of California at Berkeley

▲ RETURN TO TABLE OF CONTENTS ▲

## Concentration and Motivation

● Harvard - Harvard Course in Reading and Study Strategies
● Harvard - BSC Groups and Workshops (e.g., Maximizing Your Learning Approach; Procrastination)
Concentration - Massey University
Concentration - University of Guelph
Motivational V.I.T.A.L.S. - University of North Carolina
Concentration - University of Minnesota
25 Ways to Improve Motivation and Concentration - University of Minnesota
I Just Can't Seem to Concentrate! - University of Pennsylvania
Increasing Motivation - University of Victoria

▲ RETURN TO TABLE OF CONTENTS ▲

## Exams and Tests

● Harvard - BSC Groups and Workshops (e.g., Exam-Taking; Making the Most of Reading Period)
● Harvard -  Preparing for and Taking Exams

♥ Harvard - On-Line Final Exams from Past Harvard Courses
♥ Harvard - <u>Harvard Course in Reading and Study Strategies</u>
Preparing for Exams - University of North Carolina
Test-Taking Strategies - University of North Carolina
<u>Preparing for Tests and Exams</u> - York University
Noting the Meaning of Key Words in Essay Questions - University of Minnesota
<u>Cracking the Code for Essay Exams</u> - University of Minnesota
Making Use of the Returned Exam - University of Minnesota
<u>Exam Strategies</u> - Cornell University
<u>Multiple Choice Tests</u> - Cornell University
Problem-Solving Tests - University of Texas
<u>Study Habits and Test Anxiety</u> - SUNY at Buffalo
Test Anxiety - George Washington University

▲ RETURN TO TABLE OF CONTENTS ▲

## Foreign Language Learning and ESL

<u>Strategies for learning a Second Language</u> - University of Minnesota
<u>Tips on Studying a Foreign Language</u> - University of Texas
Learning Vocabulary - Frankfurt International School
<u>Interesting Things for ESL Students (word games, study tools, etc.)</u> - ManyThings.org
ESL Resources - Purdue University

▲ RETURN TO TABLE OF CONTENTS ▲

## LD/ADHD - Learning Disorders & Attention Deficit Disorder

♥ Harvard - Accessible Education Office
♥ Harvard - Bureau of Study Counsel, (individual consultation with a counselor)
<u>Attention Disorders: College Student FAQs</u> - University of Texas
Ask Noah about LD - noah-health.org
<u>National Resource Center - Information about ADH</u> - help4adhd.org
<u>Information about ADHD</u> - National Institute of Mental Health
<u>Fact Sheet on ADHD - Attention Deficit Disorder Association</u> - ADDA

▲ RETURN TO TABLE OF CONTENTS ▲

## Listening

♥ Harvard - <u>Harvard Course in Reading and Study Strategies</u>
♥ Harvard - <u>BSC Groups and Workshops</u> (e.g., Creative Relating)
It All Starts with Listening - University of Pennsylvania
<u>Learning From Lectures</u> - University of Guelph
<u>Listening Skills</u> - Texas A&M University
<u>Ten Bad Listening Habits</u> - Dartmouth college

▲ RETURN TO TABLE OF CONTENTS ▲

## Memory

♥ Harvard - Harvard Course in Reading and Study Strategies
<u>Improving Your Memory</u> - Texas A&M University
Remembering - Virginia Tech University
Strategies for Improving Concentration and Memory - Online Workshop -Virginia Tech University
Memory Improvement Tools - MindTools.com

▲ RETURN TO TABLE OF CONTENTS ▲

## Notemaking

♥ Harvard - <u>Suggestions for Effective Note-Making</u>
♥ Harvard - <u>Harvard Course in Reading and Study Strategies</u>
<u>Note-Taking Methods</u> - Stanford University

Taking Lecture Notes - Stanford University
Taking Lecture Notes - Dartmouth College

▲ RETURN TO TABLE OF CONTENTS ▲

**Perfectionism**

🕮 Harvard - Perfectionism at Harvard: Friend or Foe?
🕮 Harvard - BSC Groups and Workshops (e.g., Perfectionism Workshop; Procrastination Group)
Perfectionism: What it Is and How to Deal With It - University of North Carolina
An Imperfect Look at Overcoming Perfectionism - University of Minnesota
Preventing Perfectionism - University of Buffalo

▲ RETURN TO TABLE OF CONTENTS ▲

**Procrastination**

🕮 Harvard - BSC Groups and Workshops (e.g., Procrastination Group)
Internet Addiction Survey - StressCure.com
Procrastination: Putting A Stop To Putting It Off - University of North Carolina
The Procrastinator's Code - University of Minnesota
Battling the Block: Writing Through and Beyond Writer's Block - University of Pennsylvania
One of These Days I'll Stop Procrastinating - University of Pennsylvania
Overcoming Procrastination - University of Buffalo
Procrastination: FastFacts and Strategies - University of Guelph

▲ RETURN TO TABLE OF CONTENTS ▲

**Reading**

🕮 Harvard - Harvard Course in Reading and Study Strategies
🕮 Harvard - Interrogating Texts: 6 Reading Habits to Develop in Your First Year at Harvard
A Classic Method for Studying Texts: SQ4R - University of Guelph
SQ3R Method - Stanford University
Rapid Reading Technique - Stanford University
Six Reading Myths - Dartmouth College

▲ RETURN TO TABLE OF CONTENTS ▲

**Study Groups**

🕮 Harvard - Working in Study Groups  (BSC handout)
🕮 Harvard  Working in Groups - A Quick Guide for Students
Collaborative Groupwork - University of Guelph
Creating Study Groups for Collaborative Learning - University of Colorado at Boulder
Study Groups - Duke University
Study Groups - University of Illinois at Chicago
Collaborative Learning: Groupwork and Study Teams - University of California at Berkley
Collaboration and Plagiarism (guide in a computer science course) - MIT
Collaboration and Plagiarism in Computer Science - James Mason University

▲ RETURN TO TABLE OF CONTENTS ▲

**Study in the Sciences**

🕮 Harvard - The 4-Point Approach to Problem-Solving in Math and Science
🕮 Harvard - Reading Mathematics
🕮 Harvard - Harvard Course in Reading and Study Strategies
🕮 Harvard - BSC Groups and Workshops (e.g., Exam-Taking; Time Management)
How to Solve It - University of Minnesota
How to Study Math and Science - University of Minnesota
Studying Math - University of Minnesota
Preparing for Exams in Science and Engineering - Stanford University
Taking Exams in Science and Engineering - Stanford University

Top 10 Things to Do To Succeed in Biology - Cornell University
General Chemistry Study Tips - Cornell University
Study Tips in Physics - Cornell University
How to Study Math and Science - University of Texas
Writing in the Sciences - University of North Carolina
Biology: I Thought I Knew Everything But I Still Got a Bad Grade - University of Pennsylvania
Developing Math Confidence - University of Florida
Math Study Skill - Texas A&M University
Study Skills for Math Courses - South Texas State University

▲ RETURN TO TABLE OF CONTENTS ▲

## Study in the Social Sciences

● Harvard - Harvard Course in Reading and Study Strategies
● Harvard - Study Guide for Social Studies 10
● Harvard - BSC Groups and Workshops (e.g., Exam-Taking; Time Management)
Penning the Past: Advice on Writing in the Historical Disciplines - Brown University
Reading, Writing, and Researching for History - Bowdoin College
Study Tips for Economics Courses - University of Texas
Writing a Psychology Literature Review - University of Washington
How to Write an Anthropology Paper - Skidmore College
Writing in Anthropology - University of North Carolina
Writing in Sociology - University of North Carolina
Writing Tips for Political Science Students - Northern Illinois University

▲ RETURN TO TABLE OF CONTENTS ▲

## Study in Humanities/Arts

● Harvard - Harvard Course in Reading and Study Strategies
● Harvard - BSC Groups and Workshops (e.g., Exam-Taking; Time Management)
Coping with Music Performance Anxiety - University of Wisconsin -- Eau Claire
Art History Writing Guide - Wesleyan University
Writing Guide for Dance - Wesleyan University
Writing Guide for Theatre Papers - Wesleyan University
Guide for Writing on Film - Wesleyan University
Basic Guide to Textual Analysis in English Literature - North Illinois University
Writing in Literature - University of North Carolina

▲ RETURN TO TABLE OF CONTENTS ▲

## Study Tips and Guides

● Harvard - Study Tips
● Harvard - Secrets of the Super-Learners
● Harvard - Harvard Course in Reading and Study Strategies
● Harvard - BSC Groups and Workshops (e.g., Exam-Taking; Time Management)
Basic Study Techniques - Texas A&M University
Ten Traps of Studying - University of North Carolina
Top 11 Study Skills - Stanford University
Study Environment Analysis - Virginia Tech University
Study Skills Checklist - Virginia Tech University
Study Strategies - Anxiety, Procrastination, Time Management - SUNY at Buffalo
College Survival Skills - Clemson University

▲ RETURN TO TABLE OF CONTENTS ▲

## Time Management

● Harvard - Time Management
● Harvard - Harvard Course in Reading and Study Strategies
● Harvard - BSC Groups and Workshops (e.g., Time Management; Procrastination)

Some Hints on Planning a Better Study Schedule - University of Minnesota
Time Managment - Stanford University
A Simple Effective Time Management System - Cornell University
Time Management for Right-Brained People (or What To Do If To-Do Lists Aren't Your Style) - Cornell University
There's No Such Things As Time Management - University of Buffalo
Time Management - University of Florida

▲ RETURN TO TABLE OF CONTENTS ▲

Writing
- Harvard - The Writing Center
- Harvard - Twenty Tips and Worksheets for Senior Thesis Writers
- Harvard - Making the Most of College Writing: A Guide for Freshmen
- Harvard - BSC Groups and Workshops (e.g., Senior Thesis Workshops, Perfectionism)
Editorial Checklist - University of Minnesota
Writing a Term paper - University of Minnesota
Writing in College: A Short Guide to College Writing - University of Chicago
Critical Writing and Thinking - Brown University
The Writing Process: General Tips - Wesleyan University
What I Wish I'd Known 4 Years Ago: A Senior's 20/20 Hindsight On Writing - Wesleyan University
Revising for Simplicity, Clarity, and Cohesion - Wesleyan University
The Writing Process: Finding a Topic - Wesleyan University
Pressure vs. Process: Writing - University of Pennsylvania
What is an Academic Paper? Writing For College - Dartmouth College

▲ RETURN TO TABLE OF CONTENTS ▲

## STUDENT LIFE

Adjusting to College Life and Culture
- Harvard - Adjusting to life at Harvard - Harvard
- Harvard - Resources for International Students and Scholars - Harvard
- Harvard - Adjusting to a New Culture and Country - Harvard
- Harvard - Getting to Know Americans - Harvard
- Harvard - BSC Groups and Workshops (e.g., Cultural Transition Support Group)
- Harvard - Homesickness - UHS - Harvard
International Students Coping with Culture Shock - University of Wisconsin
Overcoming Homesickness - University of Wisconsin
Adjusting to College - AboutCollege.com
Crossing Cultures - Kansas State University
Understanding Culture Shock - Rotary Club Guide
Developmental Tasks for College Students - Hampton Sydney College
International Students' Adjustment - University of Miami

▲ RETURN TO TABLE OF CONTENTS ▲

Alcohol and Drug Use
- Harvard - Office of Alcohol and Other Drug Services
- Harvard - Where to Go With Questions About Alcohol and Other Drugs
- Harvard - New Directions - UHS Group
- Harvard - Guidelines for Helping a Friend Who is Intoxicated
Alcohol Use Quiz - George Washington University
"Sharing" Prescription Medications - American University
College Alcohol Inventory - University of Wisconsin
FAQs About Alcohol Use - National Institute on Alcohol Abuse and Alcoholism - NIAAA
How Can I Tell If I Have a Problem with Drugs or Alcohol? - NCADD self-assessment
Let's Talk Facts About Substance Abuse - American Psychological Association
How to Cut Down on Your Drinking - NIAAA
Drug Abuse - National Institute on Drug Abuse
Cough/Cold Meds - CBS News

Cough/Cold Meds - University of Texas

▲ RETURN TO TABLE OF CONTENTS ▲

**SMOKING**
🌑Harvard - <u>Tobacco Treatment Resources for the Harvard University Community</u>
You Can Quit Smoking - Center for Disease Control
<u>Quitting Tips</u> - Center for Disease Control
I QUIT! - Center for Disease Control
<u>Complete Guide to Quitting</u> - American Cancer Society
Help for Cravings and Tough Situations - American Cancer Society
UCanBreathe.com
<u>On Line Smoking Cessation Program (free!)</u> - American Lung Association
Tobacco Cessation Guidelines - Office of the Surgeon General
<u>AU Counseling Center Resource Page - Quitting Smoking</u>
Let's Talk Facts About Quitting Smoking - American Psychological Association

▲ RETURN TO TABLE OF CONTENTS ▲

Grief and Loss

🌑Harvard - <u>Grief and Loss</u>
🌑Harvard - <u>Taking Care of Yourself After a Traumatic Experience</u>
🌑Harvard - <u>The Trauma Response</u>
🌑Harvard - <u>LIFE RAFT Support Group</u>
🌑Harvard - <u>BSC Groups and Workshops</u> (e.g., Seasons of Grief)
Coping with Loss - University of Florida
How to Cope with a Break-Up - University of Florida
<u>Understanding Grief</u> - University of Florida
Death, Loss, and Grief - Hampton Sydney College
<u>Life After Loss: Dealing with Grief</u> - University of Texas
About Bereavement - City University of New York
<u>Grief and Loss</u> - George Washington University
Coping with Death, Grief, and Loss - University of Iowa

▲ RETURN TO TABLE OF CONTENTS ▲

How To Help Someone You Are Concerned About

🌑Harvard - <u>Guidelines for Helping a Friend Who is Intoxicated</u>
🌑Harvard - <u>What Can I Do? How to Recognize Students in Distress, and How To Help</u>
🌑Harvard - <u>BSC Groups and Workshops</u> (e.g., What Should I Do? A Workshop for Friends, Lovers, and Roommates of People with Eating Disorders)
🌑Harvard - <u>Bureau of Study Counsel,</u> (individual consultation with a counselor)
What To Do When a Friend Is Depressed - National Institute of Mental Health
<u>Helping Someone in a Suicidal Crisis</u> - University of Florida
How Can I Tell If Suicide Is a Possibility? - University of California Santa Cruz
Dealing With An Alcoholic Family Member or Friend - University of Florida
<u>How to Help a Friend Who Has Been Sexually Assaulted</u> - University of Oregon
How Can I Help a Depressed or Suicidal Person? - University of California Santa Cruz
<u>Eating Disorders: Helping a Friend</u> - University of Wisconsin
For Loved Ones of Sexual Assault/Abuse Survivors - University of Illinois
<u>Self-Injury: Notes for Concerned Others</u> - University of Chicago
<u>When You Want to Help a Friend</u> - St. Joseph's University
<u>How to Help A Student In Distress</u> - American University

▲ RETURN TO TABLE OF CONTENTS ▲

Relationships

🌑Harvard - <u>BSC Groups and Workshops</u> (e.g., Creative Relating)
🌑Harvard - <u>Connections - UHS Psychotherapy Group</u>

Changing Relationships with Parents -AboutCollege.com
Becoming Open to Others - University of Florida
Friendship Building - SUNY at Buffalo
Building Healthy Relationships - University of Wisconsin
Handling Common Relationship Problems - University of Florida
Verbal Abuse - Actabuse.com
Intrusive Contact (e.g. Stalking) Following a Breakup - Cornell University
Coping With A Broken Relationship - University of Florida
Fair Fighting in Intimate Relationships - University of Florida
Is Your Relationship Heading into Dangerous Territory? - University of Texas
Controlling Anger Before it Controls You - American Psychological Association
Anger Tool Kit : Four Proven Techniques for Managing Anger - AngerManagement.com
Anger and Agression - About.com
Understanding Anger: Theories and Facts - MentalHelp.net
**ROOMMATE RELATIONSHIPS**
❤Harvard - **Getting Along With Your Roommate(s)**
How to Live With Your Roommate - Saint Joseph/s University
Roommate Relationships - AboutCollege.com

▲ RETURN TO TABLE OF CONTENTS ▲

**Sexuality**

❤Harvard - **Office of Sexual Assault Prevention and Response**
❤Harvard - **Harvard Student Organizations**
Sexual Assertiveness Questionnaire - SUNY at Buffalo
Support for LGBT youth - YouthResource.com
Parents, Friends,and Family of Lesbians and Gays - pflag.org
Transgender Education Association, DC - tgea.net
Sexual Orientation - American Psychological Association

▲ RETURN TO TABLE OF CONTENTS ▲

**Sexual Assault, Rape**

❤Harvard - **Office of Sexual Assault Prevention and Response**
❤Harvard - **Harvard Student Organizations**
Sexual Assault and Rape - Actabuse.com
Psychological and Emotional Reactions of Rape Victims - Actabuse.com
Date and Acquaintance Rape - SUNY at Buffalo
Date Rape Prevention - SUNY at Buffalo
Becoming Whole Again - Healing from a Sexual Assault - University of Texas

▲ RETURN TO TABLE OF CONTENTS ▲

**Sleep**

❤Harvard - **University Health Services**
❤Harvard - **UHS Mental Health Services**
❤Harvard - **Sleep Disturbances**
I Just Can't Sleep! - Massey University
Making Sleep Count - St. Joseph's University
Tips for a Good Night's Sleep - University of North Carolina
Improving your Sleep - University of North Carolina
Sleep and Your Brain - University of Texas
How to Get a Good Night's Sleep - Kansas State University
Sleep-Inducing Techniques - Hampton Sydney College
Better Sleep Council - BetterSleep.org
National Sleep Foundation

▲ RETURN TO TABLE OF CONTENTS ▲

**Spirituality, Religion, and Cults**

• Harvard - United Ministry
Going to Class or Mass? Getting Religion at College - student.com
Conversion Experience (American students converting to Islam) - student.com
Finding One's Way Spiritually - Tufts University
How Students can be Targets of Cults - University of Maryland
Characteristics of Cults - International Cultic Studies Association
Cults: Questions and Answers - International Cultic Studies Association

▲ RETURN TO TABLE OF CONTENTS ▲

**Stress**

• Harvard - UHS Mental Health Services
• Harvard - Stress Management
Managing Stress: Signs of Stress, Stress Checklist, Tips - University of Texas at Austin
Strategies for Coping with Stress - Texas Women's University
Stress Periods for Students - Hampden-Sydney College
Top 10 Strategies for Wildly Effective Stress Management - University of North Carolina
Stress and College Students - University of Florida
Stress - How Can I Cope? - Cleveland Clinic
Resources for Coping with Stress - Ask NOAH
Managing Stress - University of Texas

▲ RETURN TO TABLE OF CONTENTS ▲

### MENTAL HEALTH

**Your primary resource for information and support regarding mental health issues is the HUHS Mental Health Services, (617) 495-2042.** In addition, the links below provide information regarding a wide range of mental health topics, including Anxiety Disorder, Bi-Polar Disorder, Depression and Suicide, Eating Disorders, Obsessive/Compulsive Disorder, PTSD Post-Traumatic Stress Disorder; Psychotherapy, Psychiatric Medications, Schizophrenia, Self-Injury (e.g., cutting), etc.

• Harvard - UHS Mental Health Services
• Harvard - Graduate Students: When it's More Than Just A Bad Day: Finding Help at Harvard
• Harvard - Undergraduates: When it's More Than Just A Bad Day: Finding Help at Harvard
APA HelpCenter - APA American Psychological Association
Mental Health/Illness - WhatYouNeedToKnowAbout.com
Mental Health and Behavior - NIMH National Institutes of Mental Health
Mental Health Topics - Ask NOAH
Information for Students and Young Adults - NIDA National Institute on Drug Abuse
Help for Substance Abuse Problems - SAMHSA Substance Abuse and Mental Health Services Administration
Mental Health Information - SAMHSA Substance Abuse and Mental Health Services Administration
Let's Talk Facts - APA American Psychiatric Association

▲ RETURN TO TABLE OF CONTENTS ▲

5 Linden Street
Cambridge, MA 02138-5004

Phone: 617-495-2581   Fax: 617-495-7680
E-mail: bsc@harvard.edu

Fall and Spring Semester Hours:
Monday-Friday, 8:30 AM-5:30 PM
In case of emergency contact:
Harvard Police, 617-495-1212
University Health Services, 617-495-5711

© 2006 President and Fellows of Harvard College





**Introduction**

**Examinations**

**Home**

**General Study Habits**

**Time Management**

**Taking Notes & Reading**

**Examinations**

- **Section 1**
- **Section 2**
- **Section 3**
- **Section 4**
- **Section 5**
- **Section 6**
- **Section 7**
- **Section 8**
- **Section 9**
- **Review/Quiz**

**Interacting With Instructors**

**Contact Information**

**Links**



Success on any examination is a two-step process. First, you must prepare properly so that information is in your head in a meaningful form and accessible during the exam. Second, you must discipline yourself to think carefully while reading and evaluating test questions. Your exam preparation should begin well in advance of the exam itself. Ideally, you should be studying lecture material on a regular basis, i.e., 2 to 3 times weekly throughout the pre-exam period so that very little in the way of studying is actually necessary immediately prior to the exam itself. As part of this preparation process, you should . . .

- Do all the assigned readings and take good lecture notes.
- Learn material in accordance with lecture objectives and other guidelines.
- Practice applying your knowledge by with sample exam questions.
- Write key concepts on note cards for frequent review.
- Be sure to have your questions about unclear topics answered.
- Attend any review sessions offered by the professor.
- Study enough in advance to avoid the need for all-night cram sessions.
- Get a good night's sleep and be well-rested for the examination.

All content herein ©Clemson University, 2000.
Site design by Michael R. Leigher.

Please direct all comments and/or suggestions
regarding this web site to: Dr. Jerry Waldvogel.





**Introduction**                    **Examinations**

**Home**

**General Study Habits**                    *It Takes Practice*

**Time Management**                    Like any other worthwhile skill, becoming a good exam
taker requires practice. Think of it as analogous to a
dancer, who wouldn't consider performing without
substantial amounts of practice doing the specific moves
in his or her routine. Similarly, you should think of an
exam as your "performance," and you should practice
doing the necessary maneuvers to think through
questions that you will be expected to execute during a
test.

**Taking Notes & Reading**

**Examinations**

- **Section 1**
- **Section 2**
- **Section 3**
- **Section 4**          As a general rule, you should practice taking tests to the
- **Section 5**          point that when the real examination comes around, the
- **Section 6**          process of thinking carefully and clearly is second
- **Section 7**          nature. Practice tests supplied by the professor and
- **Section 8**          questions of your own design can all accomplish this
- **Section 9**          goal. Furthermore, by practicing the test-taking process
- **Review/Quiz**        early and often in your studying, you will help yourself
                         learn the subject matter in exactly the context that the
                         professor wants.

**Interacting With Instructors**

**Contact Information**

**Links**

---

All content herein ©Clemson University, 2000.
Site design by Michael R. Leigher.

Please direct all comments and/or suggestions
regarding this web site to: Dr. Jerry Waldvogel.



**Weingarten
Learning
Resources
Center**

## text only

**About Learning Resources**

- History
- Staff
- Contact Us

**Services & Programs**

- Individual Instruction
- Walk-in Hours
- Print Information
- Interactive Workshops
- Colloborative Programs

**Useful Tools & Information**

- Time Managment Tools
- Self-Helps
- Recommended Reading
- Useful Online Sources

**Frequently Asked Questions**

**Other University Resources**

**Job Opportunities**

**Office of Student Disabilities Services**

**Site Map of the Website**

**Home**



Office of Learning Resources

## Useful Tools & Information

The Learning Resources staff has written and designed a variety of learning tools that students, professors, and staff may use independently or in consultation with a Learning Instructor. Recommended readings and websites are also provided for people who are interested in learning more about academic reading, writing, time management, and study strategies.

- Time Management Tools
- Self - Helps
- Power Point Presentations
- Recommended Readings

### TIME MANAGEMENT TOOLS

| Calendars | | Acrobat Reader |
|---|---|---|
| Weekly Calendar | Word | PDF |
| Monthly Calendar | Word | PDF |
| Spring 2007 Calendar (Undergraduate) | Word | PDF |
| Spring 2007 Calendar (Graduate) | Word | PDF |

### SELF-HELPS

| Subject | Title | | Acrobat Reader |
|---|---|---|---|
| Writing & Research | Pressure vs. Process: The process of writing | Word | PDF |
| | Good writers revise..and revise...and revise | Word | PDF |
| | Battling the block: Writing through and beyond writer's block | Word | PDF |
| | Researching with the web: How to avoid internet plagiarism | Word | PDF |
| | Evaluating web information | Word | PDF |
| Subject | Title | | Acrobat Reader |
| Study Strategies | Environment is everything: Identifying productive places to study at PENN | Word | PDF |
| | Guide to reading primary sources | Word | PDF |

FILED
APR 2 4 2
NANCY MAYER WHITTIN
U.S. DI

| | How will I learn all of this information? | Word | PDF |
|---|---|---|---|
| | I just can't seem to concentrate! | Word | PDF |
| | It all starts with listening: Notemaking from lectures | Word | PDF |
| | This is only a test | Word | PDF |
| | Take charge of your learning! | Word | PDF |

| Subject | Title | Acrobat Reader |
|---|---|---|
| Time Management | I'm too busy to manage my time! | Word PDF |
| | One of these days I'll stop procrastinating | Word PDF |

| Subject | Title | Acrobat Reader |
|---|---|---|
| Course Specific | Study biology: I thought I knew everything (but I still got a bad grade) | Word PDF |
| | Do you see what I see: Studying for Art History courses | Word PDF |
| | It's all greek to me: Learning & studying a foreign language | Word PDF |

back to top

## POWER POINT PRESENTATIONS

**Presentations**

| 10 Best Study Strategies | Power Point |
|---|---|
| Before, During, and After Lecture | Power Point |
| Essay Exams | Power Point |
| Multiple-Choice Exams | Power Point |
| Reading & Note-taking | Power Point |
| Time Management | Power Point |

back to top

## RECOMMENDED READINGS

- *Writing Your Dissertation in Fifteen Minutes a Day*, J. Bolker

- *The Craft of Research*, W. Booth, G. Colomb, & J. Williams
- *More Learning in Less Time*, N. Kahn
- *Learning Outside the Lines*, J. Mooney & D. Cole
- *How to Study in College*, W. Pauk
- *How to Excel in Medical School*, N. Susswein Saks
- *The Clockwork Muse*, E. Zerubavel

back to top

Copyright © 2003, **University of Pennsylvania**
3451 Walnut Street, Philadelphia, PA 19104 · 215-898-5000
Copyright Information | Contact Us | Privacy Policy | Disclaimer

 **Visit the Vice Provost for University Life website**

# LRC's Top Ten . . .
# Study Strategies



Learning Resources Center     University of Pennsylvania

www.vpul.upenn.edu/lrc

# #5: Study actively

Sound familiar?

- You have a Psychology midterm tomorrow, but you feel confident that you know the material.

- You've read all the chapters and reviewed your lecture notes.

- You take the exam and it seems as though the questions don't represent the information you were told to study.

*What went wrong? . . .*

# ...you didn't study *actively*.

"So, how do I do that?"

- Draw diagrams or charts representing relationships between ideas

- Work through practice problems and old exam questions

- Create a study group and quiz each other

- Cover up your notes and talk through a concept as though you were teaching it to someone else.

- Make flash cards or study sheets and review them regularly.

# Exam Strategies for Essay Exams

Office of Learning Resources

University of Pennsylvania

www.vpul.upenn.edu/lrc

# Preparing for the Exam

- Practice answering sample questions under conditions similar to those you will encounter in the actual exam.  Find a quiet place.  Set a time for the allotted time.

- Be mentally and physically prepared for the exam. Get a good night's sleep.  Eat healthy food.

**Paul**Hastings
ATTORNEYS

Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W. • Washington, DC 20005
telephone 202 551 1700 • facsimile 202 551 1705 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(202) 551-1773
michaelwhite@paulhastings.com

April 13, 2006                                                                                     09887.00007

**CONFIDENTIAL**
**BY HAND**

Ann Bishop Richardson
Associate Dean for Academic Affairs
David A. Clarke School of Law
4200 Connecticut Avenue, NW
Washington, DC  20008

Re:    Supplemental and Amended Appeal
       to the Full Faculty of Nicole Di Lella

Dear Dean Richardson:

Enclosed please find a copy of Nicole Di Lella's Supplemental and Amended Appeal to
the Faculty as a Whole From the February 27, 2006 Decision of the Academic Standards
Committee.  This document supersedes and replaces Ms. Di Lella's previous appeal, which
was forwarded to you on March 31.  I would appreciate it if at your earliest convenience
you would please distribute copies of this document to the faculty (enclosed).  Please note
that this material is confidential, and we would appreciate it if you would treat it in the
same manner that you treated the previous version.

Please do not hesitate to contact me if you have any questions or concerns.  I appreciate
your attention to this matter.

Very truly yours,

Michael D. White
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

MDW:laj

Enclosures

FILED

APR 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## SUPPLEMENTAL AND AMENDED APPEAL
## TO THE FACULTY AS A WHOLE
## FROM THE FEBRUARY 27, 2006
## DECISION OF THE ACADEMIC STANDARDS COMMITTEE

Nicole Di Lella, through undersigned counsel and pursuant to Volume II,

Section 4(d) and (e) of the University of The District of Columbia David A. Clarke

School of Law Handbook, hereby appeals the February 27, 2006 Decision of the

Academic Standards Committee regarding the Complaint of Honor System Violations

filed on October 14, 2005 by Professor Susan Waysdorf. As grounds for her appeal,

Ms. Di Lella submits as follows[1]:

### INTRODUCTION

Before the Faculty is the appeal of a student who inadvertently, and most

unfortunately, submitted study aids in place of the essay response to Part I of Professor

Susan Waysdorf's Spring 2005 Constitutional Law II examination. Deliberate

consideration of the details surrounding her mistaken submission reveals that the finding

by the Academic Standards Committee that her error was intentional, and constituted

plagiarism, is not supported by the facts.

In the first instance, it is paramount to note that the mistakenly transmitted essays

were not even a response to Professor Waysdorf's exam. Rather, they consisted of (a) a

treatment of a 2003 examination question which asked the student to make up a

hypothetical exam question and (b) a treatment of an amicus filed in <u>Lawrence v. Texas</u>

from the same 2003 exam, prepared in response to a hypothetical fact pattern based upon

---

[1] Ms. Di Lella reserves the right to amend and/or supplement this Appeal.

### CONFIDENTIAL

that case. Conversely, Part I of Professor Waysdorf's 2005 final required the student to analyze the decision in <u>Roe v. Wade</u> and to evaluate a hypothetical concerning the First Amendment. Given the dissimilarity of issues, *neither* of the mistakenly transmitted documents were *remotely* related to the questions asked on the 2005 exam. Thus, Ms. Di Lella could not have anticipated receiving any benefit from their submission as they failed to demonstrate her knowledge of the subject matter evaluated to pass the Spring 2005 course.

Second, to state, as the ASC has, that there is "no pedagogical benefit" to retyping an examination answer from a previous examination is scientifically incorrect. As the attached report from Dr. Sydnor Greenberg makes clear, the manual duplication of notes and "model answers" is of enormous benefit when preparing for a written examination. Changing the names and vocabulary of the material is a simple and effective mnemonic device that facilitates recall of the material. It is common for persons with learning disabilities to develop individual techniques to overcome the impediments imposed by their disabilities, and Ms. Di Lella has had successful experiences with these techniques in the past.

Third, the ASC's finding that Ms. Di Lella submitted the incorrect materials in order to gain an additional extension is a blatant mischaracterization of Ms. Di Lella's statements to the ASC, and in many ways the clearest example of the ASC's violation of Ms. Di Lella's due process rights, as afforded to her by the United States Constitution.

For all of the reasons set forth below, Ms. Di Lella respectfully requests that the Faculty reverse the decision of the ASC, and dismiss Professor Waysdorf's Complaint.

**CONFIDENTIAL**

## STATEMENT OF FACTS

1.    Nicole Di Lella enrolled at the David A. Clarke School of Law ("School") in the

Fall of 2003, as part of the School's Class of 2006.

2.    Section VI(b) of Volume I of the Student Handbook provides, for those students

who qualify:

> It is the policy of the School of Law to ensure individualized opportunities for students with disabilities.  The School of Law will make reasonable accommodations to the known disability of a student...
>
> The student seeking a reasonable accommodation shall notify the [School] of...her disability as soon as practicable and shall request an accommodation.  The student shall provide a statement from a professional qualified to certify the existence of the disability.  The professional must also specify the way in which the disability will or might be expected to affect educational performance in the absence of a particular accommodation by the [School]....
>
> The [School] shall meet with the student to discuss the requested accommodation and alternative accommodations...**The process should be accomplished expeditiously....**
>
> When documentation of a disability supports the need for note takers, [School] staff and faculty will collaborate to arrange this accommodation....It is the student's responsibility to... [have the School] request that a faculty member make an **anonymous announcement** in class regarding the need for a note taker.  **When making the announcement, the faculty member will be sensitive to confidentiality issues.**

Student Handbook Volume I, Section 6, at 39-41 (emph. added).

3.    As an annex to the Student Handbook, the School has published a Tolerance

Statement in which it commits, *inter alia*, as follows:

> **We confront and reject all manifestations of discrimination, including those based on the actual or perceived...disability...of any individual, or any of the other differences among people which have been excuses for misunderstanding, dissension or hatred.**  We recognize and cherish the richness contributed to our lives by our diversity.  We take pride in our various achievements, and we celebrate our differences.

**CONFIDENTIAL**

Student Handbook – Tolerance Statement (emph. added).

4.      Upon enrollment, and in accordance with the procedures set forth in Volume I, Section 6 of the Student Handbook, Ms. Di Lella presented certification of certain learning disabilities.  The disabilities with which Ms. Di Lella was diagnosed required that she be provided with class notes by the school, and required that she be given twice the amount of the normally proscribed time to take examinations and assignments.  See September 9, 2003 Letter from N. Di Lella to A. Richardson, attached as Exhibit A.

5.      Ann Richardson, Associate Dean of Academic Affairs, reviewed the disability certifications presented by Ms. Di Lella, and approved Ms. Di Lella's request for a note taker.  See September 15, 2003 Memorandum from A. Richardson to N. Di Lella, attached as Exhibit B. Dean Richardson also agreed that, as part of these accommodations, Ms. Di Lella would be provided with additional time to complete her examinations.

6.      As part of her educational regimen and to offset the effects of her certified disabilities, Ms. Di Lella frequently re-types her class notes into outline and essay form. Additionally, she retypes and modifies previously administered examinations and, when available, their corresponding model answers.  This process helps Ms. Di Lella synthesize and process the text, and facilitates the recall of pertinent concepts.[2]

7.      In addition, as part of her course of study, and consistent with the practice of other students at the School, Ms. Di Lella has obtained many study aids from Internet websites, including the websites of other law schools.

---

[2] This study method is hardly revolutionary, and advocacy for variations of this study method is widespread.  See, e.g., Study Techniques from www.findlaw.com, attached as Exhibit C.

4

**CONFIDENTIAL**

8.    One such comprehensive website, visited by numerous students and faculty[3], is the website from the University of Alberta (Canada) School of Law ("UASL"). The UASL website is popular with students because, in addition to sample examinations, it provides model examination answers.

## A. CONSTITUTIONAL LAW II & MS. DI LELLA'S TRANSFER APPLICATIONS

9.    For the Spring Semester of 2005, Ms. Di Lella enrolled in the Constitutional Law II course taught by Professor Susan Waysdorf.

10.    It was also during the Spring Semester of 2005 that Ms. Di Lella informed the school of her acceptance and intent to transfer to a joint degree program with Rutgers University School of Law and the Bloustein School of Public Policy.

11.    Throughout Professor Waysdorf's course, Ms. Di Lella sought the notes to which she, as a student with a certified disability, was entitled. Despite numerous requests, the School failed to produce these notes, which Ms. Di Lella required in order to prepare for class assignments and examinations. The School's breach of its duty left Ms. Di Lella at a disadvantage during class discussions.

12.    To this end, because she had not received the Con Law II class notes, Professor Waysdorf's Con Law II midterm examination was not administered to Ms. Di Lella on the date that her colleagues took the exam. Soon after that date, Professor Waysdorf shouted to Ms. Di Lella in the presence of other students to admonish Ms. Di Lella,

---

[3] Upon information and belief, School faculty (including Professor Waysdorf) have accessed, and repurposed in their respective courses (and without attribution), copyrighted examination questions previously administered at the University of Alberta, other law schools, and other Internet sources. Compare Examination from Prof. Salamanca, University of Kentucky School of Law, attached as Exhibit D, with Part II of the Spring 2005 Con Law II Examination of Prof. Waysdorf , (in the possession of Professor Waysdorf but to be attached as Exhibit E); compare also, Practice Torts Examination from LawNerds.com, attached as Exhibit F, with Torts Study Aid of Prof. Mack, attached as Exhibit G.

CONFIDENTIAL

stating "you must take this exam." Professor Waysdorf repeatedly admonished

Ms. Di Lella in the presence of her classmates that she "must take this exam."

13.    By alerting the other students in the Con Law II class to the fact that Ms. Di Lella

had not yet taken the exam, Professor Waysdorf exposed Ms. Di Lella's certified

disabilities to the class, taking from Ms. Di Lella the protection afforded by anonymity,

as required by federal law, the law of the District of Columbia, and Volume I of the

Student Handbook.  Ms. Di Lella was humiliated by this attention and was subsequently

harassed by other students about her disability.

14.    In May 2005, at the end of the Spring semester, Professor Waysdorf administered

the final examination in Con Law II, consisting of two parts:

- Part I, consisting of two essay questions, for which students were given one (1) week in order to complete the essays; and

- Part II (to be completed during a three hour sitting after completion of Part I), consisting of multiple choice questions, and a bonus question in which a student could write his or her own essay question.

15.    As a result of the School's continuing failure to produce the class notes which she

required and to which she was entitled, the Con Law II final examination was not

administered to Ms. Di Lella as scheduled during the Spring of 2005.

16.    Throughout the Summer of 2005, the School consistently failed to provide

Ms. Di Lella with the notes she required for her Con Law II exam.  The inability to

complete the exam impeded Ms. Di Lella's ability to finalize her transfer applications to

the Rutgers University School of Law and the Bloustein School of Public Policy.

Accordingly, Ms. Di Lella stayed in constant contact with the School, seeking the notes

in order to complete the 2005 Con Law II final examination.

**CONFIDENTIAL**

LEGAL_US_E # 70688214.2

17.     Despite never having provided Ms. Di Lella with the required notes , in August
2005 the school informed Ms. Di Lella that she would nonetheless be required to take the
Con Law II final examination before the start of the Fall 2005 semester.  Ms. Di Lella
and Dean Richardson subsequently agreed to extend this deadline to September 16.  On
the first day of classes, Ms. Di Lella independently obtained notes from another student
and scheduled Part II of the Con Law II examination for September 14.  She was also
required to hand in Part I of the exam, which she received in June and completed during
the summer without the benefit of the lecture notes.

## B. FAMILY EMERGENCY MISCOMMUNICATION AND MISTAKEN TRANSMISSION

18.     On the morning of September 14, 2005, shortly before she was to take the Con
Law II final examination, Ms. Di Lella was notified of a family emergency that would
require her to travel to Buffalo, New York.

19.     Shortly thereafter, Ms. Di Lella arrived at the School, where she informed Dean
Richardson of the emergency.  Ms. Di Lella explained that given the exigent
circumstances, she had not had an opportunity to print out Part I of the exam.  Dean
Richardson agreed to allow Ms. Di Lella to take Part II of the Con Law II exam despite
not having turned in Part I.  Ms. Di Lella submitted Part II of the Con Law II final
examination on September 14, 2005.

20.     On September 15, Ms. Di Lella flew to Upstate New York to join her family.
Shortly before her departure, she contacted Derek Littin, a friend who is not a student at
the School, and asked him to contact Dean Richardson on her behalf.  Mr. Littin
contacted Dean Richardson and emphasized the exigent nature of the circumstances and
requested a one day extension of the deadline to the Friday, September 16.  September 16

was the date upon which Dean Richardson and Ms. Di Lella had agreed in August as the deadline by which Ms. Di Lella's Con Law II exam was due. Dean Richardson granted Mr. Littin's request, allowing her to submit her work on Monday, September 19. After concluding their conversation, Mr. Littin left his office for the weekend.

21.    While at the airport in Buffalo on September 19, 2005 for her return trip to Washington, Ms. Di Lella was contacted by Mr. Littin, who informed her that Dean Richardson had contacted him to say that the deadline Part I of the examination had not been extended, and her response would be due at the end of Friday. Dean Richardson had sought to deliver this information, which constituted a reversal of her previous position, to Mr. Littin via email. Unfortunately, the email was not sent until after Mr. Littin had left the office for the weekend on Friday, September 16, and Mr. Littin did not receive it until the morning of Monday, September 19. Mr. Littin promptly replied to the email on September 19, notifying Dean Richardson that Nicole would submit her responses to the exam as soon as possible.

22.    Upset from the family emergency, and afraid that her misunderstanding concerning the Con Law II deadline would result in a penalty leading to a lower grade, Ms. Di Lella wanted to submit her response to Part I as soon possible, rather than waiting until her return to Washington at the end of the day. Accordingly, she sent Mr. Littin, via email from the airport prior to her airplane's departure, electronic files which she believed to contain her essay response to Part I of the examination.

23.    After sending these files, and receiving confirmation from Mr. Littin that he had printed the files and delivered the paper documents to Professor Waysdorf, Ms. Di Lella believed that she had completed Part I of the Con Law II examination.

8

CONFIDENTIAL

24.    In late-September and early-October 2005, because she was eager to complete her transfer applications, Ms. Di Lella attempted to contact Professor Waysdorf on three occasions to inquire as to the status of her Con Law II exam. On September 27, she placed a call to Professor Waysdorf to confirm her receipt of Ms. Di Lella's Con Law II examination in its entirety. Ms. Di Lella also notified Dean Richardson of this call. However, Professor Waysdorf never returned the call. On October 5, Ms. Di Lella again telephoned Professor Waysdorf and requested that Professor Waysdorf contact her to confirm receipt of her exam and to confirm that she was actively reviewing it. Professor Waysdorf was aware that Ms. Di Lella needed to obtain her Con Law II grade before she could transfer to Rutgers Law. On October 13, anxious to send out her transfer materials, Ms. Di Lella placed a third call to Professor Waysdorf, who again failed to respond. Via email that evening, Professor Waysdorf informed Ms. Di Lella that she had, "received [her] telephone message and have now completed grading [her] Con Law II exam for the Spring 2005 semester." She added that she did not communicate grades via telephone or email, and that she would need to obtain her grade from the School registrar. See October 13, 2005 email from S. Waysdorf to N. Di Lella, attached as Exhibit H.

### C. PROFESSOR WAYSDORF'S HONOR SYSTEM COMPLAINT

25.    On or about October 19, 2005, Ms. Di Lella received a carbon copy of a letter from Dean Richardson to the ASC, alerting her that Professor Waysdorf had accused Ms. Di Lella of plagiarism on the Con Law II final examination.

26.    Dean Richardson then provided Ms. Di Lella with a copy of the Complaint of Honor System Violations filed with her office by Professor Waysdorf. See October 14, 2005 Complaint of Honor System Violations, attached as Exhibit I ("Complaint").

**CONFIDENTIAL**

27.  In her Complaint, Professor Waysdorf stated as follows:

> It is my contention that Ms. Di Lella violated both Section
> 1(a) of the Honor System ("Honesty in crediting sources of
> ideas, information and written work") and also Section 1(b)
> ("Honesty in taking examination"), by copying material
> directly from other sources and failing to credit those
> sources on the "take-home" essay portion of the final
> examination in my course, Constitutional Law II (Spring
> 2005 semester).

Complaint at 1.

28.  The Complaint did <u>not</u> allege that Ms. Di Lella plagiarized any of her responses to

her the 2005 exam – indeed, Professor Waysdorf explicitly states that, "[f]or some

reason… she answered the essay questions from my Spring 2003 Constitutional Law II

exam… [and] submitted answers to those questions, rather than the essay questions on

the Spring 2005 exam, which she was given…." Rather, the Complaint only addressed

Ms. Di Lella's work on the questions from the 2003 exam – material made available over

School's intranet for use as study aids by students. Therefore, the only charges before the

ASC were that Ms. Di Lella had submitted study aids without attribution.

29.  Professor Waysdorf contended that, in response to "Question 1 – Write Your Own

Exam Question" *on Professor Waysdorf's **Spring 2003** examination*, Ms. Di Lella

submitted an answer "taken in its entirety" from an exam given by Professor B.

Billingsley at the University of Alberta during the 1999-2000 term; and (b) in response to

Question 4 *of Professor Waysdorf's **Spring 2003** examination*, Ms. Di Lella had "copied

directly and extensively from the Petition for Writ of Certiorari submitted by Lambda

Legal Defense and Education Fund in <u>Lawrence v. Texas</u>. Professor Waysdorf also

contended that Ms. Di Lella "failed to submit an answer to the third essay question, as

CONFIDENTIAL

required under the examination she took." Complaint, fn 1. Professor Waysdorf's 2005 examination only had two questions.

30.     Upon receipt of the Complaint, and review of the response to Part I of Professor Waysdorf's exam that was submitted on her behalf by Mr. Littin, Ms. Di Lella learned for the first time that materials that she had obtained and typed as study aids had been mistakenly submitted instead of the response to Part I that she had independently authored.

31.     As Ms. Di Lella had been in contact with Professor Waysdorf almost immediately after she returned from her family emergency, she was confused as to why Professor Waysdorf had returned her calls to raise the issue with her directly.

32.     Believing that the misunderstanding concerning "plagiarism" could be easily explained, and Professor Waysdorf's Complaint would therefore be withdrawn, Ms. Di Lella then contacted Dean Richardson to explain to her the circumstances precipitating the mistaken transmission of the study aids. Ms. Di Lella also sought to submit the response she had prepared to the 2005 Con Law II exam – materials she mistakenly believed had been turned in more than a month earlier.

33.     On October 28th, Dean Richardson returned Ms. Di Lella's voicemails to advise her that the matter was now before the Academic Standards Committee ("ASC"), and would need to be addressed in that forum. Dean Richardson told her that there was no point in discussing the submission of her response to the 2005 Con Law II exam with her or Professor Waysdorf as the matter was "in the hands" of the ASC and would need to be addressed in that forum

CONFIDENTIAL

34.     On October 28, 2005, Ms. Di Lella received a letter dated October 25 from

Professor Edward Allen, Chair of the ASC, informing Ms. Di Lella that Professor

Waysdorf had filed a Complaint of Honor System Violations. See October 25, 2005

Allen Letter, attached as Exhibit J. A copy of Professor Waysdorf's Complaint was

attached to Professor Allen's letter.

## D. STATEMENT OF EXPLANATION AND CONVENING OF ACADEMIC STANDARDS COMMITTEE

35.     Still believing that her error of transmission could be easily explained, on

November 4, 2005 Ms. Di Lella submitted her Statement of Explanation to Professor

Allen and the ASC, in accordance with Volume II of the Student Handbook. See

November 4, 2005 letter from N. Di Lella, attached as Exhibit K. Therein she explained

that her own study aids – a treatment of the Constitutional Law II examination

administered by Professor Waysdorf *in 2003* – had been mistakenly submitted in lieu of

her actual response, and set forth the circumstances of emotional duress that led her to

make the mistake.

36.     Ms. Di Lella's statements also further clarified, out of an abundance of caution,

that because the mistakenly submitted work consisted of study aids, rather than a

response to Professor Waysdorf's assigned exam, it did not constitute an "exam

response," and thus could not be judged as such for purposes by either Professor

Waysdorf's examination or the School's Honor System.

12                   **CONFIDENTIAL**

37.    On January 24, Ms. Di Lella appeared before the ASC to discuss Professor

Waysdorf's allegations.[4]  The ASC panel was comprised of Professor Allen, Professor

Tom Mack, and Professor Stephanie Brown.

38.    The composition of the ASC panel concerned Ms. Di Lella, as she had previously

had negative experiences with two of the three members, Professors Allen and Mack:

Professor Allen had lost Ms. Di Lella's work previously, and Professor Mack had failed

Ms. Di Lella in a course, which she had disputed with the ASC. Ms. Di Lella's

relationship with Professor Allen had been particularly contentious.  In addition to losing

her exam, Professor Allen had also incorrectly attributed another student's failing grade

to Ms. Di Lella, as a result of which Ms. Di Lella received a significantly lower grade.

Ms. Di Lella had several contentious meetings with Professor Allen in an attempt to

rectify this, and to discuss other discrepancies in the manner in which Professor Allen

graded Ms. Di Lella's exam.  The contentious nature of these meetings was underscored

by the fact that in Fall 2004, Dean Richardson informed Ms. Di Lella that the school was

expelling her for poor academic performance. Had Professor Allen provided Ms. Di Lella

with an accurate grade, Ms. Di Lella's cumulative grade point would have been sufficient

to maintain good academic standing.

39.    Notwithstanding her reservations about the ASC's ability to conduct a fair and

unbiased evaluation, Ms. Di Lella presented her explanation to the ASC.

40.    On January 25, 2006, Ms. Di Lella supplemented her Statement of Explanation,

clarifying for the ASC the School's failure to accommodate Ms. Di Lella's disabilities,

---

[4] Although Volume II of the Student Handbook provides that a reasonable record of the ASC proceedings
is to be kept, no such record has been provided to Ms. Di Lella to date, further prejudicing her.

**CONFIDENTIAL**

and Dean Richardson's resulting indulgence of an extension for the Constitutional Law II

examination. <u>See</u> January 25, 2006 letter of N. Di Lella, attached as Exhibit L.

### E. <u>DECISION OF THE ACADEMIC STANDARDS COMMITTEE</u>

41.    By letter dated February 27, the ASC issued its decision. <u>See</u> February 27, 2006

Decision of the Academic Standards Committee (the "Decision"), attached as Exhibit M.

The Decision adopted in its entirety (essentially verbatim and without attribution)

Professor Waysdorf's version of the facts, and stated as follows:

> The answer you submitted for ""Question 1"" *(sic)* was taken in its
> entirety, except for a change of names of the parties and other minimal
> changes, from a University of Alberta Faculty of Law web site. The
> answer you submitted for ""Question 4"" *(sic)* was copied directly and
> extensively from the Petition for Writ of Certiorari prepared by the Lamda
> Legal Defense and Education fund, filed in Lawrence v. Texas.

And although posited by the ASC as Ms. Di Lella's defense, the ASC also found that she

had "hoped" that her 2003 exam would suffice to win a passing grade, or create enough

confusion to result in more time to submit a response to the 2005 exam:

> You further assert that you had no idea you had submitted the wrong
> document until approximately one month later when you were informed
> you were being charged with plagiarism. After being so informed, you
> then submitted, for the first time, and answer responsive to the 2005 exam,
> a month beyond the September 16 deadline.[5]

> You argue that it must have been a mistake, since intentionally submitting
> a 2003 exam answer as an answer to the completely different 2005 exam
> would be of no use.

> In short, your defense is that you mistakenly submitted a study aid rather
> than an answer you hoped would suffice to win you a passing grade, *or
> would create enough confusion to result in even more time to submit an
> already overdue correct answer to the 2005 exam.*

<u>See</u> Decision at 1-2 (<u>emph.</u> added).

---

[5] While the School chastises Ms. Di Lella for submitting an "already overdue" response, it is pertinent to
note that any delay is attributable to the fact that the School never provided Ms. Di Lella with Con Law II
class notes, as required by the terms of her accommodation agreement.

**CONFIDENTIAL**

42.    The Decision further found:

> To the implausible degree that typing out a question might serve as study
> material, it was already available to view, print, or download from the
> Alberta Law School site. So there would not appear to be any reason for
> typing out a copy. And there would appear to be no pedagogical purpose
> whatsoever to changing the names of the parties.

> We do not find credible your explanation that the plagiarized document
> was a mere study aid mistakenly submitted. We find that you are
> responsible for your action in submitting a plagiarized document to a
> professor to meet the deadline imposed on you for submitting an answer to
> her exam. As such, we find that you violated the honor code as charged.

> Pursuant to its responsibilities and powers under the Honor System, the
> Committee has determined to impose the sanction of suspension for one
> year beginning in August 2006.

Id. at 2-3.

43.    In addition to the suspension – upon information and belief, the most severe
punishment rendered by the ASC at any time – the ASC instructed the Dean of Academic
Affairs and the Registrar to (1) place a copy of the Decision in Ms. Di Lella's permanent
file; (2) inform Bar Examiners of the Decision; and (3) include the Decision in any
formal letter of good standing. Although Ms. Di Lella repeatedly requested information
as to offenses addressed by the board in past years and the punishments meted out, the
School never provided it.

44.    Significantly, and perhaps most troubling, because the suspension will prevent
Ms. Di Lella from completing her studies within the 5 year period required by the school,
she will be barred from completing her coursework at the School. Thus, a putative one
year suspension will actually be a de facto expulsion.

45.    Prior to the Decision being rendered, Dean Richardson was contacted by the
Seton Hall School of Law, to inform the School that Ms. Di Lella had requested and had
been accepted to transfer that semester.. Upon information and belief, and without

15                          **CONFIDENTIAL**

Ms. Di Lella's permission, Dean Richardson disclosed to Seton Hall that Ms. Di Lella had been accused of plagiarism. This disclosure was made before Ms. Di Lella had responded to the accusations and prior to the outcome of the hearing, and was made without Ms. Di Lella's permission.

## ARGUMENT

With its Decision, the ASC has improvidently punished a student for an honest mistake. Part of the Decision is premised upon the ASC's scientifically incorrect conclusion regarding methods of study and learning for students with certified learning disabilities. The remainder of the Decision results from the ASC's exceeding its authority in mischaracterizing Ms. Di Lella's defense as having "submitted a study aid rather than an answer [she] hoped would suffice to win [her] a passing grade, or…at least create enough confusion to result in even more time to submit an already overdue correct answer to the 2005 exam." Decision at 3. This heedless misrepresentation of Ms. Di Lella's good faith explanation is simply beyond comprehension in the context of a disciplinary proceeding.

In light of the ASC's disregard for Ms. Di Lella's right to due process under the United States Constitution, the Faculty must abandon the ASC's Decision, and dismiss of Professor Waysdorf's Complaint.[6]

I.    **BY FAILING TO AFFORD MS. DI LELLA THE DUE PROCESS TO WHICH SHE IS ENTITLED, THE ASC ACTED IMPROPERLY IN RENDERING ITS DECISION.**

It is well settled that, in the context of disciplinary cases, school officials must act as a fact-finding body rather than board of academic review; for this reason, due process

---

[6] With regard to the School's clear violations of federal and District of Columbia disability laws, and the School's defamation and slander of Ms. Di Lella, these matters are not at issue in this Appeal.

may well require additional procedural safeguards. <u>Dixon v. Alabama State Bd. of Educ.</u>, 294 F.2d 150, 158-59 (5th Cir.), <u>cert. den.</u>, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). Because a student's interest in attending a university is a property right protected by the Due Process clause of the United States Constitution, decisions in disciplinary matters must be rational, careful and deliberate – not arbitrary, capricious or motivated by bad faith or ill will. <u>Abbariao v. Hamline Univ. School of Law</u>, 258 N.W.2d 108, 112 (Minn. 1977). To this end, findings of fact in a disciplinary proceeding should be determined under the "beyond a reasonable doubt" standard. <u>Cobb v. Rector of Univ. of Va.</u>, 84 F.Supp.2d 740 (W.D. Va. 2000), or, at the very least, determined by clear and convincing evidence, <u>In the Matter of Joseph A. Pennico, An Attorney at Law</u>, 36 NJ 401, 177 A2d 721 (1962).

The ASC's decision does not adhere to these standards. Instead, the entirety of the ASC's Decision is based upon three unsupported and illogical conclusions: (1) that there is "no pedagogical benefit" to manually copying prior exam responses as study aids, (2) that Ms. Di Lella "hoped" that the "substitute" 2003 exam would be accepted and graded in lieu of the 2005 final exam, and (3) that Ms. Di Lella intentionally submitted incorrect materials in order to gain additional time on the Con Law II final examination.

### A. The ASC's "No Pedagogical Benefit" Pronouncement is Unsupported in the Record, Scientifically Inaccurate, and Evidence that Ms. Di Lella Was Not Afforded Due Process in the Investigation.

With regard to the ASC's "no pedagogical benefit" conclusion, nothing in the Decision can be said to support this assertion. The ASC has failed to cite to any authority

CONFIDENTIAL

as a basis – rational or otherwise – for this conclusion.[7]  This error alone warrants a set aside of the ASC's decision, and a dismissal of Professor Waysdorf's Complaint.  Lewis v. Marsh, 672 F.Supp. 14, 17-18 (D.D.C. 1987) (finding administrator's decision to be arbitrary, capricious and not supported by substantial evidence where decision was "conclusory and without evidentiary support").

Moreover, in rendering this conclusion without either consulting *sua sponte* an expert in the field, or affording Ms. Di Lella the opportunity to present expert testimony on her behalf concerning this issue, the ASC failed to honor Ms. Di Lella's right to due process under the Constitution of the United States with respect to her property right as a student at the School.  Abbariao v. Hamline Univ. School of Law at 112-13.[8]

For these reasons, the Faculty should abandon the Decision of the ASC, and dismiss Professor Waysdorf's Complaint.

### B.    The ASC's Mischaracterization of Ms. Di Lella's Defense is Not Supported by Any Rational Basis, and Must be Disregarded.

In the materials that Ms. Di Lella submitted to the ASC, she consistently stated that her submission of her treatments of different exams as a response to Part I of Professor Waysdorf's Con Law II final was an honest mistake resulting from human error.  Despite her clear and repeated explanation of this error, in its findings the ASC cavalierly attributed a motive of confusion and deception to her, and called this her "defense."  This deliberately cruel manipulation of fact by an authoritative body is

---

[7] Again, this conclusion was rendered at the same institution which failed to provide Ms. Di Lella, and many others, with the class notes to which they were entitled because of their certified disabilities.
[8] Perhaps most alarmingly, the conclusion is scientifically incorrect: as Dr. Sydnor Greenberg has noted, the manual recreation of exams and answers is of benefit across the spectrum of learning disabilities.  See April 12, 2006 Report of Dr. James M. Sydnor-Greenburg, attached hereto as Exhibit N.

unfortunate in any circumstance; in this instance, involving a ***disciplinary committee upholding an Honor System***, such action is reprehensible.[9]

In order to make a decision that is not arbitrary and capricious, the ASC must have a rational basis to support its decision. Eastern Cent. Motor Carriers Ass'n v. United States, 239 F.Supp 591, 594 (D.D.C. 1965) ("'Arbitrary' and 'capricious' are to be understood in their legal sense as distinguished from their opprobrious or popular meaning. Accordingly, these words mean 'without rational basis'."); see also Alden v. Georgetown Univ., 734 A.2d 1103, 1109 (D.C. App. 1999). The rational basis must be supported by credible evidence which is not speculative. Eastern Cent. Motor Carriers Ass'n, 239 F.Supp. at 595-596; Lewis v. Marsh, 672 F.Supp. at 17-18. Deception is an essential element of plagiarism. (Black's Law Dictionary 1170 (7th Ed. 1999) (defining plagiarism as, "using the work of another *with an intent to deceive...*," quoting Christopher Ricks, "Plagiarism," 97 Proceedings of the British Academy, 149, 151 (1998) (emphasis in original)). Thus, to establish a rational basis for its finding of plagiarism, the evidence must demonstrate an intent and a motivation to deceive. As even a cursory review of the facts indicates, however, the ASC's conclusion that Ms. Di Lella submitted plagiarized material was arbitrary and capricious, and wholly lacking any rational basis.

As is set forth more fully above, the material submitted as Ms. Di Lella's putative response to Professor Waysdorf's 2005 exam covered subject matter wholly unrelated to that called for by the questions. See p. 1-2, supra; see also Complaint at 1. Ms. Di Lella

---

[9] Moreover, the "conclusion" is nonsensical. Ms. Di Lella had, by September 16, had the examination for months, and desperately needed to complete it in order to obtain her Con Law II grade and complete her transfer applications. For what plausible reason would she have wanted the exam for yet more time?

**CONFIDENTIAL**

LEGAL_US_E # 70688214.2

repeatedly offered a plausible and reasonable explanation for her action: distraught from a family emergency and afraid that her misunderstanding concerning the Con Law II deadline would lead to a penalty and a lower grade, she emailed a friend electronic files she erroneously believed to contain her response. Ms. Di Lella's friend printed these materials and submitted them to Professor Waysdorf on Ms. Di Lella's behalf.

It is apparent from the face of the materials that Ms. Di Lella submitted that the materials do not respond to the 2005 exam. Indeed, Professor Waysdorf acknowledged as much in her complaint. See Complaint at 1 ("For some reason… she answered the essay questions from my Spring 2003 Constitutional Law II exam…."). Given the transparently non-responsive nature of these materials to the 2005 exam questions and concurrent lack of deceit, the ASC does not allege, and there is no evidence to support, a claim that Ms. Di Lella attempted to submit a plagiarized answer to the 2005 exam. Rather, the ASC contends that Ms. Di Lella submitted a plagiarized response to the 2003 exam – an exam which had not even been assigned to her but had instead been made available by the School as a study aid. Thus, in order to conclude that Ms. Di Lella committed plagiarism, the ASC would first have to have found that Ms. Di Lella believed that Professor Waysdorf was willing to accept, for course credit and a grade, answers to an exam that she did not assign, and that Ms. Di Lella believed that she had unilateral, unrestricted discretion in her selection of exams. Given that there was no past practice of this at the School (and, indeed, that it would almost certainly be unprecedented at any law school), or any other circumstances that would lead Ms. Di Lella or any other student to find it even remotely plausible that the substitute exam would be accepted, the ASC had no rational basis to concluded that Ms. Di Lella committed plagiarism. More to the point,

**CONFIDENTIAL**

because ASC's conclusion was unsupported by any findings of fact and because the ASC

failed to maintain a record of the proceedings, this finding and the proceedings that led to

it constitute a substantial departure from accepted academic norms and lack any rational

basis. Such a finding is arbitrary and capricious and fails to demonstrate a careful and

deliberate exercise of professional judgment, and therefore should be reversed.

### C.    Because the ASC Did Not Disclose the Burden of Proof Employed in Rendering its Decision, the Decision is Arbitrary and Capricious and Must be Disregarded.

The ASC's decision does not disclose the burden of proof utilized in rendering its

decision, nor does the handbook indicate the burden to be used. Given that

Ms. Di Lella's dismissal was for disciplinary reasons and not for academic performance

reasons, due process cannot be achieved unless the burden is beyond a reasonable doubt

or at least by a clear and convincing standard. Board of Curators of the Univ. of Mo. v.

Horowitz, 435 U.S. 78, 85-89, 98 S.Ct. 948, 952-955, 55 L.Ed.2d 124 (1978)

(distinguishing dismissal for academic reasons from dismissal for disciplinary reasons,

and noting the due process requirements implicated by the latter); see also In the Matter

of Joseph A. Pennico, An Attorney at Law, 36 NJ 401, 177 A2d 721 (1962) (holding that

"clear and convincing" is the appropriate standard in disciplinary proceedings).

In Horowitz, the Court addressed the issue of whether a medical student

dismissed for poor academic performance had been afforded sufficient due process prior

to her dismissal. Justice Marshall noted that in prior decisions the Court had employed,

"a framework derived from our traditional approach to these problems." Horowitz, 435

U.S. at 100, 98 S.Ct. at 960 (Marshall, J., concurring in part and dissenting in part). This

framework assessed three factors in determining the level of process due:

**CONFIDENTIAL**

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id., quoting Matthews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Analyzing the student's dismissal in light of this framework, Marshall noted that the "private interest" implicated as "a weighty one":  dismissal from graduate school. Id. Quoting the Court of Appeals, he noted that the student had been, "...stigmatized by her dismissal is such a way that she will be unable to continue her medical education, and her chances of returning to employment in a medically related field are severely damaged." Id., quoting 582 F.2d 1317, 1321 (8th Cir. 1976).  Marshall found Judge Friendly's analysis of an analogous proceeding to be particularly apt: "...when the State seeks 'to deprive a person of a way of life to which [s]he... ha[s] come to rely,' it should be required first to provide a 'high level of procedural protection." Id., quoting Henry Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1296-97 (1975) (discussing revocation of professional licenses) (brackets and ellipses in original).  As to the remaining factors, Justice Marshall found that neither justified a reduced level of protection: reliance by the decision-maker on the reports and analysis of others presented a risk that was "not at all trivial," while a balancing of the school's interest in "summary proceedings" against the student's interest in procedural protection. Id. at 101, 98 S.Ct. at 960-61. As Justice Marshall succinctly concluded, "I believe that respondent was entitled to more procedural protection that is provided by 'informal give-and-take" before the school could dismiss her." Id. at 101, 98 S.Ct. at 961.

22                    **CONFIDENTIAL**

Reviewing all of the above, it would appear that the ASC did not frame the issues to be reviewed and did not state which burden of proof was appropriate to assure due process. The ASC's analysis was inadequate, it lacked expertise and was contrary to accepted educational norms. In short, there was insufficient evidence to support a finding under either of these standards that Ms. Di Lella intended to claim as her own work product the materials submitted as her response to the 2005 Con Law II exam. Finally, and compounding these errors, the ASC's violation of its duty to prepare findings of fact or maintain a record of the proceedings has severely prejudiced Ms. Di Lella's ability to protect her rights, and this violation of her due process and other rights standing alone warrants reversal of the ASC's decision.

There is simply no excuse for the ASC's actions. Not only is its conclusion not supported "beyond a reasonable doubt," Cobb v. Rector of Univ. of Va., 84 F.Supp.2d at 745 n.5, it is nowhere near being supporting by "clear and convincing evidence," In the Matter of Joseph A. Pennico, An Attorney at Law, 36 NJ at 419, 177 A2d at 730. By contrast, there are a number of factors which may have lead to this malicious and biased assertion (e.g., retaliation for Ms. Di Lella's complaints to the School concerning her inability to obtain needed class notes, and her past negative experiences with Professors Allen and Mack). It is *precisely* in order to prevent such biased abuses of discretion that courts hold that disciplinary procedures require "additional procedural safeguards." Dixon v. Alabama State Bd. of Educ., 294 F.2d at 159. As these safeguards were not afforded to Ms. Di Lella, the Faculty must abandon the Decision of the ASC, and dismiss Professor Waysdorf's Complaint.

**CONFIDENTIAL**

LEGAL_US_E # 70688214.2

## CONCLUSION

The student's story told above is one that will undoubtedly be repeated in the current century: one of a *good faith*, yet *mistaken*, file transmission. The manner in which it was resolved, however, is one that must not be repeated, as it indicates a failure by the School to protect the fundamental due process rights of its students.

For the reasons set forth above, Nicole Di Lella requests that the Faculty abandon the Decision of the ASC, and dismiss Professor Waysdorf's Complaint.

Respectfully submitted,

Claudia Callaway

Michael White
PAUL, HASTINGS, JANOFSKY &
WALKER, LLP
875 15th Street, N.W.
Washington, DC 20005
(202) 551-1700 (Telephone)

24                                    **CONFIDENTIAL**