Dean Ann Richardson
Associate Dean, Academic Affairs
UDC — School of Law
4200 Connecticut Avenue
Washington, DC 20008

September 9, 2003

Re:          ACCOMMODATION REQUEST

Dear Dean Richardson;

                    Per our meeting during the second week of orientation
regarding my status as a classified student with LD and my accommodation needs at UDC
School of Law, I am attaching three psychological/ educational evaluations for your
review and consideration for accommodation. The two most recent were performed in
2001 by Dr. Sydnor - Greenberg and NJ Certified Learning Consultant, Nancy Thomas,
for appeal to the LSAT for accommodation. The third evaluation is the original
diagnosis received in 1993, while I was a junior in high school, performed by Donna
Karanja. All three are original documents or only copies and therefore may be need to
be duplicated at your discretion.

                    As prescribed in the reports, I would like to request the
following accommodations, in addition to accommodations that I have utilized with
success in the past:
1.      Extended time on exams;

2.      Extended time on written projects, when necessary and requested;

3.      A separate, quite work room for exams;

4.      Timed breaks during exams when necessary and requested;

5.      A note taker for all class lectures;

6.      Additional learning supplements available to the school (i.e. - literature on
audio/ video tape, voice to text computer software, transcriptions, teacher's notes
or outlines)

7.      Any other provisions provided by the school that may be of benefit, as
necessary (i.e. - tutoring, additional academic support, recent LD materials/
information/ groups that may be helpful in coping with and developing learning
strategies, etc.)

Should you need additional information or should you have any questions or concerns
regarding this request, please let me know at your soonest convenience so that I may
be of timely assistance in the matter.

                                        Sincerely,

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**University of the District of Columbia**

**David A. Clarke School of Law**

**Ann Bishop Richardson**
**Associate Dean for Academic Affairs**



4200 Connecticut Avenue, N.W.
Washington, D.C. 20008

Telephone: (202) 274-7345
    FAX: (202) 274-5583
    Email: arichardson@udc.edu

To:        Nicole Di Lella                                        September 15, 2003

From:      Ann Richardson

Re:        Disability Determination

      Please accept this letter as memorializing my verbal communication to you that it is the policy of the David A. Clarke School of Law to provide reasonable, appropriate, and effective accommodations for students with known, qualifying disabilities. Thus, the School of Law will change practices or procedures, or provide or modify devices, services, or facilities, in order to match the student with a particular program or activity at the school. However, the school is unable to provide accommodations that fundamentally alter the educational program, such as absence from a large number of classes or waiving attendance at required courses, nor can it provide retroactive accommodations.

      Within those parameters and based upon the documentation you have submitted, the School of Law has decided:

<u>Existence of a Disability</u>: You have provided me with documentation from Dr. James M. Sydnor-Greenberg, Nancy Thomas, and Karen C. Romm that indicates the following diagnoses: Reading Disorder, Disorder of Written Expression, ADHD, Predominantly Inat6entive Type, and Scotopic Sensitivity and that these conditions may affect your academic performance.

<u>Determination as to Accommodation</u>: Beginning with the fall, 2003, semester, the School of Law will provide the following accommodations:

- You may have double time to complete examinations which will be administered to you in a separate, quiet testing room and extended time on written projects, when necessary and requested.

- We will provide you with a notetaker. The School of Law's policy and procedures for notetakers is attached.

FILED
APR 24 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

For auxiliary aids such as adaptive materials and equipment, please contact the University of the District of Columbia's Division of Student Affairs, Services for Students with Disabilities. A brochure describing those services is attached. The Director of Academic Support is Professor Derek Alphran, and you should not hesitate to contact him for advise.

Joint Responsibility as to Accommodation: Reasonable accommodation is a joint responsibility of the student and the School of Law. As part of your responsibility in this process, you must

(A) Inform me in advance of upcoming examinations so arrangements for a separate administration can be made;

(B) Consult with me periodically.

Future Review of Adequacy of Accommodation: The accommodations indicated above reflect my determination based on information provided to date. If a change in circumstances occurs that indicates that the accommodation requires modification at some future date, please bring the matter to my attention for review.

Please sign and date below to acknowledge receipt of this memorandum, and please keep a copy for your records.

Welcome to the David A. Clarke School of Law.

_____

Nicole Di Lella

Date: _____

A Renewed University for A New Century
Excellence Through Service

FindLaw: Legal Learning: Using Professors' Old Exams to Prepare          Page 1 of 2



[figure: [findlaw - study skills menu bar]]

The following is from **Starting Off Right in Torts** by Carolyn Nygren to be published in the spring of 1998.

## USING PROFESSORS' OLD EXAMS TO PREPARE

Although many law schools provide some access to old exams, few provide answers to them. I find it dangerous to use these exams to test yourself. You have no way of knowing whether you have found the issues your professor intended for you to find. You also have no way of knowing whether you have understood the issues correctly. However, you can use these exams effectively if you can find a few people who are willing to work with you to prepare.

I think the most helpful method is to assign the same question to everyone in your group. All will prepare a list of the legal theories they spot in the question. Under each legal theory, they should write a rule for the theory and the words from the fact pattern they used to decide which legal theories were applicable. When the group meets, you can share your insights. What one person doesn't find, another will. When you have agreed on a list of issues, send everyone home to write out an answer. When everyone has a written answer, meet again to share. You can compare the organization of your answers and discuss the problems you had in writing.

As you near exam time, practice under timed conditions. If the question you choose to work on is an hour question, give everyone a half hour to prepare their notes for an answer. Then meet and share notes. Next everyone should take a half hour to write the answer. If you have written answers to one-issue fact patterns throughout the semester and have started your exam preparation by practicing with the multi-issue questions, you should be prepared. You should be able to spot the issues in a long fact pattern, know which words are in it for what purpose, and have a workable format for an answer. At this point in your exam preparation your major concern should be the organization of the answers to your professor's complex questions.

This method works just as well for policy questions for which this book cannot prepare you. You and your classmates should be able to list the professor's favorite "buzz" words and figure out how to use them to answer a question. Your undergraduate essay and paper writing have probably prepared you adequately for this type of question once you have determined just what your professor is after.

# U.K

# Exam List

---

*The sample exams and exercises on this page are made available for the sole purpose of assisting students of the UK College of Law in their preparation for examinations. Any other use is prohibited. Copyright is retained by the authors.*

*Some of the exams have been password-protected. Please see the professor for the username and password.*

---

1. **One L - First Semester**
2. **One L - Second Semester**
3. **Second and Third Year Exams**

---

## First Year Exams

**First Semester**

- Contracts I
    - **Frost 1991 Exam**
    - **Frost 1991 Answer**
    - **Frost 1991 Answer (PDF version)**
    - **Frost 1994 Exam**
    - Frost 1994 Answer
    - **Frost 1994 Answer (PDF version)**
    - Frost 1996 Exam
    - **Frost 1996 Answer**
    - **Frost 1996 Answer (PDF version)**
- Civil Procedure I
    - **Harding 1995**
    - **Harding 1994**
    - **Harding 1993**
    - **Harding 1992**
    - **Harding 1991**
- Criminal Law
    - **Batt 1987**
    - **Batt 1992**
    - **Lawson 1985**
    - **Lawson 1986**
    - **Lawson Answer 1986**
    - **Welling 1989**
    - **Welling 1998 -- Sample Questions and Answers**

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON-CLERK
U.S. DISTRICT COURT

- o Fortune 1990
  - o Fortune 1996
  - o Fortune 1997
  - o Fortune 1998
  - o Fortune 1998 Exam Key
- Torts
  - o Davis 1991
  - o Davis 1992
  - o Healy 1990

**Second Semester**

- Contracts II
  - o Frost Spring 1992 – Exam – Answer (PDF versions)
  - o Frost Spring 1993 – Exam – Answer (PDF versions)
  - o Frost Spring 1995 – Exam – Answer (PDF versions)
- Civil Procedure II
  - o Harding 1996
  - o Harding 1994
  - o Harding 1992
- Constitutional Law I
  - o Goldman 1993
  - o Goldman 1992
  - o Goldman 1994
  - o Goldman 1995
  - o Goldman 1999
  - o Goldman 2003
  - o Salamanca Fall 1994 – Sample Answer
  - o Salamanca Spring 1996
  - o Salamanca Review Notes Spring 2003
  - o Salamanca Review Notes Spring 2004
  - o Salamanca Dormant Commerce Clause Worksheet Spring 2003
  - o Salamanca Sample Multiple-Choice Questions and Answers Spring 2003
- Property
  - o Bratt property
  - o Bratt answer
  - o Bratt answer
  - o Fortune
  - o Moore Fall 1993*
  - o Moore Fall 1995*
  - o Goring-Multiple Choice 1994
  - o Goring Prop I 1994 Essay & Sample Answers
  - o Goring
  - o Moore Spring 1995*

***Password-Protected***

---

Second and Third Year Exams

**Constitutional Law II**
**Professor Salamanca**

**Sample Multiple-Choice Questions**
**(approximately 20 minutes, approximately 20 points)**

**On your scansheet**, please indicate the **best** answer to each of the following questions. There is no penalty for wrong answers. No credit will be given for explanations.

1.      Bartlett, an African-American woman, applies for a job with XYZ Inc., a private company. Before her interview begins, an officer of the corporation informs her that XYZ is no longer hiring. The next day, she learns that in fact XYZ was hiring when she went in for an interview. Bartlett brings suit against XYZ for violating a federal law that prohibits "discrimination on the basis of race in employment." A potential constitutional basis for this law would be:

I.      The Contract Clause of Article I, section 10.

II.     The Enforcement Clause of the Thirteenth Amendment.

III.    The Equal Protection Clause of the Fourteenth Amendment.

IV.     The Enforcement Clause of the Fourteenth Amendment.

A.      I only.

B.      II only.

C.      II, III, and IV.

D.      III and IV.

2.    On October 15, an officer of the local board of health inspects Alice's restaurant. Alice hears nothing from the board until the day before Thanksgiving, when the board informs her that the food in her restaurant is unfit for human consumption and orders her to close her doors until the next inspection occurs, which is scheduled for mid-January. Alice's best argument against this order is that:

A.    It denies her equal protection of the laws.

B.    It deprives her of liberty or property without due process of law.

C.    It impairs her contractual obligation to serve customers who made reservations for Thanksgiving.

D.    It violates her constitutional right to engage in her chosen livelihood.

Attorney ...

3.    The Liberation Party, a Marxist group that has recently gained popularity in Cineplex City, obtains a permit entitling it to march down the main street of the city to celebrate May Day. Brown, who strenuously opposes Marxism, jumps into the middle of the parade, holding a sign that reads "Better John Lennon than V.I. Lenin, better Groucho than Karl Marx." Brown leaves the parade after the Party's leaders tell him not to march with them.  Brown later sues the Party for violating his rights under the First and Fourteenth Amendments.  The Party's best defense is:

    A.    That it is not bound by those amendments.

    B.    That the street became a non-public forum as soon as the parade began.

    C.    That the Party's exclusion of him from the parade was a valid regulation of the time, place or manner of speech.

    D.    That his sign constituted incitement.

4.    Abel seeks to join the "Gamma Society," an organization whose membership is limited to people of a particular race other than Abel's race.  Which of the following sources of law **might** successfully support his effort?

> I.    The Equal Protection Clause, provided the Gamma Society is a state actor.
>
> II.    The Equal Protection Clause, regardless whether the Gamma Society is a state actor.
>
> III.    The First Amendment, regardless whether the Gamma Society is a state actor.
>
> IV.    A municipal ordinance that forbids racial discrimination in "places of public accommodation" and that defines that phrase to include an organization like the Gamma Society.
>
> A.    I and II.
>
> B.    II and III.
>
> C.    I and IV.
>
> D.    I, III, and IV.

03/31/2006  02:53    202-686-1103                    THE CONSULATE                           PAGE  08

5.     Assume that a particular statute **would** apply constitutionally to conduct of "A," but would **not** apply constitutionally to the conduct "B."  Which of A or B, if either, could challenge the statute **on its face** as unconstitutional?

> A.     B only, provided the statute is substantially overbroad and infringes upon freedom of speech.
>
> B.     B only, because one may not challenge a statute on its face if it can be constitutionally applied to one's conduct.
>
> C.     Either A or B, provided the statute is substantially overbroad and infringes upon freedom of speech.
>
> D.     Neither A nor B under any circumstances.

6.    Under the law of Cineplex, custody of the minor children of divorced parents is presumptively awarded to the children's mother.  The state defends this presumption on the ground that "women tend to be better parents than men."  The state also cites a psychological study that lends some, although not much, empirical support to this claim.  If a father challenged this law, a court would most likely:

A.    Uphold the law as rationally related to a legitimate governmental interest.

B.    Uphold the law as resting on an exceedingly persuasive justification, given the difficulty of determining which fathers happen to be better parents than their ex-wives.

C.    Strike down the law as not being rationally related to a legitimate governmental interest.

D.    Strike down the law as not being substantially related to an important governmental interest.

7.      On May 15, 2000, Polymer, a five-star general in the United States Army, is found to have turned traitor against the United States in the course of an undeclared war between the United States and the Kingdom of Nutria.  That same day, Polymer is killed by U.S. soldiers while he (Polymer) is leading a group of Nutrian guerillas against a U.S. outpost in Alaska.  After the battle, in which the U.S. successfully defends the outpost, Polymer's body lies in the middle of field.  Seeking to make an example of Polymer, Congress enacts a statute providing that "no person shall bury the body of Polymer, lest that person shall be subject to imprisonment for one year."  But Polymer's sister, Aliquippa, cannot bear the thought of her brother's body lying in a field.  Moreover, her religion — which centers on a belief in communication between the dead and the living — absolutely requires burial within one week of death.  Accordingly, she travels to Alaska and buries her brother's body.  Which of the following is her best defense to a criminal proceeding?

A.      That the requirement that Polymer's body be buried within a week of death is central to her religion.

B.      That the statute is not generally applicable.

C.      That she sincerely believes that Polymer's body must be buried soon after death.

D.      That the Free Exercise Clause does not apply to the federal government.

8.      On January 15, 2000, the Cineplex State Police ("CSP") announces a new "Internet Policy," pursuant to which officers may use CSP computers for personal business, provided they do so during breaks, and provided they avoid "Web sites" that the CSP classifies as "pornographic, violent, or hateful." On August 15, 2000, a routine inspection of sites visited by personnel of the CSP reveals that CSP Captain Don Krebs has often visited sites that the CSP classifies as pornographic, but not obscene. On September 15, 2000, his supervisor, Rae Dawn Brubaker, suspends Krebs from duty with pay, pending resolution of formal disciplinary proceedings against him. Which of the following is Captain Kreb's best *constitutional* defense against these proceedings?

A.      That the CSP violated his right to procedural due process by not giving him notice of the disciplinary proceedings against him.

B.      That he had a legitimate interest in enforcing the law when he was investigating these sites.

C.      That the CSP's Internet Policy unconstitutionally differentiates between various forms of legally protected speech.

D.      That the sites he visited were not pornographic, notwithstanding the CSP's classification.

03/31/2006  02:53    202-686-1103                    THE CONSULATE                          PAGE  12

9.    The Cineplex City Council enacts an ordinance forbidding the distribution of leaflets to patients and visitors at the city's municipal hospital.  A religious group that sincerely believes in the power of prayer to restore physical health, and that has habitually distributed leaflets to patients in the municipal hospital, brings suit in federal court to have the ordinance declared unconstitutional.  The court will:

A.    Strike down the ordinance, because it prohibits free exercise of religion.

B.    Strike down the ordinance, because it abridges freedom of speech or of the press.

C.    Uphold the ordinance, because the regulation is reasonable and does not discriminate between points of view.

D.    Uphold the ordinance, provided it is necessary to satisfy a compelling governmental interest.

10.    The word "slavery" or one of its cognates (for example, the word "slave") appears how many times in the original, unamended Constitution?

      A.    Four.

      B.    Two.

      C.    One.

      D.    Zero.

## Answers

1.  B     Because XYZ is not a state actor, the statute on which Bartlett is suing must rest on a constitutional provision that reaches private conduct.  The substantive provisions of the Thirteenth Amendment are not limited to state action, so the Enforcement Clause of that amendment could provide a constitutional basis for Bartlett's cause of action.  You may be interested to note that some statutes predicated on Section 5 of the Fourteenth Amendment *do* reach private conduct, but we have not discussed this much (if at all) in the course, and these applications have historically been somewhat limited.  The Contract Clause could not provide a basis for Bartlett's cause of action because it applies only to state action.

2.  B     Alice's best argument is that the Board should have given her notice and an opportunity to be heard before shutting her down.  Answer A is not appealing because the distinction drawn here — between restaurants that stay open because their food is fit for consumption and those that must close because their food is not — is not a suspect classification.  Answer C is not appealing because the Contract Clause has never been understood to effect a relinquishment by the state of its police power — that is, its power to legislate for the health, welfare, safety, and morals of the population.  Answer D is not appealing because it's essentially *Lochnerist*, and because no one's telling her she can't run a sanitary restaurant.

3.  A     The Liberation Party is not a state actor.  Therefore it is not bound by either the First or the Fourteenth Amendments.  This fact pattern is reminiscent of *Hurley*, in which the Supreme Court held that the South Boston Allied War Veterans Council did not have to allow a group to march in its parade whose message it not approve.

4.  C     Option I is plausible, because a state actor almost never may discriminate on the basis of race.  Options II and III are not plausible, because the Equal Protection Clause and the First Amendment require state action.  (As noted earlier, in certain rare instances not discussed in this course, federal statutes predicated on the Fourteenth Amendment reach private conduct, but no statute is cited in Options II and III.)  Option IV is plausible, because municipal ordinances may reach private conduct, depending on the rules governing such ordinances in the jurisdiction in question.  In our course, we saw several local laws (usually enacted by states) that applied to private conduct.  (Think about the laws at issue in *Roberts*, *Hurley*, and *Dale*.)

5.  C     If a statute is substantially overbroad and arguably in violation of the First Amendment, any party charged under the statute may challenge the statute's constitutionality.  This is especially true of "B," whose conduct the First Amendment protects, but it is also true of "A," whose conduct the First Amendment would not protect.  This is because the "A's" of the world are often "chilled" from speaking by overly broad statutes.  Therefore courts want the "B's" of the world to be able to challenge such statutes for the benefit of "chilled" "A's."

6.    D    This presumption constitutes discrimination on the basis of sex, and would therefore provoke intermediate scrutiny. Although Answers B and D both use the language of intermediate scrutiny, Answer B is implausible because we know from *Frontiero v. Richardson* that administrative convenience will not justify discrimination on the basis of sex.

7.    B    Since *Employment Division v. Smith*, religiously inspired conduct receives less protection under the Free Exercise Clause than the regime of *Sherbert v. Verner* would seem to have required. Under *Smith*, a neutral law of general applicability is subject to only minimum rationality review. Therefore, Aliquippa's first objective is to establish (if possible) that the statute at issue here is not neutral and generally applicable. This may be hard to do, but if she cannot succeed the issues implicated by Answers A and C will never become relevant. Answer D is incorrect because it's not true, and because, if it were true, it would not be good for Aliquippa.

8.    C    Answer A is incorrect because it appears that the CSP has respected Kreb's right to procedural due process. He has been suspended with pay pending a formal hearing. Answers B and D are incorrect because they don't constitute *constitutional* defenses. Answer C is correct because it's the only answer left, and because it's at least plausible. The First Amendment protects non-obscene, sexually oriented speech.

9.    C    A municipal hospital is a non-public forum. The government may regulate speech in such a forum provided its regulation is reasonably designed to preserve the forum for its intended use, and provided it is viewpoint-neutral. This ordinance satisfies this test.

10.    D    Neither the word "slavery" nor any of its cognates appears in the original, unamended Constitution. The word first appears in the Thirteenth Amendment, which was ratified in 1865.

Student Exam Number _____

# CONSTITUTIONAL LAW II -- SPRING 2003
## Professor Susan L. Waysdorf

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# SEGMENT I -- FINAL EXAMINATION
## "Take Home"

### INSTRUCTIONS

1. This is the "take-home" portion of your final examination in this course, and it consists of essay questions. Segment II will be multiple-choice type questions which you will sit for during the Tuesday, April 29th session beginning at 2 p.m.

2. *Everyone* should answer Part I, which asks you to draft a Constitutional Law exam essay question (you are drafting the question only; you do not need to answer the question you draft). Then, you are to choose and answer *two (2) additional questions* out of the 6 presented in Part II. Therefore, in total you will be answering 3 questions: Part I, and then two questions out of the six essay questions presented in Part II. Clearly label each question that you are answering. *Your total exam paper should be not more than seven (7) pages typed and double-spaced. The minimum length is five (5) pages.* Answers must be typed, double-spaced and be proofed for typos, spelling and grammar problems.

3. Make sure that your Examination ID Number is clearly placed on *each page* of your examination.

4. You will be graded in part on how well you structure, organize and present your answers to these essay questions, and how well you apply legal analysis. For all parts of this exam, write in complete sentences, use correct case names (citations are not necessary), and do not use abbreviations.

5. As a "take-home," this is an open-book examination. You may refer to your casebook, your outline and your class notes. You are welcome to undertake additional research, e.g., historical background in order to answer a question. *This is not, however, a collaborative examination. You must not consult anyone else in completing this examination. The School of Law's Honor Code applies, and it will be strictly enforced.*

6. This "take home" portion of your completed Final Examination is due on *Tuesday, April 29th, at 2 p.m., during Segment II of the Final Examination.* No late papers will be accepted, except for documented medical or family emergencies.

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Fourteenth Amendment's Equal Protection clause. Justice Blackmun wants to see your argument in writing. In approximately two pages, provide the basis of your Equal Protection argument in this case. Include in your argument why you have chosen this doctrinal approach over Substantive Due Process, and explain the pros and cons of both approaches in relation to one another.

3. It is the spring of 2003 and the United States is poised for war in Iraq. The new Department of Homeland Security (DHS), has issued a mandate requiring all male non-citizens, 16 years and older, who come from designated Arab and Muslim countries to register with immigration authorities (under the federal law authorizing the creation of the DHS, the Immigration and Naturalization Service - INS, has been disbanded and its authority and role subsumed under the DHS). The men, have until April 25, 2003 to report to immigration authorities. Men who report to immigration authorities must provide the names and addresses of their parents, American contacts, information about when and where they entered the United States, their current immigration status (e.g., a student visa), and various other forms of identification. When they report, all are interviewed, required to fill out numerous forms, and are photographed and fingerprinted. If persons fitting these criteria do not report to the authorities, they will be hunted down and deported. Many who do report also have been put in detention and have been deported, either because their visas had expired or because they could no supply all the required information.

As a result, terror has struck Muslim and Arab immigrant communities throughout the United States. Some men who are in these designated categories have decided not to report; others have left the country, while others have gone underground in this country. The federal agency reports that as of March 15th, 101,589 people have complied with the requirements nationwide and that of these over 2,000 are being detained, pending deportation. Countries on the list from which men must report include Pakistan, Saudi Arabia, Bangladesh, Egypt, Indonesia, Jordan and Kuwait.

You are a lawyer at the Legal Aid Society's Immigration Assistance office in Washington, D.C. The office has been representing many individual clients who fit the criteria and must report to the authorities. Your supervisors are now considering filing a lawsuit against the federal government claiming that the DHS regulation is a violation of the designated men's constitutional rights. They have asked you to draft a memorandum, approximately two pages in length, explaining the claims and constitutional basis under which their clients would have the best chance to prevail.

4.  You are a new law clerk for Justice David Souter, who was appointed by President George Bush (dad) to the Supreme Court in 1990. Because Justice Souter joined the Court four years after <u>Bowers v. Hardwick</u>, he has never ruled on the issue of whether there is a constitutional basis to protect homosexual relationships, including homosexual sexual activity. However, Justice Souter is known for his libertarian views and his belief in a flexible concept of liberty. He has asked you to present the legal arguments, based on conventional legal doctrine and precedent, that he should apply in <u>Texas v. Lawrence</u>, now before the Court on the question of homosexual relationships. He does not want you to stake out philosophical or social policy positions, but rather to focus on the actual state of the law and theories of constitutional interpretation. Your memo to Justice Souter should be approximately two pages long.

5.  You are a law clerk for Justice Sandra Day O'Connor, and the oral arguments for <u>Grutter v. Bollinger</u> and <u>Gratz v. Bollinger</u> have just been heard by the Court. While you were not clerking for Justice O'Connor in 1992, when the Court heard <u>Planned Parenthood v. Casey</u>, you are very aware of the case's importance to the resolution of <u>Grutter</u> and <u>Gratz.</u> You know that Justice O'Connor feels very committed to her opinion for the Court in <u>Casey</u> and her extensive discussions of "liberty" and "stare decisis" in that opinion. She has asked you to outline the basis upon which she could overturn <u>Board of Regents of California v. Bakke</u> without being inconsistent with her explanation of "stare decisis" in <u>Casey</u>. Is it possible? What do you write in your brief memo (approximately two pages in length) to the Justice?

6.  From an historical perspective, provide a sound rationale, in approximately two pages, for why the Framers of the Fourteenth Amendment did not include the "Takings Clause" (as found in the Fifth Amendment) in the text of the Fourteenth Amendment. In other words, based on an understanding of the original meaning of the Takings Clause, as drafted by the Framers of the Fifth Amendment, why would this clause have been intentionally left out of the Fourteenth Amendment by its Framers? Or was it not intentionally left out? Remember that the Takings Clause was one of the first provisions of the Bill of Rights to be later incorporated under the Fourteenth Amendment. What was happening historically in the immediate Post-Civil War era that would have made the Takings Clause irrelevant, inappropriate or unnecessary for inclusion into the original text of the Fourteenth Amendment? What does this say, if anything, about the original intent of the Framers of the Fourteenth Amendment as a whole?

*END OF TAKE-HOME PORTION OF EXAM*
*BRING YOUR TYPED ANSWERS TO THE MULTIPLE-CHOICE EXAM SESSION*
*ON TUESDAY, APRIL 29th, AT 2 .P.M.*



→ About Practice Exams      → Criminal Law Exam
→ Civil Procedure Exam      → Property Exam
→ Contracts Exam      → Torts Exam

## Torts Practice Exam

**Instructions:**
Read the following fact pattern, and answer the question. Give yourself 60 minutes to complete this exam. Do not go over the time limit.

We recommend that you take this exam only after you have completed your study of Negligence issues. If necessary, review the Torts Rules of Law before starting this exam.

Once you have completed the practice exam in the time allotted, then compare your answer with this Torts Sample Answer.

### Torts Fact Pattern

David is driving 25 MPH in 25 MPH zone down a four lane street where there are children playing. One nine-year-old child, Kevin, runs into the street chasing a soccer ball. David, without looking over his shoulder, swerves into the other lane to avoid Kevin and in the process he hits a car, driven by Peter, that was speeding past him in the left-hand lane going in the same direction.

Peter loses control of his car, hits a telephone pole and is seriously and permanently injured. The telephone pole, owned by the local phone company TeleCo, easily snaps into two pieces and hits Kevin, who is still in the street, knocking him unconscious and resulting in permanent injuries.

TeleCo never did any testing of its poles to establish how easily the poles broke. The only factor used in manufacturing the poles was cost. The poles were made of low quality trees and were not treated in any significant manner except for a coating of tar. No reinforcement was used on the poles.

*Question: What are the various liabilities and rights of the parties involved?*

Once you have completed the practice exam in the time allotted, then compare your answer

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
4/23/2004



+ **About Practice Exams**          + **Criminal Law Exam**
+ **Civil Procedure Exam**          + **Property Exam**
+ **Contracts Exam**                + **Torts Exam**

# Torts Rules of Law

The following contains the Rules of Law you'll need for the Torts Practice Exam. These rules are presented in outline form only for purposes of the practice exam.

NOTE: Some rules are stated with elements that must be proven. Other rules are just stated without being broken into elements. In the latter case, you should figure out what the elements of the crime are yourself and incorporate that into your answer.

---

+ **Negligence**
  + **Duty**
  + **Breach**
  + **Causation**
  + **Damages**
+ **Defenses to Negligence**

---

**Negligence**

The prima facie case for negligence requires:

Duty is owed to the plaintiff by the defendant
Breach of the Duty
Causation: The defendant caused the harm to occur.
Damages: The plaintiff suffers harm.

**Duty**
In order to hold a defendant liable for negligence, the defendant must owe a *duty of reasonable care* to the plaintiff. Two issues arise in terms of duty of reasonable care:

1. Foreseeability
2. Standard of Care

03/31/2006 FRI 13:27 FAX 20266 63 A C B
Case 1:07-cv-00747-HHK    Document 2-6    Filed 04/24/2007    Page 3 of 8    004/009
LawNerds.com: Torts Rules of Law                                          Page 2 of 4

### Foreseeability
The *duty of care* must be toward a *foreseeable* plaintiff.

> Test for *foreseeability*: A plaintiff is foreseeable if he was in the *zone of danger* created by the defendant.

### Standard of Care
The *Standard of care* that the defendant must exercise towards the plaintiff is that of a reasonable, ordinary and prudent person in the same or similar circumstances.

Factors to consider that may or may not modify the circumstances include:

> Physical characteristics
> *A person who has great physical strength will be judged according to an ordinary person of great physical strength. Likewise, a weak person will be judged according to a standard of what an ordinary weak person would do.*
>
> Average Mental Ability
> *Everyone is judged as being of average mental ability and no accommodation is made for being extraordinarily intelligent.*
>
> Same knowledge as an average member of community
> *Presumed to have common knowledge about known dangers in the community.*
>
> Professionals
> *Professionals are judged according to other professionals in same community.*
>
> Children
> *Children are judged according to children of same age, education, intelligence and experience.*

### Breach of the Duty
In order to be held liable for negligence the action by plaintiff must fall below standard of care.

The primary issue is where to draw the line as to the standard of care. Factors to consider in drawing the line are:

1. Custom in the community

2. Violation of statute (negligence per se)
   *Violating a statute creates a rebuttable presumption of negligence. Defendant is presumed to be liable for negligence if he breaks a law and cause harm to the plaintiff but he can rebut that presumption by showing that there was a custom to break the law.*

3. Res Ipsa Loquitur
   *Latin for "The thing speaks for itself." This doctrine draws an inference of liability because the thing that caused the accident was in the exclusive control of the*

*defendant. In other words, it couldn't be anyone but the defendant who caused the harm.*

## Causation

The defendant caused the harm to occur. There are two types of causation:

1. Actual Causation

2. and Proximate Causation.

*Actual Causation*: Did the defendant actually cause the harm to occur? There are two different tests you can use.

1. "But for" Test: Ask yourself the question: "But for the defendant's actions, would the plaintiff's harm have occurred?"

2. Substantial Factor Test: If several causes could have caused the harm, then any cause that was a substantial factor is held to be liable.

*Proximate Causation*: This sometimes difficult to grasp concept is actually very simple on most exams. Be sure to check with your professor but if in doubt, use the following generally accepted test:

1. Foreseeability Test: If harm is unforeseeable, then defendant is not held liable by reason that there is no proximate causation.

2. Famous Proximate Cause Case: *Palsgraf v. Long Island RR*. Judge Cardoza. Railroad guard pushes man who drops package. Package contains hidden fireworks that explode and cause scales to fall harming plaintiff. Illustrates that harm was not *foreseeable* by guard as to plaintiff so no *proximate cause*.

## Damages

The plaintiff must suffer some harm. Two issues arise:

1. Was there actual harm?

2. Did plaintiff attempt to mitigate the harm?

*Actual harm or injury*: Can be shown by the following:

1. Personal Injury

2. Property Damage
   *Plaintiff gets Cost of repair OR fair market value*



3. Punitive Damages
   *Extra damages beyond actual damage is available if the defendant's behavior was wanton and willful, reckless or malicious*

03/31/2006 FRI 13:28 FAX 20246 85 A C B ☐006/009

*Duty to mitigate*: Plaintiff must not act in a manner that makes damages worse - i.e. not going to the doctor to get well. Defendant is not liable for damages where plaintiff did not mitigate.

### Defenses to Negligence

Even if a defendant is found liable for negligence, he can argue to be relieved of or share liability because of a valid defense. Defenses include:

*Contributory Negligence*
In these circumstance, the plaintiff contributed to the negligent act. The defendant must prove the plaintiff was negligent using the negligence test above.

Under common law, if both parties are negligent, then the one with the *last clear chance* to prevent the accident is liable; otherwise both plaintiff and defendant share liability.

*Assumption of Risk*
If plaintiff knew the risk and voluntarily assumed the risk by engaging in the behavior then the plaintiff will be denied recovery.

*Emergency Doctrine*
Allows defendant to lower standard of care because an emergency required them to act rashly in order to avoid a greater harm from occurring.

*Custom*
Custom can be used to show that behavior was in line with the behavior of everyone else, thus resulting in no breach. E.g. Everyone drives at 50 MPH on that particular stretch of the highway even though it is posted at 30 MPH.



**↑ Return to Top   ☉ Test Yourself!**

© Copyright 1999 - 2003 LawNerds.com, Inc. All rights reserved.



→ About Sample Answers       → Criminal Law Sample Answer
→ Civil Procedure Sample Answer   → Property Sample Answer
→ Contracts Sample Answer      → Torts Sample Answer

# Torts Sample Answer

*The following is a sample answer to the Torts Practice Exam. If you have not already done so, take the exam and then compare your answer to this sample. If necessary, you can also review the Torts Rules of Law for this exam. Since law school professors vary in what they consider excellent work, this answer is only presented as a sample.*

The injured individuals can seek damages based on a theory of negligence. I will examine the potential liability of each party in turn. The prima facie case for negligence is established by showing a duty of reasonable care, breach of the duty, actual and proximate cause and damage.

## Peter v. David

Although David may have breached a duty in not looking when changing lanes, he has a defense in the emergency doctrine. To prove negligence, Peter has the burden to prove that David had a duty to drive more carefully. One theory would be that David should drive slower than the speed limit when kids were present. Evidence of breaking the law is automatically considered a breach of a duty, but not breaking the law doesn't necessarily establish that a breach didn't occur. All of the facts and circumstances must be considered. Since 25 MPH is a standard speed limit for residential areas where kids normally play, I don't think that David had a duty to drive slower.

David, however, probably breached a duty of care by not looking before he changed lanes. A reasonable and prudent person would naturally look before changing lanes. Here, however, David can claim two defenses. First, he can claim contributory negligence since Peter was speeding. (See below for an analysis of Peter's liability.) Second, David can claim the emergency doctrine. Since his swerving into the lane avoided an accident with Kevin, he was justified in making the split-second decision to swerve. I think that under the duty of reasonable care analysis, David acted with the care of an ordinary and prudent person under the circumstances of an emergency. Therefore, David will probably not be found negligent in regard to Peter's claim. Even if he is found negligent, David's liability is limited if Peter is found to be liable for contributory negligence.

03/31/2006 FRI 13:28  FAX 20246   35 A C B                                       2008/009

## Kevin v. David

As to Kevin's claim of negligence against David, it is arguable that David's action was the cause of the injury that occurred to Kevin. Under the "but-for" standard of review, if he hadn't swerved into the other lane, he would not have sent Peter's car crashing into the phone pole. However, Kevin's claim against David probably loses on the issue of proximate cause. ~~Proximate cause limits the liability of David to those risks that were foreseeable.~~ Here, I don't think that a telephone pole snapping in half and falling on top of a kid is a likely result from swerving into another lane in order to avoid the kid in the first place. It is as ~~improbable a result as that in Palsgraf~~. David is probably not liable for negligence in regard to Kevin's injuries.

## Kevin, David v. Peter

Both Kevin and David can state a claim against Peter for their damages as a result of Peter's negligence in driving over the speed limit. Peter is liable under the theory of negligence per se since he was over the speed limit. Breaking the law - such as posted speed limits - creates a rebuttable presumption of negligence ~~and does not require further analysis. Peter can rebut~~ ~~the presumption of negligence by showing it was the custom~~ to speed on that street; however, the fact that children were present would go to show that Peter had a duty of care to ignore the custom and slow down under those circumstances.



Peter can also argue contributory negligence against both David for swerving and Kevin for running into the street. While David was not judged to be negligent for, I don't think his claim for damages to his car will survive. Peter's claim of contributory negligence against David is valid since David had a duty to look before changing lanes. Although the emergency doctrine relieves David of liability, it does not confer liability on Peter. David, or his insurance company, will probably have to pay damages on David's car.

Kevin will be judged by the standard of what a reasonable and prudent nine year old would do when playing games in his own neighborhood. The neighborhood represents safety in Kevin's mind, thus an exuberant nine-year-old might feel safe enough to run in the street. Even so, most kids are taught at an early age to look both ways before crossing the street. I think it is likely that Kevin, or his parents, will bear some responsibility for Kevin's injuries since he did not belong in the street.

Peter's strongest ~~defense~~ defense against Kevin's claim is to argue - as David did above - that the ~~injuries arising form the telephone pole were not foreseeable and therefore the damage is~~ ~~too attenuated for Peter to be held liable~~. Here, it is less clear. The casual connection is closer than it was with David. I think that it is foreseeable that when someone is speeding they might lose control and damage would result from that loss of control. While the pole snapping was not foreseeable, the ~~risk of some type of harm~~ coming about was ~~foreseeable~~. It is not necessary to show that ~~a specific harm~~ was foreseeable as it is that ~~some harm~~ was foreseeable. I think Peter will be liable for some measure of Kevin's damages.

## Kevin v. TeleCo

Although it may not have been foreseeable for this accident to happen, I think that TeleCo is probably liable to Kevin for damages. Here, TeleCo was under a duty of reasonable care since it knew that its telephone poles would be placed along the sides of roads. It was foreseeable that a car might hit a pole with sufficient force as to knock the pole down. Since the poles are commonly placed in neighborhoods, it is reasonable to conclude that a pole might fall on someone.

Despite its duty to protect against potential harm, TeleCo did not do any testing to determine the danger involved in falling poles. Furthermore, it did nothing to mitigate the danger by seeking to reinforce the pole with metal strips, to sink poles deeper in the ground or buy a harder type of wood. The only factor that TeleCo thought was relevant was keeping its costs down. Consequently, I think that TeleCo's failure to seek alternatives was a breach of its duty of care.

Under a causation analysis, the breach was both a direct and proximate cause of Kevin's injuries. But-for TeleCo's breach, Kevin's injuries would not have occurred. Furthermore, it is foreseeable in a car accident where a pole falls, that an innocent bystander will get hurt. Since Kevin has shown damages, I think that TeleCo will probably be found negligent and liable for damages.

✦ Return to Top   ☻ Test Yourself!

© Copyright 1999 - 2003 LawNerds.com, Inc. All rights reserved.

PETER, DAVID, KEVIN, TELCO HYPO
Syllogism tree

K V D.

In order to prove negligence, a plaintiff must prove that the Defendant had a duty, which he breached, causation and actual injury. In addition, there must be an absence of any defenses, which would relieve the defendant's liability.

I Point    **A**    **B**
Brea!    The standard of care that must be exercised is that of a reasonable and prudent person in the same or similar circumstances.

**C**    **B**
By driving in this manner, David did not exercise the care of a reasonable and prudent person.

**C**    **A**
David did not meet the standard of care.

**A**
A reasonable and prudent person would anticipate children running into the road in areas where children are playing and accordingly would slow down.

**B**
Although it was apparent that children were playing in the area, David drove the speed limit and did not slow down.    **C**

**C**    **A**
David did not exercise the appropriate stand of care

A a. Caus.
**A**
Actual cause exists if "but-for" D behavior the harm would not have occurred and if D's conduct was a substantial factor in bringing about P's injuries.

**B**    **a**
But for David swerving into Peter's lane, Peter would not have hit the pole and Kevin's injuries would not have occurred. (B)

**C**    **A**
David's conduct was the actual cause of K's injury.

Prox Cau.
**A**    **B**
Proximate Cause does not exist where the harm is unforeseeable to the Defendant by his behavior.

**b**    **c**
It was not foreseeable by David that as a result of swerving into Peter's lane, Peter would lose control of his car and hit the pole causing it to fall on Kevin.

**A**
D's actions were the not proximate cause of Kevin's injury.

Even if found to be negligent, David may not be liable if defenses to negligence exist, such as an emergency situation.

FILED
APR 24 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

In an emergency situation, a person is permitted to fall below the standard of care, by acting rashly, if this is necessary in order to avoid a greater harm.

If D hadn't swerved, there would be greater harm in that K could have been killed.

D permitted to operate at lower standard of care and is conduct is not negligence.

P v. D

(No need to restate duty is one of reasonable care. Can begin with analysis of reasonable person standard)

A reasonable and prudent person would not change lanes without looking.

D changed lanes without looking.

D did not exercise the appropriate stand of care.

Actual cause exists if "but-for" D behavior the harm would not have occurred

But for David breaching his duty, by swerving into Peter's lane, Peter's car would not be damaged.

David's conduct was the actual cause of Peter's damages.

Proximate Cause exists where the harm is foreseeable to the D by his behavior.

It was foreseeable by David that as a result of his behavior, he might hit a car in the left-hand lane.

David's actions were proximate cause of Peter's injury.

Even if David found to be negligent vis-à-vis Peter, David may not be liable if defenses to negligence exist.

Emergency doctrine – same analysis no liability

If contributed to negligent Act, then P and D share liability. Speeding similar analysis as stated above.

KvP

A                        B

D presumed negligence if breaks law if that law is intended to protect persons, including the P, from a particular hazard and that harm results.

Peter broke the speed limit, which is intended to protect people, including pedestrians such as Kevin, from injury resulting from car accidents.

Peter is negligent per se.

P can rebut by showing evidence of custom of breaking the law

David  contributory negligence -- analysis of D's actions is swerving into lane

K contributory negl -- analysis Children are judged according to children of like age, education intelligence.  K held to standard of 9 yr olds with experience of playing ball in neighborhood.

03/31/2006  02:53   202-686-    :3                    THE CONSULATE



Printed: Friday, November 25, 2005 1:09 PM

n_dilella@hotmail.com

| | |
|---|---|
| **From :** | Waysdorf, Susan <swaysdorf@udc.edu> |
| **Sent :** | Thursday, October 13, 2005 5:40 PM |
| **To :** | <n_dilella@hotmail.com> |
| **Subject :** | ConLaw II grade |

Ms. DiLella –
I received your telephone message and have now finished grading your ConLaw II exam for the Spring 2005 semester. Please contact the Registrar's office for your grade – I do not personally notify students of their exam or course grades. That is the case for all grades, regular and special administrations, and no matter what the grade is. In other words, students find out their grades from the Registrar, and not from me. So please contact the Registrar's office.
Professor Waysdorf

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNIVERSITY OF THE DISTRICT OF COLUMBIA
## David A. Clarke School of Law

Ann Bishop Richardson
Associate Dean for Academic Affairs

4200 Connecticut Avenue, N.W.
Washington, D.C.  20008
(202) 274-7345
(202) 274-5441 (fax)



October 14, 2005

To:         Academic Standards Committee

From:       Ann Richardson

Re:         Complaint of Honor System Violations

     I am attaching a memorandum and attachments I received from Professor Susan Waysdorf today in which she reports plagiarism and cheating on an examination by Nicole DiLella in violation of Sections 1(a) and 1(b) of the Honor System.  In accordance with Section 4(c)(3), I am referring this matter to the Academic Standards Committee.

     I trust you will investigate this complaint at your earliest convenience.

cc      Professor Waysdorf
       Nicole DiLella



**University of the District of Columbia**

David A. Clarke School of Law
4200 Connecticut Avenue, N.W.
Building 38, 2nd Floor
Washington, D.C. 20008

*Susan L. Waysdorf*
*Professor of Law*
Office Telephone: (202) 274-7330
Fax: (202) 274-5583
e-mail: swaysdorf@udc.edu

**CONFIDENTIAL**



October 14, 2005

TO:        Ann Richardson,
           Associate Dean for Academic Affairs

FROM:      Professor Susan L. Waysdorf

RE:        <u>Complaint of Honor System Violations</u>

Pursuant to Section 4(b), of the Student Handbook, Vol. II, p. 7 ("Honor System"), I am forwarding to you this complaint of plagiarism and cheating on an examination, against Ms. Nicole Dilella. It is my contention that Ms. Dilella violated both Section 1(a) of the Honor System ("Honesty in crediting sources of ideas, information, and written work") and also Section 1(b) ("Honesty in taking examination"), by copying material directly from other sources and failing to credit those sources on the "take-home" essay portion of the final examination in my course, Constitutional Law II (Spring 2005 semester).

The final examination in this course consisted of two parts: (1) take-home essays which students were to complete in typing and submit when they took the (2) in-class examination, which consisted of Multiple-Choice questions. This complaint concerns the take-home portion essays that Ms. Dilella submitted (see attachment 1). For some reason (which is not a part of this complaint *at this point*), she answered the essay questions from my Spring 2003 Constitutional Law II exam (see attachment 2), which is on file in the Law Library and on the School of Law's website. Ms. Dilella submitted answers to those questions, rather than the essay questions on the Spring 2005 exam, which she was given (see attachment 3).

Be that as it may, the answer that she submitted for "Question 1 - Write An Exam Question" was taken in its entirety (except for a change of names of the parties) from the University of Alberta Faculty of Law website, Constitutional Law Exam 1999-2000, Professor B. Billingsley, "Question 3: Hypothetical Fact Situation (Charter)" (see attachment 4).

Assoc. Dean Ann Richardson
Complaint of Honor System Violations
October 14, 2005
Page Two


In addition, the answer that Ms. Dilella submitted in response to Question 4 of the Spring 2003 exam was copied directly and extensively from the *Petition for Writ of Certiorari* to the United States Supreme Court, submitted by Counsel for Petitioners (Lambda Legal Defense and Education Fund) on July 16, 2002, in the case of <u>Lawrence v. Texas</u>. This official and public court document is easily accessible on-line from a variety of websites (see attachment 5). I have provided notations on Lambda's *cert* petition which show the direct and exact correlation between that text, and the sentences and paragraphs that Ms. Dilella copied and submitted as her exam answer.

Based on the above, Ms. Dilella violated the School of Law's Honor System policies against plagiarism and cheating on examinations.[1]  Thank you for your attention to this matter.


Attachment 1 - Constitutional Law II Final Exam answers submitted by Ms. Dilella
Attachment 2 - Constitutional Law II, Spring 2003 Take Home Essay Exam
Attachment 3 - Constitutional Law II, Spring 2005 Take Home Essay Exam
Attachment 4 - University of Alberta Faculty of Law website, Constitutional Law Exam 1999-2000, Professor B. Billingsley, "Question 3: Hypothetical Fact Situation (Charter)"
Attachment 5 - *Petition for Writ of Certiorari* to the United States Supreme Court, Counsel for Petitioners (Lambda Legal Defense and Education Fund), <u>Lawrence v. Texas</u>

---

[1]    Ms. Dilella failed to submit an answer to the third essay question, as required under the examination she took. In addition, she received a grade of "D" on the other half of the exam - the Multiple Choice portion (scoring 13 out of a total of 25). I have separately submitted to the Registrar's Office a grade of "F" for Ms. Dilella in this course.

# David A. Clarke School of Law
## University of the District of Columbia



**Edward Allen**
**Professor of Law**
**4200 Connecticut Ave. N.W.**
**Bldg 38 Room 226**
**Washington, D.C. 20008**

Phone:        202 274-7326
Facsimile:    202-274-5583
E-mail:       eallen@udc.edu

October 25, 2005

Nicole Di Lella
2950 Van Ness St., N.W., #528
Washington D.C. 20008

Re: alleged violations of the honor code

Dear Ms. Di Lella:

I am attaching a memo, and its attachments, dated October 14, 2005 from Professor Waysdorf to Dean Richardson, entitled "Complaint of Honor System Violations." The memo alleges that you violated the School of Law's honor system, sections 1(a) and 1(b), specifically, that you plagiarized and cheated on an examination.

The academic standards committee requests that you respond in writing to the allegations in the attached memo no later than Tuesday, November 1, 2005, by leaving a copy of your response under Professor Allen's door. The allegations are very serious and you should answer them accordingly. The committee expects you to make every relevant representation and argument in your response.

After receiving your response, the committee will schedule a hearing on Tuesday November 8, at noon in the small conference room. The substance of the hearing will depend in part on the nature of your written response. You may bring counsel to advise you, but counsel will not be permitted to speak directly on your behalf.

If you have any questions, please feel free to contact me.

Yours Truly,

Edward Allen
Chair, academic standards committee

FILED
APR 2 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Edward Allen
Chair, Academic Standards Committee
4200 Connecticut Avenue, N.W.
Building 38 Room 226
Washington, DC 20008

November 4, 2005

Dear Professor Allen:

I am responding to the Committee's letter of October 25th containing allegations of plagiarism and cheating on an examination pursuant to §1(a) and (b) of the UDCSL Honor System. For your fair review and prompt judgment, please accept this as a "Statement of Explanation" in reference to the present matter.

UDCSL's code of conduct calls for fairness and honesty in accordance with the norms of legal, professional and educational practices. The duty to uphold such policies is the obligation of the student, faculty and staff. Plagiarism is a form of cheating which reflects on an individual's honesty; in turn, it is a reflection of character and ethical fitness to practice law. [1] I support the Committee's interest and share in their intent to promote integrity, academic responsibility and well-defined standards of acceptable practices among the Law School community. I also share in the Committee's interest in achieving that mission by addressing the issue of plagiarism with full commitment to ensuring that the School of Law's policies are fair and workable within the institution and the law.

To be in full compliance with the requests of the Committee, and as not to overlook any expected argument that should be raised here in my Response, I would just like to set out my understanding of the issue before us, as it may or may not be relevant to my representation. In review of the "Complaint of Honor Code Violation" submitted on October 14th, by Professor Susan Waysdorf, I had difficulty with numerous language inconsistencies, making it unclear to determine what, in fact, the Committee has been asked to consider; more so, what I am required to explain in order for the Committee to press forward in their duty to me, as a student with a vested interested in continuing my educated at the School of Law and the overall student body, faculty and staff. Throughout the Complaint, the terms "take-home essay" "essay" "final examination" "her exam" and "exam answer" are interchangeably used to make a conclusion regarding the Constitutional Law –Spring 2005 Final Examination now introduced to the Committee. [2] However, the terms refer to statements of allegations made in regard to the 2003 exam. The Complaint makes no claim of copying on the final examination that I was instructed to take and that was assigned to the class during the semester I was enrolled in the course. Professor Waysdorf points out that I "answered the essay questions from [the] Spring 2003 Constitutional Law II exam.....rather than the essay question on the Spring 2005 exam which she [I] was given." [3] It is not in debate, then, whether or not I submitted the assigned final exam. I agree that the answers received were not assigned. However, nor were they my "exam answers" because the 2003 essay questions at issue were previously administered to the class of 2004 and are published by the Law School on their library internet as a recommended resource or "adjunct" for students to use in their various forms of study. It is not longer "an exam" in the context to which has been addressed. [4]

---

[1] UDCSL Student Handbook: Vol. II Honor System (herein "Honor System') states in part: "Students must conduct themselves lawfully and with integrity in all aspects…must observe norms of fairness and honesty…must not engage in conduct that is illegal or contrary to the general norms of conduct in a professional institution…norms and standards of the academic world as well as rules and regulations of the profession and everyday life"
[2] In ¶1 line 6 the use of the terms "'take-home' essay" and "essay portion" refer to the Constitutional Law II - Spring 2003 Final Examination on the internet (herein referred to as "sample essay questions".) The Complaint makes no claim of copying on the actual final examination that was assigned to the 2005 class during the semester I was enrolled in the course. Also, in ¶1 line 6 the term "final examination" refers to the sample essay questions from the library internet. In ¶4 line 8 "…that Ms. Dilella copied and submitted as her exam answer," "her exam" and "exam answer" refer to the sample essay questions. )
[3] October 14, 2005, *Complaint of Honor Code Violations* ¶2 line 5 - 8)
[4] The Honor System cities examples as books, notes, outlines, papers, These materials are distinct from what is considered "work" in other section of the Code and are reserved under §1(f) *Non-interference with the educational process.*)

FILED APR 24 2007 DISTRICT COURT WASHINGTON CLERK

The resounding conclusion, in good faith, would seem to indicate that the incomplete answers to the 2003 sample essay questions are my personal study references and that they were received rather than purposely submitted in error. On record I say so now in support of my position and the corroborated facts now introduced for your review.[5] I would also like to explain the circumstances that produced my less than presentable study habits for the Committee's inspection and the resulting confusion, for which I apologize and take responsibility for.

The morning I took part II, the Multiple Choice Section, of my final examination for the 2005 semester of Con Law II, a family emergency called me out of state. Due to the urgency of the matter, I spent time before my final arranging for a flight departure rather than printing out copies of my final essay answers for part I of that same exam. As Dean Richardson found the circumstances considerable to warrant other arrangements, she allowed me to take the Multiple Choice section of the 2005 final out of turn and extended the time in which to deliver my 2005 final essays. In my absence and because communication was limited in the area where I was staying, arrangements were made through Derek Littin with Dean Richardson to drop off the remaining part I of my final to complete the course for the 2005 Spring semester. On Friday, September 16th, due to a lapse in correspondence between Dean Richardson and Mr. Littin, Mr. Littin initially obtained on my behalf an extension of three additionally days to submit outstanding work. However, in a follow up email from Dean Richardson at a later time, the extension was limited and did not pertain to the submission of my Con Law II final. On Monday, the 19th, upon receiving Dean Richardson's correspondence to the latter, Mr. Littin contacted me. Already at the airport and before boarding my airplane on return from upstate NY that afternoon, in a panic, I quickly sent him several email transmissions of what I thought were my essays to part I of my final with the instruction to print and deliver the attachment as soon as he possibly could; which he did. As I was already under immense emotional stress, the fear of failing the course only heightened my depleted clarity. In preparing the documents and email from the gate and painstakingly trying to secure and re-secure a viable internet signal in the airport, I made the error of sending the wrong file with the wrong documents. At the time, I was suffering through a crisis, I was extremely affected emotionally and physically, and my performance was not at its best. In hindsight, I see that I succumbed to the moment and failed to pay more attention to detail than I did. As Mr. Littin does not keep up with my studies, he had no occasion to know that the material delivered was anything other than what it was supposed to be. He knew of no potential error for confusing sample essay answers with actual exam essays, because he was not aware that sample exam questions were made available for student reference or that I used them as an aid in developing better answer writing techniques. Although a mistake of fact as to what was expected to be delivered and what Mr. Littin actually had and did deliver can be easily explained by his lack of law school experience and the fact that is not affiliated with the field of law, I accept the fault for making the mistake. I had absolutely no idea, or further, was I given any indication, whatsoever, that the document sent and delivered to Professor Waysdorf on September 19th was anything other than my final, part I essay of my 2005 Con Law II exam until I received notification from Dean Richardson in her correspondence to the ASC, and in a later return phone call she placed to me.

Under the irregular circumstances that has brought this matter before the Committee, it would not be consistent with common practice to find that I "submitted" study materials when they were unknowingly and mistakenly given under the duress of an extenuating circumstance (and to a third party), however. Such an interpretation goes too far and would extend the boundary to an almost limitless definition of what could constitute a submission under the term.[6] The rules of plagiarism and cheating function is to insure that credit is given where credit is due and not to create a use for litigiousness that would operate to uncut the purpose of upholding rules at all. The Committee should not accept this occurrence or hang its integrity on the action I took in an emergency circumstance to constitute a rightfully submission of work claiming credit.

---

[5] See attached Affidavit from Derek Littin and corresponding emails.
[6] Specifically, in reference with the definition of plagiarism as it appears in §1(a) footnote 1: Model of Definition and Policy for Plagiarism: "Plagiarism is the submission or presentation of any work, in any form, that is not a student's own, without acknowledgment of the source."

It would also be inconsistent to hold that I "copied material directly from other sources and fail[ed] to credit those sources on the 'take-home' essay portion of the final examination" when the final examination referred to is without application to the context to which it is applied. The "take-home" portion identified to contain "copied material" is not the Con Law II 2005 final or a "final" as it has been intermingled with in the context of the Complaint. Accurately, the Con Law II 2003 exam is a resource of old essay questions made available by the Law School for study and reference use. It is not within my discretion to authorize the acceptable terms of work for each course I take, nor do I undertake to ascribe that discretion by choosing the final examinations I would like my professors to consider in determining my grade. I did not conceive to solicit credit for , nor did my actions insinuate that I was "submitting" work of my own choice, namely the 2003 exam previously administer to be substituted and objectively evaluated against the my classmates performance on the assigned course exam. It would be an impossible task to do, as well as a breach of conduct under the Honor System.[7]

"Every type of work encountered at law school" that is required to include an appropriate citation is subject to plagiarism.[8] Plagiarism refers to unearned credit and unfair advantage. It is synonymous with cheating, and "applies to every type of work encountered at law school."[9] Personal study notes are not held to the standard of "work" and do not fall within the intent of the statute, however.[10] The customary norm of academic practice defines "work" as "essays, law review articles, case briefs, pleadings and legal memoranda for class credit, homework, and examinations. Plagiarism is possible with any formal work performed in any medium"[11] or "...document for which you will receive credit (like a paper, or review, or an open book exam)[12] or an "academic exercise"[13] In addition to concluding that the 2003 sample essay questions are not an "exam" under §1(b), the assertion of plagiarism is also not evoked in this matter before the Committee. The failure to fully credit the source of information along with the copied materials into my notes that I personal use was not a failure at all. Notes of the type that I rely on to develop my writing skills allow me to accomplish what I need to do in the limited amount of personal time I have to devote to learning activities separate from school assigned coursework. Formal citations and source credits are not necessary or are they required as the Complaint suggests they should be. It would seem evident that the objective for crediting sources is not to give notice to myself or the original author for that matter, but to represent to all others in the unknowing public that the work presented is not my own by requiring a citation to include to the original source of work or ideas. The academic definition of "work" although not exhaustive, does not include nor has it ever been applied to evoked unassigned, uncredited, unpublished personal notes. To do so would expand the normal understanding beyond precedent and arguably beyond enforceability. I urge the Committee to uphold the customary norms of academia that do not advocate for a reading of "work" in plagiarism to include personal spheres of property in one's own thoughts and personal notes.

---

[7] Examples of responsibility for prevention of violations of the Honor System. "Faculty have an obligation to prevent violations of the Honor System by making the conditions of acceptable work and the types of permissible conduct clear to students in a course." §4(a) Honor System
[8] See Footnote 4.
[9] Id.
[10] "A crucial phrase in this definition is "as one's own." In all learning at University it is completely acceptable to use another person's thoughts, writings or inventions to aid our own learning and understanding. Indeed, this is a primary method of learning. We all read textbooks, research papers, manuals and many other documents, and make use of the material contained in them. This is perfectly normal and acceptable. The use of another person's work does not constitute plagiarism unless we present that work as our own. When writing essays, project reports, computer programs, or when giving any form of presentation, it is important that whenever we include the work of others, it is clearly acknowledged as such." Univ. of Birmingham (website address temporarily unavailable); "Personal notes and synthesis of library sources are one's own..." Wellesley College http://www.wellesley.edu/Activities/homepage/genjudic/plagiarism.html; See also Fairfield, Connecticut Public School System, "Warning: Proceed With Caution! How Do I Avoid Plagiarism?" http://www.fairfield.k12.ct.us/fairfieldhs/cfairfieldhs03/avoidplagiarism.htm ("Personal notes and synthesis of outside sources are one's own.")
[11] Robert D. Bills, "Plagiarism in Law School: Close Resemblance of the Worst Kind?" 31 Santa Clara L. Rev. 103 (1990).
[12] Dr. R.W. Butcher, former Dean of the GSBS, Univ. of Texas, Graduate School of Biomedical Science website.
[13] "PLAGIARISM: intentionally or knowingly representing the words or ideas of another as one's own in any academic exercise" Univ. of Maryland, Code of Conduct, http://www.studenthonorcouncil.umd.edu/code.html

Responsible students use all sources of information that are available to them in their pursuit of knowledge. It would be undesirable and an unproductive waste of time to find and precisely document every bit of information collected, whether used for research of an assignment or personal fulfillment. The progress of academia could not move forward without the vitality of emerging new information into the marketplace. As well, the looming threat of being labeled a plagiarist and the stigma so attached would certainly prevent great mind and ideas from every hitting a page of paper. On another thought, how could UDCSL prevent and how would the Committee handle all of the Honor System violations as a result of the community's obligation to report incidences of known plagiarism when simply sitting in a class next to your colleague taking lecture notes would subject most if not all participants in the free follow of discussion to disciplinary action? Unless, of course the professor cites ever bit of information taught and no one misses or incorrectly writes down whom exactly deserves what credit. Of course, this is only what I predict could be the result of reading and accepting plagiarism to apply to personal work viewed, received, dropped or submitted on university grounds, as the overall issues of the Complaint before the Committee suggests.

Plagiarism and cheating are offensive to the legitimate work done by scholars everywhere. Plagiarism warrants sanctioning because it is dishonest and plagiarists reaps what they have not sown. But that is not at all the issue or an honest and fair reading of the facts. I ask that the Committee dismiss the allegations against me of plagiarism and cheating and to expeditiously absolve my record of any wrong doing in light of the facts illustrated. Further, that my correct final examination be reviewed to determine my grade in Con Law II for the spring 2005 semester and any determination assessed from the 2003 sample be promptly disposed of.

I would like to thank the ASC members for their time and attention. I look forward to concluding our discussion on Tuesday, November 16th at 12:00 pm. Shouldyou require any addition information, please contact at your soonest opportunity so that I can be timely assistance to you and the Committee in this regard. 202.549.3597.

Sincerely,

Nicole Di Lella

January 25, 2006

Professor Ed Allen
Chair, Academic Standards Committee
David A. Clarke School of Law
4200 Connecticut Avenue, NW
Washington, DC 20008

Dear Prof. Allen,

I would like to thank the Academic Standards Committee, again, for the opportunity to meet with them to discuss the allegations of plagiarism and cheating on Tuesday, the 24th. In following up, I want to share with you some information that I have concerning the arrangements that were made in regards to the Con Law II final. I don't know whether it is of any significance, but in responding truthfully to the Committee's questions, I have learned further information that may be of assistance.

Although the emails I have are spotted between June and September, I read over numerous correspondences between myself and Dean Richardson that indicate that I picked up the Con Law II (2005) Take Home essays on June 13 and on June 24 requested an extension to complete those essays. The extension was granted as indicated in an email on June 28 from myself to Dean Richardson thanking her for the additional time. However, I have nothing in notes, or is it in the email, as to the length of time. I have subsequent emails concerning my accommodations which pertain to scheduling the Multiple Choice section, but nothing further about the essays.

To the best of my knowledge, I believe I was supposed to take the Multiple Choice section around the time the essays were to be due and my instruction was to bring them to the exam. However, arrangements to fulfill my accommodation in order to sit for the Multiple Choice section did not come about as originally thought. We tried several arrangements throughout the summer and to make other preparations, yet the deficiency was not resolved until the beginning of the fall semester. So, while the essays were given and completed around June/July, they sat in my computer and then on backup disks until my actual taking of the multiple choice section of the exam.

In further response to Prof. Mack's question regarding the working status of my printer: I still can't say if my printer was working around the time I took the 2003 practice essays because I am lacking a reference point: Because I never finished the 2003 sample essay exam, I never printed it out – on my printer or on different one. I am sorry I have nothing more in this regard.

I hope what information I have shared may be of help to the Committee in rendering a favorable decision on my behalf. If I can provide any further assistance, please kindly so advise. I look forward to your reply.

Respectfully,

Nicole Di Lella

cc: Dean S. Brown
    Professor T. Mack

FILED
APR 24 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# David A. Clarke School of Law
**University of the District of Columbia**



**Edward Allen**
**Professor of Law**
**4200 Connecticut Ave. N.W.**
**Bldg 38 Room 226**
**Washington, D.C. 20008**

| | |
|---|---|
| **Phone:** | **202 274-7326** |
| **Facsimile:** | **202-274-5583** |
| **E-mail:** | **eallen@udc.edu** |

**February 27, 2006**

Nicole Di Lella
2950 Van Ness St. N.W., #528
Washington D.C. 20008

Dear Ms. Di Lella:

I am sending you this letter to inform you of the decision of the academic standards committee regarding Professor Waysdorf's allegations that you plagiarized and cheated on an examination in violation of the Honor Code as outlined in her memorandum to Dean Richardson dated October 14, 2005. In making its decision, the committee considered your written submissions to us as well as your statements and demeanor at the January 24, 2006 hearing.

The Academic Standards Committee finds as follows:

You were required to submit an answer to a take home final exam in Constitutional Law II by a deadline of September 16, 2005. No further extension was granted, but no answer was forthcoming on that date.

On September 19, 2005, you submitted a document, identified by your exam number as your work, and proffered as your answer to Professor Waysdorf''s Constitutional Law II take home exam for the Spring, 2005, semester.

That document, on its face, ""claims as your own work product ideas or words [you had] taken, in whole or in part, from someone else."" Handbook, Vol II, sec.1(a).

The answer you submitted for ""Question 1"" was taken in its entirety, except for change of names of the parties and other minimal changes, from a University of Alberta Faculty of Law web site. The answer you submitted for ""Question 4"" was copied directly and extensively from the Petition for Writ of Certiorari prepared by the Lamda Legal Defense and Education Fund, filed in Lawrence v.Texas.

You failed entirely to credit or acknowledge these sources.

Your response to these charges is that in your attempt to submit your already completed answer to the Spring 2005 exam, you mistakenly submitted an answer to the Spring 2003 exam, which

while facially plagiarized, you had prepared solely as a ""study aid"" for your own use. As such, you argue, it was therefore not a document subject to the honor code..

You further assert that you had no idea you had submitted the wrong document until approximately one month later when you were informed you were being charged with plagiarism. After being so informed, you then submitted, for the first time, an answer responsive to the 2005 exam, a month beyond the September 16 deadline.

You argue that it must have been a mistake, since intentionally submitting a 2003 exam answer as an answer to the completely different 2005 exam would be of no use.

In short, your defense is that you mistakenly submitted a study aid rather than an answer you hoped would suffice to win you a passing grade, or would at least create enough confusion to result in even more time to submit an already overdue correct answer to the 2005 exam.

Further, you request that your ""correct final examination,"" submitted well after the September 16 deadline, now be ""reviewed to determine my grade in Con Law II for the spring 2005 semester."" The effect of our granting your request would of course be that because of your ""mistake,"" you will have achieved what you were originally denied, an extension beyond the September 16 deadline, an extra month in which to have submitted a proper answer.

Nowhere in your responses, either written or oral, have you given any explanation why, as a study aid, you would type out a constitutional law question you found on the web, word for word, except for changing the names of the parties in the question, e.g.:

""Joe Smith is a teacher and soccer coach at Dickson High"" (Alberta law school)

""Lucy Lu is a teacher and cheerleading coach at Montclair High""(you)

""Tom Tuttle is a player on Joe''s team""

""Ellen Degenereous is a player on Lucy''s squad""

""Joe has explained to Tom that the purpose of the team prayer......""

Ellen Degenereous explained to Ellen that the purpose of the team prayer......""

To the implausible degree that typing out a question might serve as study material, it was already available to view, print, or download from the Alberta Law School site. So there would not appear to be any reason for typing out a copy. And there would appear to be no pedagogical purpose whatsoever to changing the names of the parties.

We do not find credible your explanation that the plagiarized document was a mere study aid mistakenly submitted. We find that you are responsible for your action in submitting a plagiarized document to a professor to meet the deadline imposed on you for submitting an answer to her exam. As such, we find that you violated the honor code as charged.

Pursuant to its responsibilities and powers under the Honor System, the Committee has determined to impose the sanction of suspension for one year beginning in August, 2006.

In addition, the committee forwards this determination to the Academic Dean and the Registrar with instructions as follows:

1. This letter shall serve as a report of the Committee on this matter and shall be place in your permanent file.

2. The Registrar's office is direction to inform Bar Examiners–of any jurisdiction where you seek admission–of this determination and to state, in response to Character and Fitness inquiries or forms required by bar examiners, that "the student's records reflects a violation of the Honor code resulting from the student's plagiarism and cheating on an examination. The Dean's office shall similarly respond to any such inquiries addressed to them.

3. The Registrar's office is further directed to include in any formal letter of good standing submitted to another institution the same statement provided above. The Dean's office shall similarly respond to any such inquires directed to them

These sanctions, while tailored to the particular circumstances of this case, are consistent with the Committee's prior disciplinary decisions regarding students who have plagiarized, as well as the practices of many other law schools.

If you disagree with this decision, you should consult the procedures for appealing this decision in Volume II of the student handbook.

You should consult Dean Richardson regarding any question you may have concerning any related matters.

Yours Truly,

Edward Allen
Chair, academic standards committee

cc: Ann Richardson, Academic Dean
   Barbara Green,  Registrar

FROM :JSG                          FAX NO. :3017182677              Apr. 12 2006 12:42AM P2

# JAMES M. SYDNOR-GREENBERG, Ph.D.
## Clinical Psychology/Neuropsychology
### 2946 Sleepy Hollow Road, Suite 4A ~ Falls Church, Virginia 22044
### Tel 703-536-5405

April 12, 2006

### Re: Nicole Di Lella

To Whom It May Concern:

I am writing at the request of my patient, Ms. Nicole Di Lella, who was seen for a Neuropsychological Evaluation on 12/27/2001 and diagnosed with multiple learning disorders including Reading Disorder, Disorder of Written Expression, ADHD, and Scotopic Sensitivity.

The following documents were sent to me by Ms. Di Lella for my review:

- The University of Alberta Faculty of Law Constitution Law II Final Exam question and her practice response

- The October 14, 2005 letter from Susan L. Waysdorf to Ann Richardson RE: Complaint of Honor System Violations

- The 11/04/2005 letter from Ms. Di Lella to Edward Allen

- The 01/25/2006 letter from Ms. Di Lella to Edward Allen

- The 02/10/2006 letter from Edward Allen to Ms. Di Lella

Several points are worth noting. It is common procedure for students with and without learning disorders to study for essay exams by writing mock responses to old exams; as such practice helps them develop greater speed and comfort for the actual exam, thereby keeping test-anxiety to a minimum. It is also common sense that the best preparation for any task is to practice that task again and again prior to being tested on that task. A web search of essay-preparation techniques suggested by hundreds of universities' Learning Disability Clinics verifies this.

FILED

APR 2 4 2007

NANCY MAYER WHITTINGTON CLERK
U.S. DISTRICT COURT

FROM :JSG                    FAX NO. :3017182677            Apr. 12 2006 12:42AM P3

**Regarding Nicole Di Lella, Page 2**

Ms. Di Lella's multiple learning disorders make memorizing, retrieving from memory, and organizing complex information for lengthy essay writing extremely difficult despite her superior common sense reasoning skills. In order to compensate for these learning disorders, I encourage all students, including Ms. Di Lella, to practice as much as possible prior to testing situations. In preparation for the LSAT, Bar Exams, and MPRE, I recommend that students review study guides and take as many practice exams as they have time for. In preparation for final exams in law school, I encourage students to seek out prior exams from professors and practice by writing mock essays for those exams. If old exams are not available then the LD student should attempt to anticipate test questions and write mock essays. Writing mock essays is a way of making the material more real. The use of celebrity names or family members' names is another technique to aid memorization.

Ms. Di Lella has difficulty remembering meaningless "factoids" and is better able to remember information in context. She did exactly what a Learning Disordered student should do. She found an exam question on the University of Alberta's Faculty of Law website that seemed to fit the material covered by Professor Waysdorf. She used that question and the sample response as a guide in generating her own mock response. LD students, including Ms. Di Lella, need to find ways to make the material more real-life and less rote. Simply trying to remember discrete facts of Constitutional Law would be much more difficult than using "stories" (meaningful context) such as the Hypothetical Fact Situation.

The LD student must do whatever she can to make the material come alive, as this enhances encoding of new information and also makes it easier to retrieve information from memory. The use of celebrities' names (Lucy Liu and Ellen Degeneres) allowed Ms. Di Lella to be able to visualize in her mind's eye a conversation between the two people described in the Fact Situation better than the names used in the sample response on the website (Joe Smith and Tom Tuttle do not trigger any association and can not be visualized except by a person who knows them, if they even exist). It is well established that emotionally laden and outlandish information is easier to encode and retrieve than dry, boring material. Changing names and the wording of the sample response was a simple and effective way to improve memory.

Three additional points deserve mention. It is to the Learning Disabled student's advantage to simulate the actual testing experience when studying for a test and (a) this is why Ms. Di Lella actually typed her practice response. In fact, Ms. Di Lella frequently types and re-types class notes into outlines and outlines into essays. (b) The repetition is another way to improve her memory of material. (c) The mental process of summarizing the lecture notes into outlines and then essays also forces her to analyze the information from different perspectives. For example, when

**Regarding Nicole Di Lella, Page 3**

writing outlines she has to summarize it succinctly, distilling the material down to the most important points. When turning the outlines into essays she must elaborate on the important points and integrate that information with material she has learned in other classes.

Thus, I find it completely reasonable and understandable that Ms. Di Lella used an exam question found on the internet as practice for her final exam.

What I find surprising is that a learning disabilities expert from the main UDC campus or from the David A. Clark School of Law was not asked to comment on Ms. Di Lella's use of this pedagogical technique and that I was not contacted before the assumption was made that she was somehow attempting to cheat.

If there are further questions, please contact me.

Sincerely,

James Sydnor-Greenberg, Ph.D.
Licensed Clinical Psychologist

JSG/ac